# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

In re:

WILBER B. MARSHALL, JR.,

        Debtor.

Case No. 02-80496-RGM
(Chapter 11)

## <u>MEMORANDUM OPINION</u>

This case is before the court on the debtor's motion (Docket Entry 886) for reconsideration of the court's order (Docket Entry 884) approving the final application of The Meiburger Law Firm, P.C. for compensation.  (Docket Entry 864).[1]

## <u>Motion to Reconsider</u>

Janet M. Meiberger was appointed chapter 11 trustee in this case on March 20, 2003, by the United States Trustee.  (Docket Entry 85).  The court approved the appointment the following day. (Docket Entry 87).  Ms. Meiburger employed her own firm, now known as The Meiburger Law Firm, P.C., of which she was the sole attorney, as counsel to herself as chapter 11 trustee.  (Docket Entries 92 and 96).  The chapter11 trustee's proposed chapter 11 plan was confirmed on August 21, 2009.  (Docket Entry 861).

---

[1]The debtor is a party in interest as to the fee application and has standing to object to it.  He has a pecuniary interest in the outcome of the fee application.  Surplus funds have been and will be paid to the debtor and, to the extent that the fee application is disallowed in whole or in part, the amount paid to him will increase.  *Grausz v. Englander (In re Grausz),* 321 F.3d 467, 472-473 (4th Cir. 2003); *Willemain v. Kivitz (In re Willemain),* 764 F.2d 1019, 1022-1023 (4th Cir. 1985).

1

The Meiburger Law Firm, P.C., filed is final application for compensation a week after the trustee's chapter 11 plan was confirmed.  The application covered services from November 11, 2008 through the confirmation date of the chapter 11 plan, August 21, 2009.  Application of the Meiburger Law Firm, P.C., for Compensation and Reimbursement of Expenses for General Legal Services (November 1, 2008 – August 21, 2009).  (Docket Entry 864).  It was intended to be and was considered by the chapter 11 trustee, The Meiburger Law Firm, the debtor, and the court as counsel's final fee application.

The debtor objected to the final application.  Debtor's Objection to Final Compensation of Janet M. Meiburger, as Trustee and as Counsel for Herself as Trustee, and Request for Order Requiring Return of Any Previously Granted Interim Compensation Disallowed.  (Docket Entries 870 through 873, and 875).  The debtor objected to the attorney's fee application, and all interim attorney's fees and trustee's fees that had been awarded.  Ms. Meiburger responded.  Trustee's Response to Debtor's Objections to Final Compensation of Janet M. Meiburger as Trustee and as Counsel for Herself as Trustee, and Request for Order Requiring Return of Any Previously Granted Interim Compensation Disallowed.  (Docket Entries 876 and 877).  The matter was heard by the court on October 5, 2009, and the trustee's and attorney's fees allowed as previously awarded and as requested in the final application.[2]  (Docket Entries 883 and 884).

The debtor filed a motion for reconsideration.  Motion of Debtor (1) to Alter or Amend Final Order, (2) for Reconsideration of Allowance of Final Application of the Meiburger Law Firm in the Amount of $8,616.52, and (3) Determination of Claim of the Meiburger Law Firm in the Amount

---

[2]Robert O. Tyler filed and argued the objection for the debtor.  He made his appearance in the case solely for this purpose.  *See* Attorney's Section 329 Statement, ¶1 (Docket Entry 874) and Motion for Order Permitting Withdrawal of Counsel for Debtor at ¶1.  (Docket Entry 894).

2

of $11,876.74 for Fees and Expenses in Representing Herself in Defense of Her Fees and Expenses

Previously Incurred.  (Docket Entry 886).  The motion sought clarification that the order allowing

the attorney's fees denied not only the debtor's objection to the additional attorneys fees but also

denied the request for disgorgement of attorney's fees and trustee's fees previously awarded;

reconsideration of the allowance of the attorney's fees; and a determination that attorney's fees for

time expended post-confirmation and not a part of the application for compensation.  Counsel

responded to the motion.  Response to Motion of Debtor (1) to Alter or Amend Final Order, (2) for

Reconsideration of Allowance of Final Application of the Meiburger Law Firm in the Amount of

$8,616.52, and (3) Determination of Claim of the Meiburger Law Firm in the Amount of $11,876.74

for Fees and Expenses in Representing Herself in Defense of Her Fees and Expenses Previously

Incurred.  (Docket Entry 888).

There appears to be some confusion as to the extent of the court's ruling and, as indicated

by the hearing on the motion, the court's findings of facts and conclusions of law.[3]  This

Memorandum Opinion supplements the oral rulings on the final application and the motion to

reconsider (Docket Entries 864 and 886) and constitutes the court's findings of facts and conclusions

of law.

## Review of Trustee's Fees

The debtor objected to the attorney's fees requested and previously awarded and the trustee's

fees previously awarded, requested that the prior awards be reviewed, and that attorney's fees and

trustee's fees previously awarded be disgorged.

---

[3]William Daniel Sullivan filed and argued the motion for reconsideration.

3

An award of compensation to a trustee's counsel is separate from an award of compensation to the trustee. They each stand on their own. Both the trustee and counsel are compensated for their own work. There are differences in determining the compensation for counsel and for a trustee. A trustee's compensation is capped and there is at least one additional consideration. *See* 11 U.S.C. §§326(a) and 330(a)(7). This is true even when the trustee and counsel are one and the same. Even though separate, their work and applications for compensation overlap. Nonetheless, the attorney may not be paid for trustee work.[4]

Ms. Meiburger is both the chapter 11 trustee and counsel to the chapter 11 trustee. She maintained separate records for both trustee work and attorney work and filed separate fee applications for both.[5] Some of the debtor's objections to the attorney's fee application implicate, rather directly in some instances, Mr. Meiburger's responsibilities and actions as trustee, but not necessarily as counsel for the trustee. For example, the debtor asserts that Ms. Meiburger did not comply with Bankruptcy Code §1106(a)(5). The caption of §1106 is "Duties of trustee and examiner". Section (a) starts: "A trustee shall — ". Quite clearly, these are trustee duties, not attorney duties. There is significant discussion in the objection of the manner in which Ms. Meiburger administered the estate and whether she had a plan for administering the estate. These

---

[4]The order approving the application for compensation (Docket Entry 884) contained an error in computation. There was 1.1 hours of attorney time that was in fact trustee time and should not have been included in the final award. The correct amount of fees is $8,210.00. Counsel has returned the overpayment and, other than correcting the amount in the order, nothing remains to be done.

[5]Each of her three applications for payment of trustee's fees was accompanied by her trustee time records. (Docket Entries 523, 669 and 805). If paid on the basis of time expended, the trustee would have requested $148,846.50; however, trustee's fees are capped. 11 U.S.C. §326(a). In this case the maximum trustee's fees through the third application is $129,403.70.

objections, if meritorious, should affect the trustee's compensation, but not necessarily an attorney retained by the trustee who reasonably and competently followed the trustee's direction.

The debtor requested the court to review Ms. Meiburger's trustee's fees as well as her attorney's fees. Both parties fully addressed all of the issues presented and the court will treat the final application for attorney's fees as a request for a final award on the trustee's fees already awarded. All of the debtor's objections, arguments and requested relief – both as to the trustee's fees and the attorney's fees – will be considered. While the discussion below often focuses on Ms. Meiburger's attorney work, all work and all time records – both trustee and attorney – are considered. Similarly, the court recognizes that Ms. Meiburger acted as both trustee and counsel to the trustee, but will most often refer to her simply as the "trustee" or the "chapter 11 trustee" notwithstanding that she may have been acting in her capacity as attorney for the trustee. The convention simply reduces the possibility of confusion by reducing the number of identifiers for the same person.

### **Collateral Estoppel**

Interim fee awards under 11 U.S.C. §331 are not final and are subject to further consideration at the conclusion of the case. 11 U.S.C. §330(a)(5); *In re Computer Learning Centers, Inc.,* 407 F.3d 656, 661-662 (4th Cir. 2005). Nonetheless, collateral estoppel may be applicable. For example, the debtor consistently objected to the chapter 11 trustee selling his home in Great Falls. After the chapter 11 trustee was authorized to sell the property, he appealed the decision to the District Court which affirmed this court's order. His objection to the fee application rests, in part, on the propriety of the sale of that property. He wraps his argument in the chapter 11 trustee's management of the

5

administration of the estate which places this particular issue and similar issues in a slightly different light. The resolution of this argument and the debtor's other arguments requires an examination of the sale of the Great Falls property and other decisions made by the chapter 11 trustee that were approved by orders of this court. Because of the depth of the examination undertaken, the court will consider all of the debtor's arguments *de novo* and will not apply the doctrine of collateral estoppel, assuming, for purposes of argument only, that it does not apply.

## **Background**

## **I.  Prior Filings**

This case is the debtor's third bankruptcy filing. His first case was a chapter 13 case. It was filed on May 24, 2000. *In re Wilber Buddyhia Marshall,* Case No. 00-12315-SSM. His schedules and his chapter 13 plan were due on June 7, 2000. On the due date, he filed motions requesting an extension of time within which to file them. The motions were granted. He did not file his schedules or his chapter 13 plan by the extended date and the case was dismissed on June 19, 2000.

His second case, filed under chapter 11, was commenced on August 29, 2000, and converted to a case under chapter 7 on February 20, 2001. *In re Wilber B. Marshall, Jr.,* Case No. 00-13601-SSM. He received a discharge on June 6, 2001. The chapter 7 trustee filed a no distribution report on December 4, 2001, and the case was closed on December 7, 2001.

The chapter 7 trustee did not administer any assets because no unsecured creditor filed a proof of claim. In this case, the debtor stated that the second case was closed "with no claims having been filed by the unsecured creditors." Wilber Marshall, Jr. Disclosure Statement of Claims and

Interests at ¶II.2.[6]  (Docket Entry 32).  The United States Trustee agreed.  He stated that the chapter

7 trustee was "unable to administer [the chapter 7] case as an asset case because no claims were filed

by the unsecured creditors."  *See* Motion to Convert to Chapter 7 of the Bankruptcy Code or in the

Alternative to Dismiss with Prejudice at ¶7.  (Docket Entry 16).


## II.  Proceedings in The Present Case

### A.  Proceedings Prior to Appointment of the Chapter 11 Trustee

### 1.  Schedules and Statement of Financial Affairs

This chapter 11 case was commenced by the debtor on February 5, 2002.  The debtor did not

file his schedules with his petition.  The deadline to file them was February 20, 2002.  On

February 19, 2002, he filed a motion requesting an extension of time within which to file his

schedules.  The motion was granted and the schedules and statements were filed on March 4, 2002,

the extended deadline.  (Docket Entry 12).

The schedules listed three secured creditors:  Meritech Mortgage Services with a claim of

$800,000.00 secured by the debtor's home in Great Falls, Virginia; GE Capital Mortgage Services,

Inc., with a claim of $90,000.00 secured by property in Melbourne, Florida; and Homecomings

Finance Network with a claim of $400,000.00 secured by property in Scottsdale, Arizona.  The

Internal Revenue Service's claim was scheduled as an unsecured priority claim for income taxes due

of December 31, 1986 and October 26, 1994.  The amounts were scheduled as unknown.  The claims

---

[6]This was an interesting development because, according to the same disclosure statement, the debtor "could not continue" in the first case, the chapter 13 case, "because of the amount of his unsecured debt."  Disclosure Statement, ¶II.2.  (Docket Entry 32).  The first case was dismissed and the second case was filed under chapter 11.  It was eventually converted to a chapter 7 case.

were listed as disputed.  Two unsecured claims were scheduled: City of Scottsdale in the amount of
$600.00 for utilities; and APS in the amount of $1,000.00 for electrical services.

The schedules listed four homes on Schedule A, "Real Property".  They were located in Great
Falls, Virginia (valued at $1,400,000); Scottsdale, Arizona (valued at $820,000); Titusville, Florida
(valued at $120,000 and unencumbered); and Melbourne, Florida (valued at $120,000).  The value
of all personal property listed on Schedule B, "Personal Property" was $40,003.  The most valuable
asset was listed under "Furs and jewelry" and was described as "Various including wedding and
engagement rings."  The value listed was $20,000.  The second most valuable asset listed was
described as "Handguns, workout equipment."  The value was listed at $15,000.  He listed one bank
account with a balance given as $0.00.  He listed three assets each with a value of $1.00:  National
Football League 401(k) retirement account; a claim against Chase Manhattan Mortgage; and a
Workers Compensation claim.

Schedules I and J, Current Income and Current Expenses, respectively, showed total monthly
income of $13,500 which consisted of a disability payment of $7,000; "Bank Disability Claims, etc."
of $5,000; and income from real property of $1,500.  Expenses totaled $12, 346.  He listed home
mortgages of $10,000 and utilities, telephone and other home related expenses of $510.  He listed
the mortgage on the Melbourne property at $704[7] and support payments of $832.  (The debtor
reported that he was divorced.)  The remaining expense was $300 for food.

---

[7]Schedule J says: "Mortgage – College Park Circle, Titusville, FL    $704.00."  According to Schedule A, the
Melbourne property was located on College Park Circle and the Titusville property (with no mortgage) on Sir Page Lane.

There were expenses notable by their absence. There were no insurance expenses.[8] While insurance on the three properties subject to mortgages may have been included in the mortgage payments, the Titusville property was unencumbered. An insurance premium, prorated on a monthly basis, should have been listed if insurance was in effect. There was no health insurance. There were no expenses for clothing, medical expenses, recreation, school or other usual activities.[9] There was no provision for payment of federal or state income taxes or for real estate taxes on the Titusville property which was unencumbered. There were no automobile or other transportation related expenses.[10] There was no automobile insurance.

The schedules do not reflect where the debtor's income was going before he filed his petition. It is clear from the Statement of Affairs and the proofs of claims filed in the case that the debtor was not paying $10,000 a month for mortgage payments on his Great Falls and Scottsdale properties. Question 3 on the Statement of Financial Affairs states that no payments were made to any creditors aggregating more than $600 in the 90 days preceding the commencement of the case. The proofs of claims filed by the secured lenders corroborate the accuracy of the debtor's answer to this

---

[8] Schedule B, Item 9, "Interests in insurance policies" stated that there were none.

[9] The debtor listed two children, ages 10 and 12 as dependents. While the custody arrangements were not disclosed in the schedules, there are no expenses related to them.

[10] No automobiles were listed, either as owned or leased. *See* Schedule B, Item 23, "Automobiles, trucks, trailers, and other vehicles"; Schedule G, "Executory Contracts and Unexpired Leases"; and Statement of Financial Affairs, Question 14, "Property held for another person." ("List all property owned by another person that the debtor holds or controls."

DaimlerChrysler Services North America filed a proof of claim on April 29, 2002, asserting a claim of $69,593.05 secured by a 1997 Mercedes Benz S4Z. The debtor's personal obligation was probably discharged in his chapter 7 case. DaimlerChrysler filed a motion for relief from the automatic stay on January 18, 2005, asserting an arrearage of $51,827.15. (Docket Entry 482). The chapter 11 trustee abandoned the vehicle. *See* Trustee's Notice of Intent to Abandon Debtor's Automobile. (Docket Entry 474). The debtor opposed the motion for relief from the stay. (Docket Entry 488). Relief was granted on February 23, 2005. (Docket Entry 504).

question.  Schedule J stated what the debtor *intended* to do *after* the filing of his petition in bankruptcy, but not what he was doing *before* he filed his petition.  It showed that the debtor did not have the financial ability to propose or consummate a chapter 11 plan that merely reinstated the mortgage arrears over time.  The net disposable income reflected on Schedules I and J was $1,154 a month, an amount clearly insufficient to service the current mortgages and pay the arrearage within a reasonable period, such as five years.  This does not take into account the absence of taxes, insurance, transportation and reasonable living expenses for the debtor and his two children.  An increase in income was not anticipated.  Schedule I, at the bottom, requires the debtor to "Describe any increase or decrease of more than 10% in any of the above categories anticipated to occur within the year following the filing of this document."  None was described.  The debtor's chapter 11 plan had to be a liquidation plan (in whole or in part) or had to be funded from another source, such as the two unliquidated claims listed on Schedule B.

The chapter 11 trustee filed amended schedules on September 29, 2004.  (Docket Entry 416).

## 2.  The Debtor's Proposed Chapter 11 Plan and Disclosure Statement

The first meeting of creditors was initially set for March 7, 2002.  The debtor failed to attend the meeting and failed to provide the United States Trustee with proof of insurance of his four homes and proof of the opening of debtor-in-possession bank accounts.  The United States Trustee filed a motion to convert or dismiss the case on March 15, 2002.  The hearing on the motion was held on April 23, 2002.  The court did not grant the motion, but rescheduled the first meeting of creditors, continued the United States Trustee's motion to May 14, 2002, and set a deadline to file a plan and disclosure statement.  The debtor filed a plan and disclosure statement on the deadline.

10

The debtor's plan was predicated on receiving $240,000 in at least two payments from the

Bert Bell/Pete Rozelle NFL Player Retirement Plan or the NFL Player Supplemental Disability Plan

("the NFL Disability Plan") as a disability award and recovering on a lender liability claim.  He

expected the first payment from the NFL Disability Plan of $60,000 in May, 2002.  The debtor

stated:

> Debtor will receive a lump sum this month [May 2002] of approximately $60,000.00
> .   .   . as well as an additional $9,157.00 of monthly disability income which had
> been awarded to him at the time of the filing of this Petition.

Disclosure Statement at 4.  (Docket Entry 32).  He continued in his disclosure statement that:

> In addition, Debtor expects to receive additional back disability in the form of a lump
> sum award of approximately $180,000.00.  Debtor is attempting to obtain an increase
> in this sum due to the interest lost and resulting financial distress [caused] by the
> failure of the National Football League physicians to recommend the prompt
> commencement of disability payments.

Disclosure Statement at 4.

In addition, the debtor stated that he was pursuing a claim against a prior mortgage lender

with respect to the Great Falls property, a proposed refinance on the Scottsdale property and an

untimely rejection of an application for refinancing the Great Falls property.  The details were not

set out or discussed in the Disclosure Statement.  *See* Disclosure Statement at 4.

The exact treatment of the secured lenders, such as payment dates and amounts, was not

precisely set out in the proposed chapter 11 plan or described in the Disclosure Statement.  The

debtor acknowledged that he was unable to make current mortgage payments, but stated that he

would "be able to commence payments and pay postpetition arrearages .   .   . upon the

commencement of his NFL disability payments and receipt of the initial lump sum."  Disclosure

Statement at 5.

The crux of the plan was:

> Depending upon the final outcome of Debtor's NFL Disability Plan and forgery and
> Truth in Lending Claims, Debtor will either sell his Scottsdale, Arizona property
> within six (6) months, or attempt to refinance said property in a thirty (30) year term
> along with his Great Falls, Virginia property.  In any event, Debtor will bring all
> existing mortgages current within sixty (60) months of the date of the filing of the
> petition herein.

Disclosure Statement at 7.  The sixty-month period expired on February 5, 2007.

The debtor's proposed chapter 11 plan stated:

> Debtor will receive NFL Disability payments later this month [May 2002] and
> proposes to commence payments to his Secured creditors and cure post petition
> arrearages.  Debtor also proposes to refinance on a thirty (30) year basis or sell his
> real estate with improvements thereon located in Scottsdale, Arizona. .   . . Upon
> the sale or refinancing for a thirty (30) year term said property and the receipt of an
> additional NFL Disability Lump Sum Debtor intends to pay pre-petition arrearages
> to his secured creditors as may be allowed by this Court. .   . . In any event, all
> postpetition arrearages will be cured within sixty (60) months of Debtor's filing for
> relief [that is, by February 2, 2007].

Wilber Marshall, Jr. Plan of Reorganization at 2 - 3.  (Docket Entry 31).

This was re-emphasized in paragraph 1 of Article IV, "Execution and implementation of the

Plan", of the proposed plan.  It states:

> The funds necessary for the satisfaction of creditors' claims shall be generated from
> the refinancing of sale of debtor's real estate in Scottsdale, Arizona, the reinstatement
> of his NFL disability and the additional funds which may be forthcoming from his
> claims for back disability and damages and fraud and Truth in Lending violations
> with respect to requests for refinancing through Chase Manhattan Mortgage, Inc.

Plan of Reorganization, Article IV, ¶1 at 3-4.

There were no provisions for paying unsecured creditors or the Internal Revenue Service, if

its claim was allowed.  The IRS filed a proof of claim on July 1, 2002, asserting an unsecured

priority claim of $268,972.83, for the tax years 1998 through 2001.  The proof of claim asserted that

the debtor had not filed tax returns for the prior three years. The claim was later amended down to $77,276.94 for priority taxes and interest plus $14,354.35 as an unsecured non-priority claim for penalties and interest.

The proofs of claims for Meritech and HomeComings asserted arrearages of $202,031.59 and $110,606.15, respectively, amounts that exceeded the debtor's estimate of the lump sum payments from the NFL Disability Plan. Both proofs of claims were filed before the debtor's plan and disclosure statements were filed.

The Virginia Department of Taxation filed a proof of claim for unpaid taxes for 1998 through 2001. The priority claim was $12,542.34 and the unsecured non-priority claim was $2,748.66 for a total of $15,291.00.

The United States Trustee's motion to convert or dismiss the case was continued to July 23, 2002. On July 23, 2002, the debtor's disclosure statement was approved and the confirmation hearing was set for September 11, 2002. (Docket Entry 48). The confirmation hearing was continued to October 18, 2002,[11] at which time the confirmation hearing and the United States Trustee's motion to convert or dismiss were continued to November 12, 2002. They were again continued, this time to February 25, 2003. The debtor was unable to obtain any votes in favor of his proposed chapter 11 plan and at the February 25, 2003 hearing, the court denied confirmation, and, rather than converting or dismissing the case, ordered the appointment of a chapter 11 trustee.

---

[11]The docket is not clear why the confirmation hearing was continued from September 11, 2002, to October 18, 2002. However, the docket shows that the first notice of the confirmation hearing stated that the hearing would be held in Richmond, not Alexandria. New notice was given. (Docket Entries 53 and 54). On October 18, 2002, the debtor mailed a notice of the further continuance. (Docket Entry 65). The certificate of service on all three notices stated that they were mailed to the United States Trustee and the three parties secured by the liens on the debtor's real estate.

(Docket Entry 81).  The United States Trustee appointed Janet M. Meiburger as the chapter 11

trustee and the court approved the appointment on March 21, 2003.  (Docket Entry 87).


### 3.  Monthly Operating Reports

The United States Trustee's motion to convert or dismiss the case also asserted that the

debtor had not filed his required monthly operating reports.  In addition to setting a new date for the

first meeting of creditors and a deadline for filing a plan and disclosure statement, the debtor was

required to file all past-due monthly operating reports.  All the monthly operating reports were filed

late.  The February and March 2002 monthly reports were filed on May 14, 2002; the April 2002

report on June 5, 2002; the May, August and September 2002 reports on November 12, 2002; the

June and July 2002 reports on November 15, 2002; and the October, November and December 2002

reports and January 2003 report on February 24, 2003.

The first thing that stands out on the monthly reports is their consistency.  The numbers on

the Income Statement which shows the debtor's income and expenses are identical on the February

through July 2002 reports.  In fact, the reports, which are handwritten, are so consistent that they

appear to be photocopies of the February 2002 report, with a few changes.  They show income of

only $1,614.00 a month and expenses of exactly the same amount.  The reports show that no

payments were made to secured creditors.  The September 2002 through January 2003 monthly

reports are as consistent as the first series.  The numbers are different.  The debtor started receiving

$9,156.00 a month in income.  A mortgage payment of $3,000.00 is reported for each month.

There was no net disposable income shown on any monthly report and it is unclear how the

debtor provided for his basic needs.

### 4. Motions for Relief from the Automatic Stay

The debtor originally listed four properties on Schedule A – Real Property. (Docket Entry 12). They were his residence in Great Falls, Virginia; a home in Scottsdale, Arizona; a home his mother occupied in Titusville, Florida; and a rental property in Melbourne, Florida. He valued the Great Falls property at $1,400,000 subject to liens of $800,000;[12] the Scottsdale property at $820,000 subject to liens of $400,000;[13] the Titusville property at $120,000 without any liens; and the Melbourne property at $120,000 subject to liens of $90,000.[14]

Homecomings Financial Network which was secured by the Scottsdale property filed its motion for relief from the automatic stay on April 9, 2002. (Docket Entry 17). The debtor objected to the relief requested. (Docket Entry 22). The motion was continued to May 15, 2002, to July 17, 2002, and finally to August 7, 2002. On August 7, 2002, adequate protection payments of $3,000 a month were ordered to be made. (Docket Entry 55).

Chase Bank of Texas, N.A. which was secured by the Great Falls property filed its motion for relief from the automatic stay on April 27, 2002. (Docket Entry 24). The debtor objected.

---

[12]Meritech Mortgage Services as servicing agent filed a proof of claim asserting a total claim of $813,692.00. The principal balance was $620,542.86. Accrued interest was $160,351.40. The escrow deficiency was $19,027.14. Other charges totaled $13,770.60. The total arrearage to be cured under a plan was $202,031.59. Saxon Mortgage, Inc., was the original named payee of the note and beneficiary of the deed of trust. An Assignment of Deed of Trust from Saxon Mortgage to Chase Bank of Texas, N.A., was attached to the Proof of Claim.

The debtor borrowed $621,000 on September 1, 1999. The first payment was due on November 1, 1999. As of February 5, 2002, the debtor had missed 26 payments out of 28. The payments ranged from $6,592.77 to $7,596.83.

[13]Homecomings Financial Network filed a proof of claim asserting a total claim of $468,316.85. The principal balance was $357,710.70. The debtor borrowed $436,800.00 on December 18, 1995. He was in arrears 21 payments when he filed his third case for a total arrearage to be cured under a plan of $110,606.15. The payments ranged from $4,223.20 to $5,136.92.

[14]Wells Fargo Home Mortgage, Inc., asserted in its motion for relief from the automatic stay that the debtor borrowed $84,000.00 on May 6, 1991; that the principal balance due as of May 10, 2002, was $77,717.72; and that the amount necessary to cure the pre-arrearage was $25,120.68, plus late charges, attorneys' fees and costs. (Docket Entry 42).

(Docket Entry 27). The preliminary hearing on the motion on June 5, 2002, was continued to July 17, 2002, to August 7, 2002, and finally to August 21, 2002. At the final hearing, the debtor was ordered to make monthly adequate protection payments of $5,855.35 commencing September 1, 2002. (Docket Entry 59). On February 27, 2003, Chase filed a notice of default asserting that the debtor had made none of the required adequate protection payments and that the total default was $35,132.10. (Docket Entry 82). The debtor objected to the notice of default. (Docket Entry 84). The chapter 11 trustee was appointed a week later.

Wells Fargo Home Mortgage, Inc., filed its motion for relief from the automatic stay on June 8, 2002. (Docket Entry 42). The preliminary hearing was held on July 17, 2002, and continued to August 7, 2002, which was continued to August 21, 2002. At the final hearing the debtor agreed to make monthly adequate protection payments of $964.20 commencing September 1, 2002. (Docket Entry 58). Wells Fargo filed a notice of default on October 1, 2002, asserting that the first adequate protection payment was not made. (Docket Entry 62). The debtor objected to the notice of default. (Docket Entry 63).

### 5. Adversary Proceedings

The debtor commenced his only adversary proceeding, Adv. Proc. No. 03-1012, on January 2, 2003. The complaint alleged that Ocwen Federal Bank had wrongfully commenced a foreclosure on the Scottsdale property. It stated, that in an effort to resolve an alleged default, the debtor sought to refinance the mortgage and pay-off Ocwen. The effort to refinance the mortgage was unsuccessful and the debtor was forced to refinance his Great Falls property to save the Scottsdale property. Generally, the complaint asserted that the loan officers forged the debtor's

16

signature on a Foreclosure Postponement Agreement which waived the debtor's right to pursue

Ocwen for the wrongful commencement of the foreclosure; that the loan rate was higher than the

promised loan rate; that the promised loan was never approved; and that there were violations of the

Truth in Lending Act.

### 6.  General Activities

The debtor's general activities are reflected in the court's docket and his counsel's time

records.  Debtor's counsel's time records are not comprehensive and caution needs to be exercised

in drawing conclusions from them.  (Docket Entry 253).  For example, the docket shows that

debtor's counsel filed a chapter 11 plan and disclosure statement on May 13, 2002 as stated in

counsel's time records. (Docket Entries 31 and 32).  However, even though the first meeting of

creditors was rescheduled for that day, May 13, 2002 (Docket Entry 28), counsel's time entries for

that day do not reflect that he attended the meeting.  As another example, the time records reflect that

debtor's counsel prepared a document authorizing him to discuss and negotiate with Allstate

Insurance Co., but there are no time entries showing that he negotiated with Allstate.  As a third

example, there are no time entries for telephone conferences or meetings with the debtor.

Notwithstanding counsel's incomplete time records, the total absence of counsel's time

devoted to critical issues suggests that the case was going nowhere.  The time records show no time

devoted to the NFL disability claim or the claim against the Chicago Bears.  These were supposed

to be the sources of the lump sum payment to creditors.  One payment of $60,000.00 was expected

when the chapter 11 plan was filed.  There are no time entries showing any discussions or any

correspondence with the NFL in this regard.  No Rule 2004 order was requested.  A Rule 2004

examination would have permitted counsel to investigate the NFL claim, the Chicago Bears claim or the lender liability claim before a complaint was filed.  There was no time entry for reviewing proofs of claims.

### B.  Status of Case When the Chapter 11 Trustee was Appointed

The debtor's chapter 11 case had collapsed when the chapter 11 trustee was appointed.  The debtor's proposed chapter 11 plan failed to garner any votes and was denied confirmation.  Substantial tax claims had not been addressed.  The three encumbered pieces of real estate were subject to adequate protection orders requiring monthly payments which exceeded the debtor's monthly income as reported by him in his monthly reports.[15]  The adequate protection payments for the Great Falls property were never made and the lender had issued a default notice on February 27, 2003.  (Docket Entry 82).

The schedules were inaccurate.  The debtor failed to file monthly reports on time.  The reports that were filed were facially suspect.  If they were accepted as accurate, they showed a total inability to service the mortgages on the Great Falls and Scottsdale properties much less reinstate them.

The claims against the Chicago Bears and the NFL Disability Plan were not close to resolution.  No lump sum payments were in sight.  The debtor had filed his suit against the lenders

---

[15]The payments were $5,855.35, $3,000.00 and $964.20, totaling $9,819.55.  The $3,000.00 monthly adequate protection payment for the Scottsdale property was made, as reported by the debtor on his monthly operating reports, for the months of August through December 2002.  The $964.20 adequate protection payment for the Melbourne property was likely made by the rental agent from rents received.  *See* Trustee Interim Report (First) ¶3 at 2.  (Docket Entry 89).  Although the rents received and the payments made from the rents should have been reported on the monthly operating reports, they were not.  The adequate protection payment on the debtor's Great Falls home of $5855.35 was never made.

on January 2, 2003, eleven months after the commencement of the case and almost eight months

after he filed his proposed chapter 11 plan that relied, in part, on the outcome of the case.  The

outcome of the litigation could reasonably be expected to take months and the debtor had no ability

to make the adequate protection payments until the litigation was resolved.

### C.  Proceedings After the Appointment of the Chapter 11 Trustee

### 1.  Sales of Real Property

### a.  Scottsdale Property

The debtor listed the Scottsdale property for sale in October 2002.  When the chapter 11

trustee was appointed in March 2003, the listing was due to expire on April 16, 2003.[16]  After

consultation with the debtor and his counsel, she stated on April 23, 2003 that she intended to

continue to market the property and to sell it.  *See* Trustee Interim Report (First) ¶6 at 3.  (Docket

Entry 89).  The chapter 11 trustee retained the same realtor that the debtor had chosen.  The property

was initially listed for $799,000.00.  Trustee Application for Approval of Real Estate Listing

Agreement and Employment of Realtor.  (Docket Entries 100 and 111).  The property did not sell.

After a personal inspection of the Scottsdale property and viewing other properties for sale, the

chapter 11 trustee sought to extend the listing agreement on January 26, 2004, reduce the listing price

to $739,900.00 and sell the property in its "as is" condition.  She noted that the equity was

decreasing at the rate of $4,500.00 a month as additional interest accrued on the mortgage.  (Docket

Entry 147).  The debtor unsuccessfully objected to the reduction in the listing price.  (Docket Entries

157 and 165).  On March 29, 2004, the chapter 11 trustee filed motions to sell Scottsdale property

---

[16]The debtor did not file an application to employ the realtor or to enter into a listing agreement.

and to sell or dispose of the personal property located at the Scottsdale property.  The proposed sales price was $685,000.00 in "as is" condition and without an inspection contingency.[17]  (Docket Entries 204 and 202).  The chapter 11 trustee reviewed other offers made for the property, including one for $688,000.00 that came in after the $685,000.00 and explained why she felt the $685,000.00 offer was the better offer.  While the chapter 11 trustee did not estimate the net proceeds that she expected, the information given suggested about $130,000.00.  She noted that the payoffs to the lender and to the homeowner's association were disputed and requested that the sale be free and clear of the disputed claims with the liens to attach to the proceeds of sale.  The debtor objected to the sales, asserting that the sales price for the house was insufficient and that there would be no benefit to the estate by the sale of the personal property.  (Docket Entries 223 and 220).  Both of the chapter 11 trustee's motions were granted.  (Docket Entry 237).  The Scottsdale property went to closing on June 4, 2004.  An escrow for the liens of $515,000.00 was established.  Report of Asset Sale. (Docket Entry 376).  The chapter 11 trustee received $123,561.77.  *Id.*

On October 15, 2004, the chapter 11 trustee filed a motion seeking approval of a settlement with Chase (the lender then secured by the Scottsdale property), Ocwen (the former lender secured by the Scottsdale property who was alleged to have wrongfully commenced a foreclosure) and the homeowner's association in which the Scottsdale property was situate.  (Docket Entry 430).  Ocwen and Chase agreed to pay $45,000.00 in settlement of the adversary proceeding.  The pay-off of Chase for the Scottsdale loan was agreed upon and the escrow established on the sale of the Scottsdale property was agreed to be disbursed.  (Docket Entry 430).  The debtor objected.  (Docket Entry 437). He asserted that the chapter 11 trustee had incorrectly computed the maximum damages that she

---

[17]The prospective purchaser inspected the property prior to making his offer.

could recover and that the amount of the settlement was consumed by the chapter 11 trustee's attorneys fees. While the latter statement was true, Ms. Meiburger's legal fees exceeded the amount recovered, the objections were overruled and the was settlement approved. (Docket Entry 448). *See* Chase Adversary Proceeding, below.

### b. Melbourne Property

The chapter 11 trustee received an unsolicited offer to purchase the Melbourne property for $180,000. The property was a three-unit rental that was managed by Woodlake Realty, Inc. The chapter 11 trustee investigated the offer and accepted it. The real estate commission was 6%. Four percent was paid to Evans Butler Realty, Inc., and 2% was paid to Woodlake Realty, Inc. as the seller's (chapter 11 trustee's) agent. Trustee's Motion for Order Approving the Sale of Real Property in Melbourne, Florida, Free and Clear of Liens, Approving Payment of Liens at Closing and Authorizing Payment of Real Estate Commissions. (Docket Entry 149). The debtor scheduled the property on Schedule A, "Real Property," with a current market value of $120,000. The draft settlement statement showed estimated net proceeds to the bankruptcy estate of $60,036. (Docket Entry 159). The sale was approved at a hearing on February 10, 2004, at which debtor's counsel participated. (Docket Entry 163).[18] The sale closed on February 13, 2004. The net proceeds of sale paid to the chapter 11 trustee was $58,935.62. Report of Asset Sale. (Docket Entry 214).

---

[18]The order was entered on the docket on February 18, 2004. (Docket Entry 166).

### c.  Great Falls Property

The most contested sale was the debtor's home in Great Falls, Virginia.  The Great Falls property was the debtor's principal residence.  He listed the current market value on Schedule A, "Real Property", at $1,400,000.00 with a mortgage of $800,000.00.

When the chapter 11 trustee was appointed in March 21, 2003, the automatic stay had been modified as to Chase Bank of Texas which was secured by the Great Falls property.  The stay was continued in force provided that the debtor made monthly adequate protection payments of $5,855.35 commencing September 1, 2002.  (Docket Entry 59).  On February 27, 2003, Chase filed a notice of default asserting that the debtor had made none of the required adequate protection payments and that the total default was $35,132.10.  The debtor objected to the notice of default.  (Docket Entry 84).  The chapter 11 trustee was appointed a week later.

The chapter 11 trustee sought to modify the relief from stay order by reducing the monthly adequate assurance payment.  Trustee's Motion to Modify Agreed Order Regarding Motion for Relief from the Stay Filed by Chase Bank of Texas, N.A.  (Docket Entry 109). She stated that there was equity in the property, that there were substantial tax claims against the debtor that could be paid from the equity and that there were claims against the Chicago Bears and Ocwen.  She stated that she needed nine months to either refinance or sell the Great Falls property.  *Id.* at ¶¶7 and 9.  Chase initially objected to the motion.  Opposition to Trustee's Motion to Modify Agreed Order Regarding Motion for Relief from the Stay Filed by Chase Bank of Texas, N.A. (Docket Entry 117).  The court modified its prior order and reduced the adequate protection payment to $3,000 a month commencing in August 2003.  The debtor consented to the order and his counsel endorsed it.  Order Regarding Adequate Protection and Resolving Trustee's Motion to Modify Agreed Order Regarding

22

Motion for Relief from the Stay Filed by Chase Bank of Texas, N.A. (Docket Entry 121). The order recited that the chapter 11 trustee had represented to the court that the "mortgage held by Chase Bank of Texas, N.A., will be refinanced or [the property] sold." *Id.* at 1. The order also set the matter for a status hearing on September 17, 2003, "at which time the Trustee shall inform the court as to whether the property .   .   . will be sold or refinanced." *Id.* at ¶5.

The September 17, 2003 hearing was continued to October 1, 2003, and then to January 21, 2004. On December 1, 2003, the chapter 11 trustee filed a motion seeking to require the debtor to make the Great Falls property available for inspection by her and her realtor. Trustee's Motion for Entry of Order Requiring the Debtor to Make His Great Falls, Virginia Property Available for Inspection by the Trustee and the Realtors Selected by the Trustee. (Docket Entry 133). The hearing on the motion was continued to January 13, 2004, at which time the court granted the motion. Order Granting Trustee's Motion for Entry of Order Requiring the Debtor to Make His Great Falls, Virginia Property Available for Inspection by the Trustee and the Realtors Selected by the Trustee. (Docket Entry 151). On January 26, 2004, the chapter 11 trustee filed an application for employment of real estate agents to sell the Great Falls property. Trustee's Application for Approval of Real Estate Listing Agreement and Employment of Realtors for the Sale of the Debtor's House in Great Falls, Virginia (Docket Entry 145). In the application, she described the financial burden of the property, the equity and the debtor's lack of cooperation in making the reduced adequate protection payments required by a prior order of the court. She also stated that she had investigated refinancing the property, including a short-term loan, but was unsuccessful. She requested a listing price of $1,499,000 with the ability to reduce it by $100,000. She intended to sell the property as either a single residence, or if zoning and covenants permitted, a subdividable parcel. The debtor

23

objected.    Debtor's Response to Trustee's Application for Approval of Real Estate Listing Agreement and Employment of Realtors for the Sale of Debtor's House in Great Falls, Virginia. (Docket Entry 156).  He attached a May 31, 1999 appraisal valuing the property at $1,400,000.  The application was approved on February 10, 2004.  The order was entered on the docket on February 18, 2004.  Order Approving Trustee's Application for Approval of Real Estate Listing Agreement and Employment of Realtors for the Sale of the Debtor's House in Great Falls, Virginia. (Docket Entry 164).  The debtor filed a motion to reconsider which was denied.  Debtor's Motion to Reconsider Order Granting Trustee's Application for Approval of Real Estate Listing Agreement and Employment of Realtors for the Sale of Debtor's House in Great Falls, Virginia and Order Denying Debtor's Motion to Reconsider Order Granting Trustee's Application for Approval of Real Estate Listing Agreement and Employment of Realtors for the Sale of Debtor's House in Great Falls, Virginia.  (Docket Entries 178 and 236, respectively).  In both the debtor's objection to the motion and his motion for reconsideration, he asserted that the Great Falls property was worth more than the chapter 11 trustee was going to list the property, that there were adequate resources to make mortgage payments on the Great Falls property and that the litigation should be concluded before the Great Falls property was sold.  The debtor also argued that he expected a favorable response to refinancing applications, noting that the chapter 11 trustee had expressly authorized him to pursue refinancing.  In support of his argument that there were adequate assets available to pay all claims without selling the Great Falls property, he annotated the chapter11 trustee's analysis of the estate's assets and liabilities, stating that the chapter 11 trustee's estimate of the value of the assets was "too low" and the professional fees for the chapter 11 trustee were "very high".  (Docket Entry 182). Chase Bank of Texas opposed the debtor's motion for reconsideration.  Response of Chase Bank of

Texas to Debtor's Motion to Reconsider Order Granting Trustee's Application for Approval of Real

Estate Listing Agreement and Employment of Realtors. (Docket Entry 197). It noted the extended

protection that the debtor had by virtue of the automatic stay, the failure to make payments and the

necessity for court approval of any contract of sale. The debtor filed a number of additional

documents in support of his motion to reconsider which was continued several times.

On March 29, 2004, the chapter 11 trustee filed a motion requesting to modify the listing

agreement by increasing the listing price to $2.3 million which was much closer to the debtor's

valuation of $2.4 million. She also requested authority to spend about $35,000 from the sale of the

Scottsdale property on repairing the Great Falls property. She stated that the repairs would assist in

obtaining a higher sales price. Trustee's Motion to Modify and Extend Real Estate Listing

Agreement for Great Falls, Virginia Property. (Docket Entry 209). The debtor continued to object

to the marketing of the Great Falls property, even at the higher value asserting that all claims could

be paid from other assets without the sale of the Great Falls property. Debtor's Response to

Trustee's Motion to Modify and Extend Real Estate Listing Agreement for Great Falls, Virginia

Property. (Docket Entry 217). The debtor's motion to reconsider was denied. Order Denying

Debtor's Motion to Reconsider Order Granting Trustee's Application for Approval of Real Estate

Listing Agreement and Employment of Realtors for the Sale of Debtor's House in Great Falls,

Virginia. (Docket Entry 236). The motions to increase the listing price and use proceeds from the

sale of the Scottsdale property were granted. Order Approving Trustee's Motion to Modify and

Extend Real Estate Listing Agreement for Great Falls, Virginia Property; and Order Approving Use

of Certain Proceeds of Sale of the Debtor's Arizona Property to Prepare the Debtor's Great Falls,

Virginia, Property for Sale. (Docket Entries 313 and 238, respectively).

25

The debtor appealed the order denying his motion to reconsider the order authorizing the listing of the Great Falls property and the order authorizing the use of $35,000 from the proceeds of the sale of the Scottsdale property order. Notices of Appeal. (Docket Entries 262 and 263). A motion for a stay pending appeal of the order authorizing the chapter 11 trustee to market the Great Falls property was denied. Motion for Stay Pending Appeal and Order Denying Debtor's Motion for Stay Pending Appeal. (Docket Entries 276, 305 and 311). The debtor withdrew his appeal of the use of the $35,000 proceeds from the Scottsdale sale to repair the Great Falls property. Notices of Dismissal. (Docket Entries 439 and 635). The District Court denied the debtor's appeal of the listing of the Great Falls property on October 25, 2004. Order and Memorandum Opinion. (Docket Entry 447).

The District Court issued a written Memorandum Opinion. (Docket Entry 447). It summarized the debtor's objection to the marketing of the Great Falls property:

> During the April 13, 2004 trial, Debtor sought to have the bankruptcy judge wait six months to a year to sell the house to give the Trustee time to litigate various claims on behalf of the debtor in an effort to find enough money to allow the Debtor to keep his home. (*See* Tr. of April 13, 2004 at 83-84.)

*Id.* at 2. The Court also wrote:

> Debtor does not contest the Trustee's analysis of the bankruptcy estate's liabilities and administrative expenses. He only contests her determination that sale of the Great Falls house is necessary. Debtor believes that the Trustee should first pursue the adversary proceedings, maintaining that a favorable result in any of those proceedings would allow Debtor to keep the Great Falls house. (Appellant's Br. at 5). . . .

> Debtor argues that these "adversary proceedings have not been pursued in a manner calculated to either rehabilitate the Debtor or conserve his assets."

*Id.* at 5.

26

The District Court reviewed the chapter 11 trustee's analysis and reasons for the sale of the Great Falls property and this court's ruling, summarizing this court's reasons for overruling the debtor's objection and authorizing the listing of the property and denied the debtor's appeal. *Id.* at 6 and 7. The District Court made clear to the debtor that there was still time to save his Great Falls home. "Despite the invitation of the bankruptcy court," the District Court stated,

> Debtor has not provided a new plan for reorganization and refinancing that would allow him to keep the Great Falls house. Although the house is listed for sale, before any contract is accepted and the house is sold, the bankruptcy court must first authorize the proposed contract. Until that time, the Debtor can provide the bankruptcy court a financing plan that would allow him to keep the Great Falls house.

*Id.* at 6-7.

The debtor followed-up on the District Court's suggestion. He obtained a preliminary loan offer on June 28, 2004, and sought court approval of the refinance. Debtor's Motion for Approval of Refinancing. (Docket Entry 355). The proposed loan was for $1.2 million with interest at 12.99% per annum.[19] The loan was to be amortized over 30 years, but due in five years. The monthly payment of principal and interest on the loan was $13,265.02. Taxes and insurance added about $1,100 more for a total of about $14,365 a month.[20] There was a loan origination fee of 2% plus costs and a prepayment premium.[21] There would be an interest reserve of $125,000 to make

---

[19]The rate dropped to 11.99% upon reduction of the principal balance to $1.0 million provided there were no late payments.

[20]The chapter 11 trustee estimated the payment at $14,665. *See* Trustee's Response to Debtor's Motion for Approval of Refinancing, ¶1 at 2. (Docket Entry 367).

[21]The prepayment "premium" was the greater of (1) six months interest on the amount prepaid or (2) 24 months interest on the amount prepaid, less any interest payments made by the debtor through the date of the prepayment. Put another way, the lender was guaranteed two years interest, or about $311,760. If the loan were paid off within the first 18 months, the prepayment premium would be the amount necessary to pay this amount. If the loan were prepaid between months 18 and 24, the prepayment penalty would be about $77,940. The actual amounts would be a bit lower
(continued...)

27

payments during the first year, or about $10,425 a month leaving the debtor responsible for approximately $4,000 a month during the first year.

The chapter 11 trustee opposed the proposed loan. Trustee's Response to Debtor's Motion for Approval of Refinancing. (Docket Entry 367). She argued that the loan was not in the best interests of the debtor or the bankruptcy estate because neither had the financial ability to make the estimated $14,665 monthly payment after the interest reserve was exhausted in 12 months and there was no assurance that the loan could be paid down or refinanced within the 12-month period. The proposed "new mortgage gives rise to an unacceptable risk that the new mortgage will go into default when the payment reserve is exhausted and that most or all of the equity in the great Falls residence will be lost to foreclosure." *Id.* at ¶3 at 3.

The chapter 11 trustee also stated that the debtor would "almost certainly" need the equity in the Great Falls property to reorganize his finances and avoid a future bankruptcy. *Id.* at ¶4 at 3. The chapter 11 trustee discussed her estimate of the amount necessary to pay the claims in the case and the administrative expenses. The amount estimated did not include "unpaid income taxes on the post-petition disability payments received by [the debtor], which are not being paid by [him] and which must be dealt with by [him] at some point." She also noted that the administrative expenses exceeded the chapter 11 trustee's prior estimates:

> in part because of [the debtor's] filing of motions for reconsideration and appeals of the court's orders approving the Trustee's proposed actions, and in part because of litigation such as the Bank One lift stay motion and the motion to withdraw the reference with respect to the adversary proceeding against the NFL benefit plans.

---

[21](...continued)
because the principal is reduced with every monthly payment. The debtor intended to prepay the loan at least in part from the proceeds of the litigation. Unless a lender agrees to modify the note, a prepayment does not reduce the monthly payments. This suggests that the loan would be paid early by refinancing it.

28

*Id.* ¶4 at 3.

The court denied the debtor's motion.  Order Denying Debtor's Motion for Approval of Refinancing.  (Docket Entry 370).

The chapter 11 trustee continued to market the Great Falls property.  The listing was extended twice, each time reducing the listing price. Trustee's Second Motion to Modify and Extend Real Estate Listing Agreement for Great Falls, Virginia Property; and Trustee's Third Motion to Modify Real Estate Listing Agreement for Great Falls, Virginia Property.  (Docket Entries 427 and 484, respectively).  On March 7, 2005, the chapter 11 trustee filed a motion to sell the Great Falls property for $1,520,000. Trustee's Motion for Order Approving the Sale of Real Property in Great Falls, Virginia, Free and Clear of Liens and Authorizing Payment of Real Estate Commissions. (Docket Entry 513).  The expected net proceeds were $405,280.  In addition, the chapter 11 trustee sought authority to sell or dispose of the personal property in the residence and obtain possession of the property from the debtor.  *See* Trustee's Motion for Authority to Sell or Otherwise Dispose of Personal Property Located at the Debtor's Residence; and Trustee's Motion for Self-enforcing Order of Possession.  (Docket Entries 525 and 515, respectively).  The debtor objected asserting the inadequacy of the sales price.  Objection To:  (i) Trustee's Motion for Authority to Sell or Otherwise Dispose of Personal Property; and (ii) Trustee's Application to Employ Donna Blake Bolton to Sell Personal Property and to Provide Appraisal Services to the Trustee.  (Docket Entry 530).  The objections were overruled and the sales of the real and personal property were authorized.  Order Resolving Trustee's Motion for Authority to Sell or Otherwise Dispose of Personal Property Located at the Debtor's Residence; and Order Approving the Sale of Real Property in Great Falls, Virginia, Free and Clear of Liens and Authorizing Payment of Real Estate Commissions. (Docket Entries 539,

29

542 and 553).  The sale of the Great Falls property netted $397,635.83.  Report of Asset Sale (Great

Falls, Virginia Real Property).  (Docket Entry 561).

## 2.  Adversary Proceedings

There were four adversary proceedings.  The debtor filed the first on January 2, 2003.  It was

against Chase Manhattan Mortgage Corporation, HomeComings Financial Network, Inc., Ocwen

Federal Bank FSB and two individuals.  *Wilber B. Marshall, Jr. v. Ocwen Federal Bank, FSB, et al.,*

Adv. Proc. No. 03-1012.  The debtor's claims arose out attempts to resolve what he believed was

the wrongful commencement of a foreclosure on his Scottsdale property and the consequent

refinance of his Great Falls property.  The chapter 11 trustee substituted herself as the complainant.

The chapter 11 trustee filed three complaints.  The first was against the Bert Bell/Pete

Rozelle NFL Player Retirement Plan, the NFL Player Supplemental Disability Plan and the members

of the boards of both of them on February 4, 2004.  *Janet Meiburger, Trustee v. The Bert Bell/Pete*

*Rozelle NFL Player Retirement Plan, et al.,* Adv. Proc. No. 04-1020.  The second was against The

Chicago Bears Football Club, Inc. and Bank One National Association also on February 4, 2004.

*Janet Meiberger, Trustee v. The Chicago Bears Football Club, Inc., et al.,* Adv. Proc. No. 04-1019.

The last was against the chapter 7 trustee in the debtor's prior case.  Adv. Proc. No. 04-1237.  It was

filed on July 21, 2004.

## a.  Chase Manhattan Bank Adversary Proceeding

The debtor commenced the suit against Chase Manhattan Mortgage Corporation and two

individuals on January 2, 2003.  The suit alleged that Chase and the two individuals breached their

fiduciary duties to the debtor and conspired to injure the debtor in his trade or business. Va.Code (1950) §18.2-499 *et seq.*

The debtor alleged that in June 1999, HomeComings Financial Network, the successor in interest of Ocwen Financial, was in the process of foreclosing on the Scottsdale property. The debtor believed it to be a wrongful foreclosure but sought to refinance the property in order to avoid the foreclosure. He asserted that by the end of June 1999 he had received a commitment from Chase to refinance the mortgage. The interest rate was to be 9%. Chase told HomeComings that settlement would occur on July 7, 1999 and promised full payment by July 8, 1999. HomeComings faxed Chase a "Foreclosure Postponement Agreement" with respect to the foreclosure sale which was scheduled for July 15, 1999. Without telling the debtor and without his knowledge or consent, the individual defendants forged the debtor's signature on the agreement and returned it to HomeComings. The agreement waived the debtor's rights to contest the validity of the foreclosure then in progress. The individuals, also without the debtor's knowledge or consent, prepared a handwritten loan application to Chase about July 19, 1999. The application was denied on August 6, 1999. In order to avoid the foreclosure on the Scottsdale property, the debtor refinanced the Great Falls property, but at a higher interest rate. The loan closed on September 1, 1999. Complaint. (Adv.Proc.No. 03-1012, Docket Entry 1). This was the second refinance of the Great Falls property. The first was handled by the same loan officers and closed on June 18, 1999. The second refinance caused him to lose the benefit of the recent first refinance.

Chase filed a motion to dismiss asserting that it had no fiduciary duty to the debtor; that there can be no conspiracy between an employer and its employees; and that the cause of action remained property of the chapter 7 trustee, not the debtor. Defendant Chase Manhattan Mortgage

31

Corporation's Motion to Dismiss the Complaint Pursuant to Rule 12(b)(6). (Adv.Proc.No. 03-1012, Docket Entry 12). The chapter 11 trustee was appointed before the motion to dismiss was argued. She filed an amended complaint. (Adv.Proc.No. 03-1012, Docket Entry 21). She withdrew the conspiracy count and added HomeComings and Ocwen as defendants. She added a breach of contract claim. She alleged that Chase had breached its contract to make a loan to the debtor secured by the Scottsdale property and that it and the individuals had breached their fiduciary duties to the debtor. She alleged that Ocwen and HomeComings had breached the terms of the existing mortgage by wrongly instituting a foreclosure on the Scottsdale property and violated the Fair Debt Collection Practices Act.

A motion to dismiss the breach of fiduciary duty count was granted as time barred. The court found that the statute of limitations expired during the course of the debtor's second bankruptcy case.[22] Memorandum Opinion. (Adv.Proc.No. 03-1012, Docket Entry 57). A motion to dismiss the breach of contract claims was denied. Memorandum Opinion. (Adv.Proc.No. 03-1012, Docket Entry 72). The parties engaged in discovery and reached a settlement. In her motion to approve the settlement, the chapter 11 trustee stated that she calculated the maximum damages as $95,332.04. She agreed to settle the case for a payment of $45,000.00. Trustee's Motion for Approval of Settlement. (Docket Entry 430). The debtor objected to the settlement. (Docket Entry 437). He asserted that the settlement was inadequate and that the damages were several times those computed by the chapter 11 trustee. "Further, the overall settlement is essentially negated by the Trustee's fees

---

[22]The debtor filed his second bankruptcy case on August 29, 2000. It was filed as a chapter 11 case but was converted to chapter 7 on February 20, 2001. The chapter 7 trustee requested that a notice be sent to all creditors advising them that there may be assets in the case and that they needed to file proofs of claims. The bar date for filing proofs of claims was July 11, 2001. No claims were filed and the trustee filed a no distribution report on December 4, 2001. The case was closed on December 7, 2001.

32

and expenses in pursuing this litigation." Objection at 2. (Docket Entry 437). The court overruled

the objections and approved the settlement at a hearing held on October 26, 2004. Order Granting

Trustee's Motion. (Docket Entry 448).

### b.  Chapter 7 Trustee Adversary Proceeding

After the court dismissed the breach of fiduciary duties count in the Chase Adversary

Proceeding because the statute of limitations had expired, the debtor urged the chapter 11 trustee to

sue the chapter 7 trustee because he did not file the breach of fiduciary duty suit during his

administration of the chapter 7 case. The chapter 11 trustee did not file the suit the debtor demanded

she file. On May 10, 2004, the debtor filed a motion requesting that the chapter 11 trustee abandon

the cause of action to the debtor. The debtor asserted that "Debtor's claim against the former

Chapter 7 Trustee represents a very substantial adversary proceeding in favor of Debtor and Debtor's

estate." Debtor's Motion for an Order Directing the Chapter 11 Trustee to Abandon the Debtor's

Estate's Claim Against the Former Chapter 7 Trustee, ¶2 at 2. (Docket Entry 278) (emphasis in

original). The chapter 11 trustee responded. She stated that she was pursuing the adversary

proceeding against Chase and that if she was successful, there would be no damages caused by the

chapter 7 trustee's failure to timely pursue the breach of fiduciary duty claim. She opposed

abandoning the claim because she believed that the estate might need the funds if she were not

successful in the Chase suit. She stated that she had no objection to the debtor prosecuting the claim

on behalf of the estate at the debtor's own expense, provided that any recovery was paid to the estate.

Trustee's Response. (Docket Entry 294). The initial hearing on the debtor's motion was set for

May 25, 2004. It was continued to June 8, 2004, at which time the parties announced that they had

settled the matter:  The chapter 11 trustee agreed to pursue the matter.  The motion was denied as moot by an order entered on June 23, 2004.  (Docket Entry 352).

The chapter 11 trustee filed a complaint against the former chapter 7 trustee on July 21, 2004.  But, she did not serve the former chapter 7 trustee.  On September 13, 2004, the debtor filed a motion to compel the chapter 11 trustee to serve the former chapter 7 trustee.  (Docket Entry 401).  The chapter 11 trustee responded on September 24, 2004.  (Docket Entry 414).  She stated that Federal Rule of Bankruptcy Procedure 7004(a) which incorporates Federal Rule of Civil Procedure 4(m) allows 120 days within which to serve a complaint and that the period may be extended.  She wanted to re-evaluate the suit in light of discovery in the Chase suit, the transaction in which Chase was alleged to have breached its fiduciary duty that the former chapter 7 trustee had failed to prosecute.

As a result of discovery, she revised her opinion concerning the suit against the former chapter 7 trustee.  She felt that if there were a viable breach of fiduciary duty claim against Chase, there were no damages.  Further, the execution of the "Foreclosure Postponement Agreement", even if wrongful, benefitted the debtor – not harmed him – because it avoided an imminent foreclosure at which he would have lost the Scottsdale property.  She viewed the suit against the former chapter 7 trustee as having little or no value.  She, therefore, had no objection to abandoning the claim and the pending suit to the debtor.  Response at 3-4.  (Docket Entry 414).  An order was entered on October 28, 2004, abandoning the claim.  (Docket Entry 444).  On November 17, 2004, the adversary proceeding was closed.  The debtor never pursued the claim against the former chapter 7 trustee.

34

### c.  Chicago Bears Adversary Proceeding

**The Signing Bonus**

The Chicago Bears drafted the debtor to play professional football in 1984.  They agreed on a signing bonus of $1,668,000 in addition to his salary in four one-year contracts.  The compensation package was one of the most lucrative at the time.  The signing bonus was not a straight-forward transaction.  In addition to his salary, the Bears agreed to pay the debtor $100,000 a year for three years starting in May 1985, and to provide him with a $600,000 interest-free loan.  The loan, originally made by American National Bank and Trust Company of Chicago, was held by Bank One when the debtor filed bankruptcy in 2002.  It was in the principal amount of $600,000 with quarterly payments of interest only for 19 years when the outstanding principal balance became due and payable.  The interest rate was the bank's "Prime Rate" which at the time the loan was made in May 1984 was 12% per annum, or $72,000 a year.  The Bears agreed to pay the interest.

Both the Agreement to Provide Loan and the Signing Bonus had the same attachment titled "Signing Bonus Compensation."  *See* Complaint, Exhibit A, Signing Bonus and Exhibit B, Agreement to Provide Loan (Adv.Proc.No. 04-1019, Docket Entry 1).  The attachment showed three columns.  The third column was titled "Direct Cash Payment" and showed three payments to the debtor of $100,000, one each on May 2, 1985, May 2, 1986 and May 2, 1987.  The first column was titled "Year of Payment" and contained the years from 1984 through 2003.  The second column was titled "Interest Payment on Behalf of Player."  There was a number for each of the years listed.  The amount was $48,000 for 1984; $72,000 for each year from 1985 through 2002; and $24,000 for 2003.  The annual interest payments totaled $1,368,000.  The last line of the attachment stated:

"TOTAL        $1,368,000    +    $300,000    =    $1,668,000"

35

The Agreement to Provide Loan required the Bears to provide the debtor with an IRS Form

1099 annually showing the interest "paid for Player in each year of the Loan."  Agreement to Provide

Loan at 2.

The Bears expressly agreed that in the event that the interest rate exceeded 12%, they would

pay the additional interest.  *See* Agreement to Provide Loan, Exhibit B to Complaint.  The

Agreement to Provide Loan stated:

> In the Club's signing bonus agreement with Player, Club has agreed as a part thereof
> to pay Player the sums set forth on the attachment hereto, beginning in 1984 and
> ending in 2003, setting forth the interest to be paid on behalf of Player by Club, and
> other signing bonus compensation.  The amount of the interest payments shown on
> the attachment are based upon an initial 12% annual interest rate payable on the
> Loan.  In the event the interest rate on the Loan shall at any time exceed 12%, Club
> will, on Player's behalf, pay the amount of any excess above the interest figures
> shown on the attachment, and such excess shall not be set off against other and direct
> signing bonus payments reflected on the attachment.

Agreement to Provide Loan at 2.  There was no complementary provision addressing the contingency

of the Prime Rate falling below 12%.  The Prime Rate fell below 12% during the term of the loan.

The loan was secured by the debtor with a Zero Coupon Easy Growth Treasury Receipt

Series Five bond (the "Zero Coupon Bond") with a face value at maturity of $600,000.  The maturity

date was to coincide with the due date of the $600,000 loan.[23]  The debtor provided the bank with

an "Easy Growth Treasury Receipt" in the face value of $600,000.  The idea of a zero coupon bond

is fairly basic.  Borrowers, particularly corporate or governmental borrowers issue a long-term note

with interest coupons attached.  As each interest payment  matures, the noteholder (once) literally

clipped the interest coupon off the note and submitted it for payment.  The principal debt would be

---

[23]In fact, the maturity date of the collateral note was November 2003, about six months after the due date of the
debtor's loan from the bank.  The differing maturity date was not raised as an issue in this case.

paid at maturity, unless amortized.  With a zero coupon bond, the original noteholder strips all of the

interest coupons off the note at the beginning of the loan, keeps the interest coupons and sells the

note, in effect separating the payment of interest from the payment of the principal.  The seller, that

is, the original noteholder, redeems the interest coupons as they become due and the buyer, the new

noteholder, holds onto the note until it matures years later.  He receives no payment in the interim.

The purchasing noteholder will, of course, purchase the note at a discount – the later the maturity

date and the higher the discount rate, the steeper the discount, that is, the lower the purchase price.

The purchasing noteholder should pay the original noteholder the present value of the future payment

of the face amount of the note.

### **The Complaint**

The chapter 11 trustee alleged that the bank's Prime Rate fell below 12% and the Bears paid

less than $72,000 annually in interest.  In fact, she alleged, the Bears paid about $455,000 less in

interest than was scheduled on the attachment.  The chapter 11 trustee asserted that the Bears were

obligated to pay the entire $72,000 a year notwithstanding the reduced interest rate.  Complaint.

(Adv.Proc.No. 04-1019, Docket Entry 1).  Either the Bears should have paid the difference between

the reduced interest and the $72,000 directly to the debtor or it should have paid it to the bank which

should have credited the amount in excess of the interest to the principal of the loan.  In the latter

case, the loan balance would have been much lower than $600,000 when it matured and the debtor

would have received the difference between the loan payoff and $600,000 at maturity.

The Bears disagreed.  It asserted that the signing bonus only obligated it to provide an

interest-free loan.  It were responsible for paying the interest on the $600,000 loan, whatever that

interest may have be over the course of the loan.  Answer to Complaint at ¶¶5 and 26.

37

(Adv.Proc.No. 04-1019, Docket Entry 10).  The Bears' theory, apparently, was that the present value of the deal when made in 1984 was $1,368,000.  If the interest paid actually by the Bears together with total of the $300,000 paid to the debtor and the $600,000 loan received by the debtor exceeded $1,368,000, the Bears would bear the burden of paying the additional interest.  If the interest actually paid by the Bears resulted in a total of less than $1,368,000, the Bears would enjoy the benefit.

### The Mathematics of the Signing Bonus

The matter was settled and the court heard no evidence and made no rulings on the meaning of the Signing Bonus.  However, the mathematics of the deal are plain on the face of the agreements of the parties.  The present value at a 12% discount rate of the stream of income shown on the attachment – a stream of income totaling $1,368,000 over 19 years – is $536,536.77.  The present value of a note with an interest rate of 12%, compounded quarterly, and a single $600,000 payment due in 19 years is $63,463.23.[24]  The sum of the two is $600,000, the amount the debtor borrowed from the bank.  The mathematics show that the debtor received the present value of the $1,368,000 stream of income at the beginning of the 19-year period ($536,536.77) plus enough money to purchase a zero coupon bond ($63,463.23) that would have a face value equal to the loan at the end of the 19-year period.  In short, if the 12% discount rate was the appropriate discount rate, the debtor was paid the full present value in May 1984 by a loan from the bank.  If everything worked right, he would make no further payments on the loan.  The Bears would pay the interest on the bank loan and the zero coupon bond would pay the principal of the bank loan.

---

[24]That is, if $63,463.23 were paid 12% interest quarterly for 19 years with all the interest earned reinvested and interest were earned on the interest earned, the single payment at the end of the 19 years would be $600,000.

The trustee took the deposition of Scott Worthem who was the controller for the Bears from 1993 through September 1997. He testified, in part, about the payment of the interest on the debtor's loan from Bank One, the discovery of the bank's error in charging the Bears a fixed interest rate of 12% on the loan rather than the contractual adjustable rate, and the actions taken to correct the overcharge. He testified that players compensation was reported to the National Football League and that in the case of deferred compensation, the League required all teams to use the same discount rate. He also testified that the Bears carried a liability on its books for the interest to be paid on the debtor's outstanding loan. The total interest payments were reduced to their present value. Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment ¶23; *citing* Ex. 16, Tr. of Scott Worthem at 91-94. (Adv.Proc.No. 04-1019, Docket Entry 78). Ernst & Young computed the present value of the debtor's signing bonus as $891,111.05. *Id.* Ex. 17. The present value computation used a 10% discount rate and included the three $100,000 annual payments. Excluding the three annual $100,000 payments, the present value of the 19-year stream of income was $642,425.85. It is not clear when the present value computation was made.

One of the interesting question raised by the transaction is the proper capitalization or discount rate to be applied to the transaction and the Zero Coupon Bond. If it were 12%, then the debtor received in 1984, the present value of the promised $1,668,000 signing bonus which would otherwise have been paid over 19 years. If the cap rate or the discount rate was properly more or less than 12%, then the debtor did not receive in 1984, the present value of the promised bonus. He received either more or less than the present value of the transaction. A second and closely related question is the significance of the present value computation on construing the contractual arrangement between the parties.

39

### Tax Considerations in 1984 of the Signing Bonus

The Signing Bonus Agreement required the Bears to provide the debtor with a Form 1099 reflecting the interest it paid on the bank loan for the debtor.  Is the $72,000 a year the Bears paid to the bank income to the debtor?  Generally, yes.  When an employer pays an obligation of an employee to a third party in consideration for services rendered, such as playing football, the employee receives income in the amount of the payment to the third party, here the interest payment to the bank.  This does not look like a particularly attractive transaction if the debtor would have $72,000 of income but no cash with which to pay the income tax on it.  In 1984 all personal interest was deductible for a taxpayer itemizing his deductions.  Thus, the debtor would have had $72,000 in income, but also an interest deduction in an equal amount.  The net would have been no income tax.  26 U.S.C. §163(a) (1984).[25]

The receipt of a loan is not income.  Thus, the debtor's loan of $600,000 was not income in 1984.[26]  However, he realized income annually on the increased value of the Zero Coupon Bond.  Over the 19 years of the loan, he realized income in the amount of the difference between the amount of the loan received ($600,000) and the cost of the Zero Coupon Bond (possibly $63,463.23), that is, $536,536.77.  The tax advantage to the debtor was that he obtained the use of the money when he received the loan in 1984, but paid taxes on it over the following 19 years.

---

[25]The Internal Revenue Code was amended in 1986.  After 1986, personal interest was not a deductible expense.  It had to meet additional tests, such as being qualified residence interest or be investment interest remained deductible.  Tax Reform Act of 1986.  Pub.L. 99-514, 100 Stat. 2085 (1986).  The debtor's 1995 federal tax return reflects the transaction.  It shows interest income from the Bears of $55,738 and an interest deduction in the same amount.  *See* Memorandum in Opposition to the Trustee's Motion for Summary Judgment, "1995 Federal Tax Return", Tab 27 at 4-5.  (Docket Entry 86-30).  *See also* "1997 Federal Tax Return" and IRS Letter.  *Id.* at Tabs 23 and 24.  (Docket Entries 86-26 and 86-27).

[26]The three annual payments of $100,000 were direct compensation and were income in the years in which they were received.

40

### The Litigation and Settlement

The chapter 11 trustee filed her complaint on February 4, 2004. She sued the Bears and Bank One on a number of theories. There was significant discovery. Motions for summary judgment were argued. The matter was settled shortly before trial.

One of the first responses was from Bank One which held the Zero Coupon Bond as collateral. It filed a motion for relief from the automatic stay on May 6, 2004, and an amended motion for relief from the automatic stay on May 7, 2004, seeking to permit it to liquidate the Zero Coupon Bond and pay its note. (Docket Entries 268 and 270).[27] The Bears supported the motion and the trustee opposed it. Trustee's Response to Amended Motion for Relief from Stay Filed by Bank One National Association. (Docket Entry 300). One of the reasons she alleged in opposition to the motion for relief from the automatic stay was that the issues of the amount due to the bank and the extent and validity of the bank's debtor and security interest were the subject of the adversary proceeding.[28]

The chapter 11 trustee filed a motion on May 7, 2004, seeking to liquidate the Zero Coupon Bond, place the proceeds in an escrow account in the name of the bankruptcy estate subject to the bank's lien, and disburse the proceeds in accordance with the outcome of the adversary proceeding. Motion for Authority to Liquidate Treasury Receipt. (Docket Entry 273). The bank opposed the motion. Objection of Bank One to Trustee's Motion. (Docket Entry 291). After a hearing held on May 25, 2004, the court authorized the chapter 11 trustee to liquidate the Zero Coupon Bond and

---

[27]The bank filed its first motion for relief from the automatic stay with respect to the Zero Coupon Bond on April 16, 2004. (Docket Entry 233). It was dismissed without prejudice by an order entered on May 11, 2004 after a hearing on May 5, 2004. (Docket Entries 267 and 284).

[28]The bank filed a motion for leave to file a late proof of claim on August 26, 2004, which was granted. (Docket Entries 390 and 423).

41

hold the proceeds in escrow subject to any lien of the bank and without prejudice to the bank's pending motion for relief from the automatic stay. Order. (Docket Entry 322). Trial on the bank's motion for relief from the automatic stay was set for July 7, 2004. *See* Procedural Order for Final Hearing. (Docket Entry 332). The final hearing was continued to November 4, 2004, the date of the scheduled trial in the adversary proceeding, and thereafter to December 13, 2004 and January 4, 2005. (Docket Entries 366 and 471). Both the motion for relief from the automatic stay and the adversary proceeding were to be tried together.

The Bears filed a motion to substitute a bond for the Zero Coupon Bond on August 30, 2004, which the chapter 11 trustee opposed. The Chicago Bears Football Club, Inc.'s Motion for Substitution of "Collateral" and Trustee's Response. (Docket Entries 391 and 397). Ultimately, the Bears, the bank and the chapter 11 trustee reached an agreement with respect to the Zero Coupon Bond. They agreed that the Bears would post a letter of credit in place of the Zero Coupon Bond and permit the bank to redeem the Zero Coupon Bond. The bank's motion for relief from the automatic stay was dismissed and a new scheduling order was entered in the adversary proceeding. Stipulation of Settlement and Consent Order. (Docket Entry 479).

Meanwhile, discovery was underway in the adversary proceeding. One of the chapter 11 trustee's conclusions was that the debtor was not likely to be a strong witness for the estate. In a motion to continue a trial date, the she stated, "Neither the Trustee nor [the debtor] has any personal knowledge of the events that gave rise to this adversary proceeding." Trustee's Motion to Modify Final Pretrial Order By Extending Discovery Deadline and Postponing Trial, ¶3 at 2. (Adv.Proc.No. 04-1019, Docket Entry 35). In an excerpt of the debtor's deposition attached to the bank's motion for partial summary judgment, there are indications that the debtor relied greatly on his agent,

Richard Bennett who died 1994, in negotiating the signing bonus and may not have fully understood the complex transaction. It is clear that the passage of time – more than 20 years – diminished the debtor's recollection. *See* Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment, "Statement of Undisputed Facts", ¶II(A)(2) (Adv.Proc.No. 04-1019, Docket Entry 78) and Bank One National Association's Memorandum of Law in Support of Its Motion for Partial Summary Judgment, Exhibit F, "Deposition Transcript (excerpts) of Wilber Marshall" (Docket Entry 80-6).

In June 2005, the parties filed their respective motions for summary judgment. The bank filed a motion for summary judgment on the issue of whether it had a security interest in the Zero Coupon Bond. (Adv.Proc.No. 04-1019, Docket Entries 79 and 80). The chapter 11 trustee argued that the agreements between the Bears and the debtor were not ambiguous and that parol evidence was inadmissible to modify or change the terms of the contracts. She argued that the Bears were required to pay the debtor at least $1,668,000 and that the $72,000 a year payments to the bank should have been applied to interest first, then principal when the interest rate fell below 12%. (Adv.Proc.No. 04-1019, Docket Entries 77 and 78).

The chapter 11 trustee's motion for summary judgment was denied, but the bank's motion for summary judgment was granted. Order entered on August 10, 2005. (Adv.Proc.No. 04-1019, Docket Entry 93). Trial on the complaint was set for November 17, 2005. Order entered on August 10, 2005. (Adv.Proc.No. 04-1019, Docket Entry 94). The chapter 11 trustee's motion for reconsideration of the denial of her motion for summary judgment was denied. (Adv.Proc.No. 04-1019, Docket Entries 101, 105 and 108).

43

The case was ready for trial. All exhibits were filed and trial subpoenas were issued. The chapter 11 trustee, the Bears and the bank reached a settlement shortly before trial. The chapter 11 trustee filed a motion for approval of the settlement on November 15, 2005. (Docket Entry 606). The Bears agreed to pay $350,000 to settle the matter and withdraw its claims in the bankruptcy case.[29] Trustee's Motion for Approval of Settlement of Adversary Proceeding and Claims of the Chicago Bears Football Club, Inc. (Docket Entry 606). The chapter 11 trustee agreed to abandon the letter of credit substituted for the original Zero Coupon Bond and filed a notice of abandonment on November 10, 2005. (Docket Entry 605). An order approving the abandonment of the letter of credit was entered on December 1, 2005. (Docket Entry 609).

The debtor objected to the settlement. Objection to Trustee's Motion for Approval of Settlement of Adversary Proceeding and Claims of the Chicago Bears Football Club, Inc. (Docket Entry 611). The debtor asked the court to:

> carefully examine the Trustee's settlement proposal in light of the context of the timing of this settlement in relation to the administration of the underlying bankruptcy and the claims available to the Trustee in this adversary proceeding.

Objection at ¶1. The debtor correctly noted what the settlement gave up and that the settlement would be fully taxable to the estate. He also stated:

> The Debtor will not be substantially rehabilitated by implementation of this settlement. Debtor asks this Court to examine whether this settlement will be fair and equitable in the context of Debtor's participation and interest the bankruptcy estate.

Objection at ¶5.

---

[29]The chapter 11 trustee sought damages of $460,699.20 plus pre-judgment interest. The Bears filed an administrative claim in the amount of $189,859.05 and a contingent unsecured claim in the amount of $605,000.

The debtor's objections were overruled and the settlement was approved on December 13, 2005.  Order Approving Settlement of Adversary Proceeding and Claims of the Chicago Bears Football Club, Inc. (Docket Entry 613).

The adversary proceeding was dismissed as settled on January 12, 2006.

### d.  NFL Disability Plan

### Proceedings in the Bankruptcy Court

The Bert Bell/Pete Rozelle NFL Player Retirement Plan and the NFL Player Supplemental Disability Plan provide retirement, disability and related benefits to eligible professional football players.  The Retirement Plan is tax-exempt pursuant to §401(a) of the Internal Revenue Code and was excluded from the bankruptcy estate.[30]  11 U.S.C. §541(c)(2); *Patterson v. Shumate,* 504 U.S. 753, 112 S.Ct. 2242 (1992).  The Supplemental Disability Plan is an employee welfare benefit plan. It was property of the estate.  11 U.S.C. §541(c)(1).[31]

The Retirement Board determined that the debtor was eligible to receive total and permanent disability benefits from May 1998 through April 2001 and from January 2002 forward.  However, it also determined that the debtor was not eligible to receive disability payments from May 2001 through December 2001.  The debtor was eligible to receive benefits under the Disability Plan as long as he was eligible to receive payments under the Retirement Plan.  The Retirement Board's denial of benefits from May to December 2001 terminated his benefits under both plans.  The

---

[30]The debtor did not claim his interest in the Retirement Plan as exempt but the chapter 11 trustee did not make a claim to it. *See* Trustee's Motion for an Order Requiring the Debtor to Turn Over His Monthly Supplemental Disability Payments to the Trustee, ¶4 at 3.  (Docket Entry 104).

[31]The matter is more fully discussed in the Trustee's Motion for an Order Requiring the Debtor to Turn Over His Monthly Supplemental Disability Payments to the Trustee.  (Docket Entry 104).

Retirement Plan's benefit was $4,000 a month.  The Supplemental Disability Benefit was $5,167 a month.  The total amount not paid from May to December 2001 was $72,436.28.[32]

The chapter 11 trustee's original complaint contained five counts.  The first two asserted that the Retirement Board wrongfully denied the debtor benefits.  In Count I, she asserted that the this court could review the Board's decision *de novo.*  In Count II, she asserted that the Board's decision was an abuse of its discretion.  In Count III she asserted that the Board wrongfully denied the benefits on a retroactive basis when it found the debtor eligible for benefits In January 2002.  The last two counts were based on the Plan's failure to provide proper appeals procedures and breach of fiduciary duties.  Complaint.  (Adv.Proc.No. 04-1020, Docket Entry 1).

The Benefit Plans filed motions to withdraw the reference and to dismiss the complaint. (Adv.Proc.No. 04-1020, Docket Entries 10 and 20).  The parties asked that consideration of the motion to dismiss be held in abeyance until after the District Court ruled on the motion to withdraw the reference.  The District Court denied the motion to withdraw the reference on August 23, 2004, and the adversary proceeding was prosecuted in this court.

The Benefit Plans' motion to dismiss raised the issue of whether the chapter 11 trustee was the proper plaintiff.  It argued that the bankruptcy estate had no interest in the Retirement Plan and that the Disability Plan contained an anti-alienation provision that prevented any payment to the bankruptcy estate.  The chapter 11 trustee addressed these issues with the debtor and reached an agreement with him.  They agreed that the debtor would intervene in the adversary proceeding as an

---

[32]The monthly payments are taken from the Trustee's Motion for an Order Requiring the Debtor to Turn Over His Monthly Supplemental Disability Payments to the Trustee, ¶1 at 1.  (Docket Entry 104).  The total is taken from the Trustee's Amended Complaint, *Janet M. Meiberger, Trustee, et al. v. The Bert Bell/Pete Rozelle NFL Player Retirement Plan et al.,* Adv.Proc.No. 04-1020, at ¶13. (Adv.Proc.No. 04-1020, Docket Entry 41).  The totals from both pleadings are not exactly the same.

additional plaintiff; that the debtor's and the chapter 11 trustee's attorney's fees (both after approval by this court) would be paid from any recovery; that if the recovery did not pay all attorney's fees, the debtor would be responsible for the balance of his attorney's fees and the estate would be responsible for the balance of the chapter 11 trustee's attorney's fees; and that, after payment of attorney's fees, any recovery would be shared, 56% to the bankruptcy estate and 44% to the debtor. Motion for Entry of an Order Approving Agreement Regarding Adversary Proceeding Against NFL Benefit Plans.  (Docket Entry 251).  They further agreed that either could submit a settlement proposal with the NFL Benefit Plans to this court and the settlement proposal would be binding on both if approved by this court.  Paragraph 4, Exhibit 1 to Motion.  (Docket Entry 251).  The agreement was approved by an order entered on the docket on May 28, 2004.  (Docket Entry 308).

The debtor filed his motion to intervene which was granted.  (Adv.Proc.No. 04-1020, Docket Entries 34 and 42).  The chapter 11 trustee filed her motion to amend the complaint.  (Adv.Proc.No. 04-1020, Docket Entry 32).  She sought to dismiss Count IV and V and to add the debtor as a co-plaintiff.  The Benefit Plans did not object to the dismissal of the two counts or adding the debtor as a plaintiff, but continued to argue that the amendment would not cure the chapter 11 trustee's standing problem because she still sought payment to her in violation of the anti-alienation and anti-assignment provisions of the Benefit Plans.  (Adv.Proc.No. 04-1020, Docket Entry 37).  The court allowed the amendment and the chapter 11 trustee filed an amended complaint on June 2, 2004.  (Adv.Proc.No. 04-1020, Docket Entry 41).  The Benefit Plans again filed a motion to dismiss on the basis of the chapter 11 trustee's alleged lack of standing.  (Adv.Proc.No. 04-1020, Docket Entries 44 and 47).

Motions for summary judgment were filed by both Benefit Plans and the chapter 11 trustee

both of which were fully briefed. (Adv.Proc.No. 04-1020, Docket Entries 65 and 80). Supplemental

briefs were required on various issues. The court granted the chapter 11 trustee's motion for

summary judgment and denied the Benefit Plans' motion. (Adv.Proc.No. 04-1020, Docket No. 106).

The chapter 11 trustee requested an award of attorney's fees and costs of $77,413.70 under

§502 of ERISA. (Adv.Proc.No. 04-1020, Docket Entry 93). This included her attorney's fees, the

debtor's bankruptcy attorney's fees and the debtor's ERISA attorney's fees. The last was for the law

firm of Beins, Axelrod, Kraft, Gleason & Gibson, P.A. which represented the debtor in the benefit

matters both before and after the chapter 11 trustee was appointed.[33] The amounts sought were

$50,360.50, $1,030.00 and $24,332.50 for the three attorneys, respectively.

---

[33]Beins Axelrod first met with the debtor on July 2, 2002. This bankruptcy case was commenced on February 5, 2002. The chapter 11 trustee was appointed in March 2003. The debtor never sought to employ Beins Axelrod in this case. The first time entry on the law firm's time records referring to the bankruptcy was on April 22, 2003. The time entry was "Call from bankruptcy trustee."

The chapter 11 trustee did not seek to employ Beins Axelrod either. In her motion for attorney's fees in the Benefit Plans adversary proceeding, she properly noted that the Retirement Plan was not property of the estate. Plaintiff's Application for Attorney's Fees Pursuant to ERISA §502 at 16-17. (Adv.Proc.No. 04-1020, Docket Entry 93). In fact, it was on this basis that the Benefit Plans sought to dismiss the complaint as to the chapter 11 trustee. Beins Axelrod was not acting on behalf of the bankruptcy estate to recover the benefits due under the Retirement Plan and was not required to file an application for employment in the bankruptcy case. The time records show that the law firm continued to represent the debtor after the appointment of the chapter 11 trustee and communicated and cooperated with the chapter 11 trustee. It is possible that the chapter 11 trustee should have sought to employ the firm to assist her with respect to the Supplemental Disability Plan claims that were property of the estate, although it is not clear from the time records that the firm's activities extended beyond representing the debtor with respect to his Retirement Plan claims which were, for all intents and purposes, the same as the trustee's Supplemental Disability Plan claims.

Whether the chapter 11 trustee should have sought to employ Beins Axelrod (and whether they could have been employed at the same time that they were representing the debtor) is a moot issue. The firm never sought payment of its fees from the bankruptcy estate. Their fees were paid by the Benefit Plans. The chapter 11 trustee did disburse some funds to Beins Axelrod, but these were surplus funds that would have been paid to the debtor. The chapter 11 trustee was authorized to disburse them to him or on his behalf. *See Patterson v. Shumate*, 504 U.S. 753 (retirement plan not property of the estate).

The question is an interesting one that merits the close attention of a debtor in possession or a chapter 11 trustee. In this case, no request seeking a ruling was made. The matter was not briefed. Resolution is not necessary to the disposition of this matter or this case.

48

The Benefit Plans objected to the allowance of some of the requested attorney's fees. (Adv.Proc.No. 04-1020, Docket Entry 94). The Benefit Plans opened its objection with this provocative statement: "Plaintiffs seek an award of $77,413.70 in fees and expenses incurred to recover a little more than $18,000 for Wilber Marshall." Defendants' Memorandum in Partial Opposition to Plaintiffs' Application for Attorneys' Fees Pursuant to ERISA at 2. (Adv.Proc.No. 04-1020, Docket Entry 94).[34] However, the Partial Opposition did not object to the chapter 11 trustee's attorney's fees because of their magnitude. They accepted the large bill but objected to the fees incurred by the chapter 11 trustee in unsuccessfully pursuing a discovery motion. Partial Opposition at 5-6. They objected to all of Beins Axelrod's fees, asserting that they were not incurred as a part of the litigation and therefore not included within §502 of ERISA. Partial Opposition at 2-5. *See also* Trustee's Memorandum on Fees to be Awarded for Services Rendered by Beins , Axelrod, Kraft, Gleason & Gibson, P.A. and on Amount of Prejudgment Interest to be Awarded (Adv.Proc.No. 04-1020, Docket Entry 101); Defendants' Memorandum in Opposition to Trustee's Memorandum on Fees to be Awarded for Services Rendered by Beins, Axelrod, Kraft, Gleason & Gibson, P.A. and on Amount of Prejudgment Interest to be Awarded (Adv.Proc.No. 04-1020, Docket Entry 104); and Trustee's Reply to Defendants' Memorandum in Opposition to Trustee's Memorandum on Fees to be Awarded for Services Rendered by Beins, Axelrod, Kraft, Gleason & Gibson, P.A. and on Amount of Prejudgment Interest to be Awarded (Adv.Proc.No. 04-1020, Docket Entry 105). The objection was substantially overruled.

---

[34]This was not the full story. In fact, the chapter 11 trustee obtained a judgement for the entire amount she sued. The principal amount of the judgment was $72,436.28 pre-judgment interest of $17,153.96. She also recovered attorney's fees. If the Benefit Plans were attempting to calculate the debtor's share of the recovery as opposed to the estate's share in accordance with the agreement approved by the court on May 11, 2004 (Docket Entry 283), the debtor's share was 44% and the estate's share was 56%, or $31,871.96 and $40,564.32. In the end, when all appeals were resolved, the debtor got it all. *See* Order entered on December 1, 2005. (Adv.Proc.No. 04-1020, Docket Entry 106).

49

The court entered its Judgment Order on December 1, 2005.  Order entered on the docket on

December 2, 2005.  (Adv.Proc.No. 04-1020, Docket Entry 106).  It ruled for the Benefit Plans on

Counts I and II and for the chapter 11 trustee on Count III.  Judgment on Count III was entered

against the Benefit Plans in the amount of $72,436.28 plus attorney's fees to the chapter 11 trustee's

law firm of $50,693.15; to the debtor's bankruptcy attorney of $1,030; and to Beins Axelrod, the

debtor's ERISA attorney, of $10,962.50 plus pre-judgment interest of $17,153.96, for a total of

$152,275.89.

### Proceedings on Appeal

The Benefit Plans appealed on December 8, 2005.  Notice of Appeal.  (Adv.Proc.No. 04-

1020, Docket Entry 107).  This court does not have the District Court or the Court of Appeals

dockets before it.  The District Court's 26-page Memorandum Order sustained this court's findings

on Counts I and II and reversed this court's judgment on Count III.  Memorandum Order dated

September 11, 2006.  (Adv.Proc.No. 04-1020, Docket Entry 121).  The chapter 11 trustee and the

debtor appealed to the Court of Appeals which reversed the District Court as to Count III.  Mandate

filed February 5, 2008.  (Adv.Proc.No. 04-1020, Docket Entry 123).  *See Meiburger v. The Bert

Bell/Pete Rozelle NFL Player Retirement Plan (In re Marshall),* 261 Fed.Appx. 522 (4th Cir.

2008)(not selected for publication).

### The Final Judgment

The chapter 11 trustee mailed a notice of a hearing on a proposed supplemental and final

judgment order in the adversary proceeding on April 10, 2008.  (Docket Entry 127).  The proposed

order was approved at a hearing and entered on the docket on April 23, 2008.  (Docket Entry 129).

The Supplemental and Final Judgment Order entered judgment for the same amounts as in the

December 2, 2005 order plus additional attorney's fees incurred on the appeals to the District Court and the Court of Appeals and post-judgment interest.  The additional attorney's fees were $87,307.83 to the chapter 11 trustee's law firm and $61,231.74 to Tighe Patton Armstrong Teasdale, PLLC, the debtor's attorney on the appeal.  The order directed the Benefit Plans to disburse the judgment to the parties entitled to the funds: $12,139.09 to Beins Axelrod; $61,334.22 to Tighe Patton; $144,728.50 to the chapter 11 estate; and $99,205.86 to the debtor.  The payment for the chapter 11 trustee's attorney's fees was directed to the bankruptcy estate because all of the chapter 11 trustee's attorney's fees must be approved by the court prior to payment and because a portion had previously been approved and paid.[35]  This payment funded the balance of the chapter 11 trustee's attorney's fees and reimbursed the estate for attorney's fees already disbursed.  The payment to Tighe Patton was for the firm's entire fee in the adversary proceeding.  The chapter 11 trustee had previously disbursed $49,000 to Tighe Patton on the debtor's behalf.  The $99,205.86 was all of the payments that the debtor had been denied plus interest, not just the 44% he had agreed to accept previously.  The Supplemental and Final Judgment Order expressly provided that the May 28, 2004 order entered in the main case (Docket Entry 308) providing for the division of the recovery between the estate and the debtor was modified and superseded.  The debtor received the entire payments he had been denied plus all the pre- and post-judgment interest.  Supplemental and Final Judgment Order at 4. (Adv.Proc.No. 04-1020, Docket Entry 129).

---

[35]The chapter 11 trustee's attorney filed an application for compensation on May 23, 2008, requesting a final $11,602.50 for services rendered in connection with the Benefit Plans litigation.  (Docket Entry 779).

### 3.  Distribution of Disability Payments to Debtor During the Case

At the commencement of this case, the debtor reported monthly income of $13,500 which consisted of a disability payment of $7,000; "Bank Disability Claims, etc." of $5,000.00; and income from real property of $1,500.  Schedule I.  (Docket Entry 12).  The chapter 11 trustee reviewed the debtor's income and asserted the debtor's regular monthly income was $10,840 which consisted of $4,000 from the Retirement Plan; $5,167 from the Supplemental Disability Plan; and $1,673 from Social Security.  Motion for an Order Requiring the Debtor to Turnover His Monthly Supplemental Disability Payments to the Trustee at 1-2.  (Docket Entry 104).[36]  The chapter 11 trustee acknowledged that the Social Security disability payment and the Retirement Plan payment income were exempt or not property of the bankruptcy estate.  However, she asserted that the Supplemental Disability Payment was not exempt or excluded from the estate and should be paid to her for administration.  *Id.* at *6.*  She filed a motion for turnover of the disability payment to which the debtor did not respond.  The motion was granted on July 22, 2003.  Order Granting Motion for an Order Requiring the Debtor to Turn Over His Monthly Supplemental Disability Payments to the Trustee.  (Docket Entry 113).  The Supplemental Disability Plan would not disburse disability payments directly to the chapter 11 trustee because the plan contained an anti-assignment provision. The chapter 11 trustee's order provided that she could withdraw the disability payment from the debtor's bank account each month after it was deposited by the Supplemental Disability Plan.  The arrangement was to begin in August 2003.  *See* Monthly Operating Report (July 2003) at 1-2. (Docket Entry 122).

---

[36]The $10,840.00 was as of June 2004.  Prior to that, there were offsets to recover prior overpayments.

The arrangement did not work. The debtor withdrew most of the disability deposit on the day it was deposited by the NFL and before the chapter 11 trustee could make her withdrawal. She asserted that as of January 26, 2004, the debtor had withdrawn $6,680.76 more than he should have withdrawn. The chapter 11 trustee was authorized to withdraw $30,904.05, but there were only enough funds to withdraw $24,223.29.[37]   Trustee's Motion at ¶¶4-5. (Docket Entry 143). The chapter 11 trustee requested an order prohibiting the debtor from interfering with her withdrawals. The debtor did not file a response to the motion and it was granted at a hearing held on February 10, 2004. (Docket Entry 160). The order reversed the procedure. It provided that the chapter 11 trustee could transfer all funds in the account to the trustee bank account and then transfer the debtor's portion to an account maintained by the debtor. It also provided that the chapter 11 trustee could cancel the debtor's debit or ATM card for the bank account; prohibited the debtor from applying for a new debit or ATM card; and prohibited the debtor from making any withdrawal from the account. Order Prohibiting the Debtor from Withdrawing Funds. (Docket Entry 167).

This arrangement appears to have worked as long as the debtor resided in his Great Falls property. In April 2005, the chapter 11 trustee sold the Great Falls property and the debtor was required to move. Order Approving the Sale of Real Property in Great Falls. (Docket Entry 553). In addition, the debtor's Mercedes Benz was repossessed. Consent Order. (Docket Entry 504). The debtor filed a motion requesting that the amount that the chapter 11 trustee was disbursing to him be increased, citing the change in circumstances. He stated that the amount he currently received "significantly fails to cover Debtor's necessary living expenses." Motion for Increase in Debtor's

---

[37]The $3,000 a month adequate protection payment for the Great Falls property was to be split with both the debtor and the chapter 11 trustee paying $1,500. The chapter 11 trustee was authorized to withdraw the debtor's half from the bank account in addition to the disability fund payment. Trustee's Motion at ¶3. (Docket Entry 143).

Monthly Payments from the Chapter 11 Trustee at ¶3. (Docket Entry 562). There was no discussion of the needs of the bankruptcy estate or the effect, if any, on the chapter 11 trustee's efforts to administer the estate.

The chapter 11 trustee opposed the motion. Trustee's Objection. (Docket Entry 566). She acknowledged the change in circumstances, particularly the repossession of the Mercedes Benz and the sale of the Great Falls property. She also noted that she had paid the debtor's security deposit and the first month's rent on his new residence, each in the amount of $3,000 and had also paid his moving expenses in the amount of $9,895.00, all pursuant to the Order Resolving Trustee's Motion for Authority to Sell or Otherwise Dispose of Personal Property (Docket Entry 542). She argued that the debtor was receiving $5,700 a month which was more than he stated in his motion but, nonetheless rented a four-bedroom house for $3,000 a month. She believed that he was not paying his estimated income taxes and knew he would need a car. She concluded that "Debtor's asserted inability to afford a car is a result of his own financial mismanagement, and the estate should not be required to provide him with any additional funds under these circumstances." Trustee's Objection at ¶6. (Docket Entry 566). The motion was denied. Order Denying Motion for Increase in Debtor's Monthly Payments. (Docket Entry 571).

The settlement of the adversary proceeding against the Bears and Bank One over the signing bonus agreement was approved on December 14, 2005. Order Approving Settlement of Adversary Proceeding and Claims of the Chicago Bears Football Club, Inc. (Docket Entry 613). On February 10, 2006, The chapter 11 trustee filed a motion seeking to pay a larger portion of the Supplemental Disability Plan payments to the debtor for an interim period of six months. Trustee's Motion for Authority to Pay Supplemental Disability Benefits. (Docket Entry 631). She set out the

54

history of the payment of funds of the estate to the debtor.  As of February 2006, the debtor received

$10,968 a month.  This came from the Retirement Plan, the Supplemental Disability Plan and Social

Security in the amounts of $4,000, $5,167 and $1,801.  The debtor received the Retirement Plan and

Social Security payments.  The estate received the Supplemental Disability payment.  The debtor had

not initially complied with the order requiring turnover of the Supplemental Disability payment and

owed the estate $4,000 as a result.  In addition, the chapter 11 trustee and the debtor had reached an

informal arrangement.  The chapter 11 trustee advanced funds to the debtor from time to time when

he had "an unusual need for additional funds."  *Id.* at ¶7.  She recouped the advances from future

payments.  As of February 2006, she had advanced $12,494.94 which had not yet been recouped for

a total indebtedness by the debtor to the estate of $16,494.94.  *Id.* at ¶7.  She succinctly summarized

the status of the administration of the estate:

> At the present time, the administration of the bankruptcy estate is winding down.
> The pending adversary proceedings have been resolved, except for an appeal which
> is pending in the United States District Court.  The Trustee is examining and
> objecting to claims so that the case can be closed as soon as the appeal is resolved,
> if not before.  All income taxes and professional fees have been paid through
> December 31, 2005.  The estate consists of cash in the amount of approximately
> $300,000, a judgment against the Retirement Plan and the Disability Plan for unpaid
> disability benefits of approximately $150,000 (which is the subject of the appeal),
> and unencumbered real property in Titusville, Florida with an estimated value in
> excess of $200,000.  The Trustee believes that, regardless of the outcome of the
> appeal and regardless of the outcome of the claims objections, all claims and
> administrative expenses will be paid in full and some assets of the bankruptcy estate
> will be returned to Mr. Marshall.

*Id.* at ¶9.

She also stated that the debtor had outstanding bills due to his attorney and his accountant.

He, not the estate, was responsible for paying these professionals.  He also had not paid his estimated

federal and state income taxes.  She proposed paying the $5,167 monthly Supplement Disability

payment to the professionals and taxing authorities over the next six months.  *Id.* at ¶11.

The debtor filed a response in which he stated that he had no objection to the motion in

principle, but thought that the six-month period should be extended and that he should receive a

$20,000 lump sum distribution so that he could purchase a car.[38]  Debtor's Response to Trustee's

Motion for Authority to Pay Supplemental Disability Benefits to Mr. Marshall or for His Benefit on

an Interim Basis.  (Docket Entry 634).  The chapter 11 trustee's motion was granted and included

a provision to pay the debtor the requested $20,000.  The order also provided for a reduction in the

estimated tax payments if the Retirement Plan or the Supplemental Disability Plan started to

withhold taxes from the monthly payments.  Order Resolving Trustee's Motion.  (Docket Entry 642).

The chapter 11 trustee filed a second motion for authority to pay Supplemental Disability

benefits to or on behalf of the debtor.  She stated that debtor's counsel had authorized that $3,808.00

of the disbursement that should have been made to counsel be made to the debtor.  She requested

authority to pay the next three monthly disability payments to the debtor, less the $3,808 which

would be paid to the debtor's attorney.  Second Motion for Authority.  (Docket Entry 662).   The

debtor did not respond to the motion and it was granted.  Order Granting Trustee's Second Motion

for Authority.  (Docket Entry 665).

The chapter 11 trustee filed her Third Motion for Authority on October 18, 2006.  (Docket

Entry 694).  The motion covered the Supplement Disability payments for the months of November

2006 to January 2007.  The chapter 11 trustee proposed paying $8,349.94 directly to the debtor;

---

[38]The record does not reflect when the Mercedes Benz was repossessed or what the debtor's arrangements for
transportation during the interim had been.

56

$6,185.34 to debtor's counsel; and $965.66 to debtor's accountant.  An order was entered on November 6, 2006, granting the motion. (Docket Entry 706).

The chapter 11 trustee filed her Fourth Motion for Authority on January 12, 2007.  (Docket Entry 730).  The motion covered the Supplement Disability payments for the months of February 2007 to April 2007.  She proposed paying $6,501.00 directly to the debtor and  $9,000.00 to Mr. Sullivan's firm for work on the appeal in the Court of Appeals.  An order was entered on February 1, 2007, granting the motion. (Docket Entry 734).

The chapter 11 trustee filed her Fifth Motion for Authority on April 20, 2007.  (Docket Entry 740).  The motion covered the Supplement Disability payments for the months of May 2007 to September 2007.  She proposed paying $8,835.00 directly to the debtor and $17,000.00[39] to Mr. Sullivan's firm for work on the appeal in the Court of Appeals.[40]  An order was entered on February 1, 2007, granting the motion. (Docket Entry 743).

The chapter 11 trustee filed her sixth motion, styled "Agreed Motion for Authority" on September 21, 2007.  (Docket Entry 759).  The motion covered the Supplement Disability payments for the months October 2007 to January 2008.  They agreed that she wold pay the debtor $3,151.96; Mr. Sullivan's law firm $13,000; and the debtor's accountant $1,182.04.  An order was entered on September 25, 2007 granting the motion. (Docket Entry 760).

The chapter 11 trustee filed her seventh motion, also styled "Agreed Motion for Authority" on January 23, 2008.  (Docket Entry 771).  The motion covered the Supplement Disability payments

---

[39]The motion said $23,000 in the total column but this was a mistake.  It should have been $17,000 which is the amount in the order.

[40]Mr. Sullivan's firm agreed with the debtor to defer $2,000 of its April 2007 payment so that it could be paid directly to the debtor.  This was added to the disbursement provided in this period.  Trustee's Fifth Motion for Authority at ¶6.  (Docket Entry 740).

for the months February 2008 to April 2008.  They agreed that she wold pay the debtor $5,501.00;

Mr. Sullivan's law firm $10,000.  An order was entered on January 24, 2008, granting the motion.

(Docket Entry 772).

On June 2, 2008, the trustee filed an Agreed Motion to Terminate Bank Account

Arrangement.  (Docket Entry 784).  In the motion, the chapter 11 trustee stated that the Disability

Pension appeal had been successfully concluded and that she did not believe that the estate needed

the Supplemental Disability payments any further.  She sought authority to make one final

distribution on behalf of the debtor to the debtor's accountant in the amount of $3,292.00.  The order

was entered on June 4, 2008.  (Docket Entry 785).  The chapter 11 trustee's control over the debtor's

Supplemental Disability benefits ended.

On October 7, 2008 the trustee requested authority to disburse $15,000 to the debtor, at the

debtor's request, for funeral expenses in connection with the death of the debtor's father.  Trustee's

Motion for Authority. (Docket Entry 798).  The chapter 11 trustee acknowledged that she had

sufficient funds on hand to complete the administration of the estate and that the surplus, which was

greater than the requested $15,000, would be paid to the debtor.  The motion was granted.  (Docket

Entry 799).

On November 19, 2008, the trustee requested authority to disburse $25,000 to the debtor

which motion was granted.  (Docket Entries 810 and 811).   The chapter 11 trustee stated that

administration of the estate was almost complete.  She was waiting on the completion of the estate's

2008 tax return and its acceptance by the Internal Revenue Service.  She expected to dismiss the case

rather than have a chapter 11 plan confirmed.  Her plan throughout the administration of the case had

been to resolve the law suits and pay the creditors without proposing a plan.  The outcome of the

lawsuits would have a significant effect on the necessity for liquidation of the remaining real property.  Once the suits were resolved and the claims paid, there would be no need for a chapter 11 plan.[41]

On July 14, 2009, the trustee requested authority to disburse $10,000 to the debtor, at the request of the debtor, which motion was granted.  Trustee's Motion for Authority.  (Docket Entries 851 and 855).  Debtor's counsel supported the motion, explaining the debtor incurred unexpected expenses in connection with his daughter's illness.  (Docket Entry 854).

During this period, the chapter 11 trustee sought to pay the pre-petition creditors.  On September 6, 2006, she requested authority to pay them and disburse $10,000 to the debtor.  Trustee's Motion for Authority to Pay Pre-Petition Creditors.  (Docket Entry 671).  The debtor and the United States Trustee objected, stating that they did not have sufficient information about the claims sought to be paid.  (Docket Entries 674 and 676).  The debtor then objected to two claims.  (Docket Entries 685 and 686).  Both had been included in the trustee's scheme of distribution.[42]  The chapter 11 trustee's motion was granted except for the two claims to which the debtor had filed objections at a hearing held on October 11, 2006.  (Docket Entry 690) and Order Granting Trustee's Motion.  (Docket Entry 698 corrected at Docket Entry 699).  On November 9, 2006, the chapter 11 trustee requested authority to pay an additional $10,000 to the debtor.  The chapter 11 trustee stated that she understood that the $10,000 authorized to be paid to the debtor on October 11, 2006 was to be used by the debtor to pay the retainer for William Daniel Sullivan to represent him in the appeal

---

[41]Neither the debtor nor the United States Trustee objected when these statements were made in court or in the pleadings.  The debtor never proposed a chapter 11 plan after the chapter 11 trustee was appointed.

[42]One was the claim of Joni Klyana in the amount of $800.00 which was allowed in the amount of $260.00.  The other was the claim of Dominion Virginia Power in the amount of $2,017.00 which was disallowed.  (Docket Entry 722).  *Also see* Docket Entries 687, 688, 691, 692, 693, 712 and 713)

in the Court of Appeals of the Disability Plans.  However, the debtor used the funds for other purposes.  She requested authority to make the retainer payment directly to Mr. Sullivan.  Trustee's Motion for Authority to Advance $10,000 to Mr. Marshall.  (Docket Entry 708).  The motion was granted without objection by the debtor.  (Docket Entry 714).

For the period from February 2006 when the Disability Plan litigation ended to June 2008, the chapter 11 trustee disbursed $161,342 to the debtor or on his behalf from the Disability Plan benefits.  Of this amount, $47,000 was paid to Mr. Sullivan's firm which represented the debtor personally in the Court of Appeals; $42,567 was paid to the debtor's personal bankruptcy attorney and his personal accountant.  The balance, $71,775, was paid directly to the debtor.  In addition, the chapter 11 trustee disbursed $60,000 to the debtor from the surplus funds she was holding, paid the debtor's moving expenses, first month's rent and security deposit of $15,895, and informally advanced him $16,495.

### D. The Trustee's Chapter 11 Plan

The debtor's proposed chapter 11 plan was denied confirmation at a hearing on February 25, 2003.  Upon denial of confirmation, the chapter 11 trustee was appointed.  Throughout the chapter 11 trustee's administration, she announced in her pleadings and in court that she did not intend to file a chapter 11 plan.  She saw the major issues as the resolution of the claims that resulted in the adversary proceedings.  In the course of this, she recognized that she needed to sell some of the real estate.  She felt that neither the debtor nor the estate could restructure the mortgages such that the debtor would be able to pay them in the future.  The debtor's effort to refinance was rejected by the court.  She believed that when all the matters had been resolved, it would be a straightforward

matter to pay the few creditors of the estate.  Since all creditors were to be paid in full, the addition

of a discharge added no benefit for the debtor.  He had previously received a discharge in his case

filed on August 29, 2000.  In these circumstances she felt that the additional time and effort to

propose and obtain confirmation of a chapter 11 plan was not warranted.  Instead, she intended to

ask that the case be dismissed upon the completion of her administration.  The debtor never objected

and, after the appointment of the chapter 11 trustee,  never filed a chapter 11 plan.

On April 13, 2009, the court directed that the chapter 11 trustee file a plan and disclosure

statement by April 20, 2009,which was accomplished. Order entered on April l3, 2009.  (Docket

Entry 828).  The plan was filed (Docket Entry 830) and the disclosure statement was approved.

(Docket Entry 840).  The chapter 11 trustee's initial plan did not include a discharge for the debtor.

The debtor requested that he be granted a discharge.[43]  The chapter 11 trustee amended the plan and

the amended plan was confirmed on August 21, 2009.  (Docket Entry 861).

## E.  Applications for Compensation

Ms. Meiburger filed thirteen fee applications as counsel to the trustee.  One, a supplemental

to the Ninth Application, added time records omitted from the Ninth Application.  The applications

are as follows:

| Application | Period Ending | Case Admin. | Chase AP AP 03-1012 | Bears AP AP 04-1019 | Disability AP AP 04-1020 | Ch. 7 Tr. AP AP 04-1237 | Total Fees |
|---|---|---|---|---|---|---|---|
| First | Feb 2004 | $24,616 | $22,354 | $2,420 | $4,280 | $0 | $53,670 |
| Second | Apr 2004 | $14,194 | $2,206 | $2,442 | $6,960 | $0 | $25,802 |
| Third | July 2004 | $10,250 | $9,195 | $19,043 | $3,095 | $1,385 | $42,968 |
| Fourth | Sept 2004 | $7,240 | $20,345 | $13,215 | $2,300 | $575 | $43,675 |

---

[43]A chapter 11 discharge discharged not only pre-petition debts, but all debts incurred up to the confirmation date.  11 U.S.C. §1141(d)(1).  Mr. Sullivan, the debtor's counsel, represented that there were no unpaid post-petition, pre-confirmation debts.

| Fifth | Jan 2005 | $6,115 | $5,135 | $45,810 | $5,950 | $150 | $63,160 |
| Sixth | July 2005 | $14,372 | $0 | $58,348 | $40,492 | $0 | $113,212 |
| Seventh | Dec 2005 | $6,388 | $0 | $51,558 | $17,320 | $0 | $75,266 |
| Eighth | May 2006 | $14,948 | $0 | $148 | $15,316 | $0 | $30,412 |
| Ninth | Apr 2007 | $0 | $0 | $0 | $16,168 | $0 | $16,168 |
| Supplement | Dec 2006 | $0 | $0 | $0 | $14,986 | $0 | $14,986 |
| Tenth | Apr 2008 | $19,910 | $0 | $0 | $11,603 | $0 | $31,514 |
| Eleventh | Oct 2008 | $9,392 | $0 | $0 | $0 | $0 | $9,392 |
| Final | Aug 2009 | $8,568 | $0 | $0 | $0 | $0 | $8,568 |
| | | | | | | | |
| Total | | $135,994 | $59,235 | $192,984 | $138,468 | $2,110 | $528,792 |

(Docket Entries 186, 289, 386, 435, 509, 574, 616, 655, 746, 752, 779, 807 and 864) (Cents are not displayed which may result in differing totals.)

The first application covered work performed from May 2003, a period of almost one year. Except for the fee applications filed in 2004, most were filed semi-annually. The fees for the Disability Adversary Proceeding can be subdivided by the court in which the case was pending at the time. The total fees for the Disability Adversary Proceeding was $138,468. The fees in the Bankruptcy Court were $77,152; in the District Court, $21,009; and in the Court of Appeals, $40,308.

**The Pleadings and the Debtor's Objections**

**I.  The Pleadings**

The Meiburger Law Firm, P.C., the principal of which is the chapter 11 trustee in this case, filed its application for final compensation on August 28, 2009. Application of the Meiburger Law Firm, P.C., for Compensation and Reimbursement of Expenses for General Legal Services

(November 1, 2008 – August 21, 2009).  (Docket Entry 864).  The debtor, by counsel,[44] objected to

it.  Debtor's Objection to Final Compensation of Janet M. Meiburger, as Trustee and as Counsel for

Herself as Trustee, and Request for Order Requiring Return of any Previously Granted Interim

Compensation Disallowed (Docket Entry 870) and Memorandum in Support of Debtor's Objection

to Compensation of Janet M. Meiburger as Trustee and Counsel.  (Docket Entry 875).  The chapter

11 trustee filed a response to the objection.  (Docket Entry 876).  The application was approved on

October 5, 2009.  (Docket Entry 883).  Order entered on October 7, 2009.  (Docket Entry 884).  On

October 19, 2009, the debtor, by Mr. Sullivan, filed Motion of Debtor (1) to Alter or Amend Final

Order, (2) for Reconsideration of Allowance of Final Application of the Meiburger Law Firm in the

Amount of $8,616.52, and (3) Determination of Claim of the Meiburger Law Firm in the Amount

of $11,876.74 for Fees and Expenses in Representing Herself in Defense of Her Fees and Expenses

Previously Incurred and his memorandum in support of it.  (Docket Entry 886).  The chapter 11

trustee filed her response to the motion to alter or amend.  Response to Motion of Debtor.  (Docket

Entry 888).  The matter was argued before the court.

---

[44]The objection was filed by Robert O. Tyler of Tyler Bartl Ramsdell & Counts whose representation was
limited to this objection.  Attorney's Section 329 Statement.  (Docket Entry 874).  The debtor has been represented by
other attorneys.  Mark F. Werblood of Tesler and Werblood, filed the petition and represented him throughout the
proceeding.  Steven H. Greenfeld of Cohen Baldinger & Greenfeld, LLC represented him in the main case for a period
of time after the appointment of the chapter 11 trustee.  Application to Employ Gins & Greenfeld.  (Docket Entry 440).
The representation appears to have centered on the chapter 11 trustee's efforts to sell the debtor's Great Falls property.
Mr. Greenfeld filed the debtor's objection to the chapter 11 trustee's attorney's Fifth Interim Application for
Compensation.  (Docket Entry 517).  William Daniel Sullivan of Butzel Long Tighe Patton PLLC was retained primarily
to argue the Disability Plan appeal in the Court of Appeals, but also others matters in the main case as appropriate.
Disclosure of Compensation of Attorney for Debtor.  (Docket Entry 710).

## II.  The Debtor's Objections

The debtor objected to the final application for compensation of the chapter 11 trustee's attorney, sought review of all interim awards and disgorgement of any amounts previously paid in excess of those now allowed.  The debtor summarized his objections as follows:

The essential grounds of this objection are:

– that the amounts of compensation sought are grossly excessive in light of any benefits realized by the Debtor, the estate, or creditors;
– that Ms. Meiburger never, during the entire course of her six-and-a-half-year tenure as trustee and as counsel to herself, proposed any plan, formal or informal,  for dealing with the assets of the estate until instructed by the Court on April 13, 2009 (Docket No. 829) to do so; and
– that Ms. Meiburger's actions, both as Trustee and as counsel were inappropriate, wasteful, and not in the best interests of either the estate or the Debtor.

Debtor's Objection to Final Compensation at 2.  (Docket Entry 870).

The debtor first argues that "The amounts sought are grossly excessive in light of any benefits realized by the debtor, the estate, or creditors."  Memorandum in Support of Debtor's Objection to Compensation of Janet M. Meiburger as Trustee and Counsel at 4.  (Docket Entry 875).  Debtor's Objection at 4.  He argues that if the final fee application were approved, Ms. Meiburger would be paid $677,567.44 which consists of trustee's fees of $129,403.70; attorney's fees of $518,656.59; and expenses of $29,507.15.  By contrast, the total disbursement to unsecured creditors was $122,856.29, an amount less than the net proceeds from the sales of the Scottsdale and Melbourne properties.  He does not consider the disbursements to him, particularly his portion of the disability payment.

64

The debtor spends most of his Memorandum in Support of his Objection[45] arguing that "[t]he trustee never had any plan for administering the estate; rather, she dealt with the estate on an *ad hoc* basis, 'administering' the estate reactively rather than with any estate-oriented goal in mind." Debtor's Memorandum at 5.  After reviewing the assets of the estate, he argues that the trustee never had a plan to administer the estate.  Section 1121(a)(5), he argues, requires a chapter 11 trustee to file a chapter 11 plan, a report of why the trustee will not file a plan, or recommend conversion to chapter 7, 12 or 13, or dismissal of the case "as soon as practicable." He states:

> Of the six "interim" reports (and more than six dozen operating reports) filed by the Trustee, not one of them contains a description of her intentions in the case.  Rather, each is merely a recitation of what she had done so far.
>
> Indeed, from the very beginning of her trusteeship, Ms. Meiburger had no plan, formal or informal, for dealing with this estate.

Memorandum in Support at 7.

> While acknowledging that the trustee's initial actions were appropriate, he wrote:
>
> But other actions taken with respect to the assets of the estate in those first ten months were taken without any plan or even minimal justification for those actions in the overall context of the administration of the estate. Those actions included seeking to liquidate the greater part of the assets of the estate. Ms. Meiburger, all without any plan for the estate,
>
> •   Continued to litigate the Chase claim;
> •   Put the Arizona property up for sale;
> •   Accepted a contract for the sale of the Melbourne property based on an unsolicited offer, without competitive bids or having listed the property (November 25, 2003);
> •   Moved to put the Great Falls residence up for sale (December 1);
> •   Commenced litigation against the Chicago Bears Football Club and Bank One for underpayment of Mr. Marshall's signing bonus (February 4); and

---

[45]*See* Memorandum in Support at 5 - 18.

65

- Commenced litigation against the NFL Pension Benefit Plans for denial of Mr. Marshall's disability benefits (also on February 4).

Debtor's Memorandum in Support at 9.  He then discusses the trustee's various actions: the Chase adversary proceeding, the sale of the Scottsdale property; the sale of the Melbourne property; the sale of the Great Falls property; the Bears adversary proceedings; and the Disability Plan adversary proceeding.  In each instance he is critical of the trustee's actions and suspicious of the trustee's motives.  *Id.* at 9 to 18.

The debtor's last argument was that "[t]he trustee's conduct of the case, and that of her law firm, were inappropriate, wasteful, and not in the best interests of the estate."  *Id.* at 18.  He first refers to his prior discussion of the trustee's administration of the estate without a plan.  He wrote:

> The Debtor has already noted examples of the inappropriate and wasteful conduct of the Trustee – her failure to have a plan for what she intended to do and her failure to analyze and deal appropriately with the Arizona residence, the Great Falls residence, the Melbourne property, and the various litigations.

*Id.* at 18.  But his principal argument was different.  "The most inappropriate of her conduct, however, was in hiring herself as counsel and never deviating from that retention."  *Id.* at 18.  He discusses, at length, the appropriateness of hiring oneself as counsel for the trustee when one is the trustee.  He properly notes three concerns when the trustee is his own attorney: determining when professional services should be performed, that is will "those services be in the best interests of the estate or merely sufficiently arguably so to as to provide a basis for compensation"; determining whether those services should be rendered by the trustee's own law firm or another law firm; and the appearance of impropriety.  *Id.*  at 20.

The debtor concludes that:

66

Were this bankruptcy a simple one – had this bankruptcy consisted merely of the very few claims against it, easily liquidated assets, and the filing of estate tax returns – the Debtor has no doubt that she could have handled it competently.  But Ms. Meiburger was faced with a relatively complex estate with four real properties in three states and three matters in virtually simultaneous litigation, none of which litigations was one in which, to the knowledge of Debtor's counsel, she had any proven competence.  In the span of eighteen months, she sold three of the properties in three states and litigated all three adversary proceedings – herself.

*Id.* at 21-22.  He supports this with several arguments.  First, he says, the chapter 11 trustee brought

into the estate "just over $1 million (not including the $600,000 Bank One security, which went right

out again)."  *Id.* at 22.  However, this cost over $670,000 in fees, commissions and expenses.

Because of the cash flow situation created by her administration, he asserts, the manner in which she

sold assets of the estate left:

many hundreds of thousands of dollars in value left on the table, including

- o    the value of the Melbourne property had it been exposed to the market,
- o    the value of the Arizona residence of $200,000 for not having been exposed to the market,
- o    the value of the Great Falls residence had it been adequately exposed to the market,
- o    the $500,000 difference between the value of the Bears claims and the settlement amount.

*Id.* at 23.  He concludes that:

On a net basis (after turning over his supplemental disability benefit), the Debtor received none of what Ms. Meiburger brought into the estate.

*Id.* at 23.

In fashioning the relief he requested, the debtor did not go through each and every time entry

to determine which was appropriate and which was inappropriate.  He stated:

It is not possible to sort through all of Ms. Meiburger's time records, both for herself as Trustee and for her firm, to correlate them to each other, and to specify, as

67

> to each entry, the work that ought not to have been done from that which was proper.
> Indeed, viewed in isolation, most of them appear to have been proper. But Ms.
> Meiburger did not act in isolation; she acted under the statutory command that she
> either file a plan or say why one could not be filed. In either event, that command
> was intended to lead to the orderly administration of the estate.

*Id.* at 23. Instead, he looked to the results:

> Counsel for the Debtor, therefore, has not attempted to isolate as improper
> specific entries in Ms. Meiburger's time entries but to look to the results of what she
> did—and did not do.

*Id.* at 24.

The debtor requested that all of the requested attorney's fees be disallowed and that all amounts previously paid be disgorged because she should not have employed herself as counsel. *Id.* at 24. In the alternative, he requested that no compensation be allowed for the Chase and the Bears adversary proceedings because she "mishandled her litigation" and "There was no reason she should have been litigating those claims herself, and especially not on an hourly basis." *Id.* at 24. No compensation should be allowed for the sale of any of the real property because she did not properly market the three properties and the sale of the Great Falls property was "completely unnecessary." *Id.* at 26.

The debtor did not object to the fees in the Disability Plan adversary proceeding because the "most of those fees were recovered from the defendants." *Id.* at 25.

## Discussion

## I.  The Legal Standards for Fee Awards

The legal standards for allowing compensation to attorneys in bankruptcy cases is well established.  Section 330 provides the statutory basis.  It provides:

(a)(1) After notice to the parties in interest and the United States Trustee and a hearing, and subject to sections 326, 328, and 329, the court may award to a trustee, a consumer privacy ombudsman appointed under section 332, an examiner, an ombudsman appointed under section 333, or a professional person employed under section 327 or 1103–

    (A)    reasonable compensation for actual, necessary services rendered by the trustee, examiner, ombudsman, professional person, or attorney and by any paraprofessional person employed by any such person; and

    (B)    reimbursement for actual, necessary expenses.

(2)    The court may, on its own motion or on the motion of the United States Trustee, the United States Trustee for the District or Region, the trustee for the estate, or any other party in interest, award compensation that is less than the amount of compensation that is requested.

(3)    In determining the amount of reasonable compensation to be awarded to an examiner, trustee under chapter 11, or professional person, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including–

    (A)    the time spent on such services;

    (B)    the rates charged for such services;

    (C)    whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

    (D)    whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

    (E)    with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

    (F)    whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

(4)    (A) Except as provided in subparagraph (B), the court shall not allow compensation for –

        (i) unnecessary duplication of services; or

        (ii) services that were not--

            (I) reasonably likely to benefit the debtor's estate; or

(II) necessary to the administration of the case.

(B) In a chapter 12 or chapter 13 case in which the debtor is an individual, the court may allow reasonable compensation to the debtor's attorney for representing the interests of the debtor in connection with the bankruptcy case based on a consideration of the benefit and necessity of such services to the debtor and the other factors set forth in this section.

(5)    The court shall reduce the amount of compensation awarded under this section by the amount of any interim compensation awarded under section 331, and, if the amount of such interim compensation exceeds the amount of compensation awarded under this section, may order the return of the excess to the estate.

(6)    Any compensation awarded for the preparation of a fee application shall be based on the level and skill reasonably required to prepare the application.

(7)    In determining the amount of reasonable compensation to be awarded to a trustee, the court shall treat such compensation as a commission, based on Section 326.

11 U.S.C. §330(a).

The Court of Appeals for the Fourth Circuit has addressed the issue of attorney's fees in bankruptcy and other types of cases and has adopted the lodestar analysis for attorney's fees, that is, the reasonable hourly rate is multiplied by the reasonable number of hours expended.  Once the appropriate lodestar amount is established, the court must then determine whether that result should be increased or decreased.  *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891, (1984); *Daly v. Hill*, 790 F.2d 1071 (4th Cir.1986); *Harman v. Levin,* 772 F.2d 1150 (4th Cir.1985); *Ballard v. Schweiker,* 724 F.2d 1094 (4th Cir.1984); *Arnold v. Burger King Corp.,* 719 F.2d 63 (4th Cir.1983); *Barber v. Kimbrell's Inc.,* 577 F.2d 216 (4th Cir.1978); *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974); *In re King,* 88 B.R. 768, 770 (Bankr.E.D.Va.1988).  Congress basically adopted the factors in these cases in 11 U.S.C. § 330(a)(3) and (4).  The factors set out in *Johnson* are the time and labor required; the novelty and difficulty of the questions presented; the skill necessary to perform the services; the preclusion, if any, of other employment resulting from acceptance of the case; the customary fee for similar work in the community; whether

70

the fee is fixed or contingent; time pressures imposed; the amount involved and the results obtained

as a result of the attorney's services; the desirability of the case; the nature and length of the

professional relationship with the client; and the awards in similar cases.  *Johnson v. Georgia*

*Highway,* 448 F.2d at 717 -719.  The Fourth Circuit's decisions incorporate and apply the statutory

criteria.


## II.  Application of Legal Standards

The applicant bears the burden of persuasion.  *In re King*, 88 B.R. at 770-71.  She must

satisfy the criteria for the final award of her fees.  In this case, the discussion can best be structured

around the debtor's objections.  The objections are well developed, extensive and address most of

the elements that counsel must satisfy in order to have her final application for fees and expenses

approved.

The debtor makes three basis objections.  He asserts that:

(1)    The amount requested is grossly excessive, particularly in light of the results
of the case.
(2)    The chapter 11 trustee did not have a plan to administer the estate and did not
propose a chapter 11 plan until late in the administration of the estate.
(3)    Counsel's work was inappropriate, wasteful, incompetent and did not benefit
the estate.

### A.  Amount of Fees Requested

Whether the requested fee is "grossly excessive" cannot be determined in isolation.  The

dollar amount of a fee is itself not the determining factor of whether a requested fee is excessive.

A small fee may be excessive in the circumstances of a particular case and a large fee, even a very

large fee, may be inadequate in another.  What matters more is the fee in relation to the case.  An

attorney's fee is determined on the basis of reasonableness which is itself a result of the application

of the criteria set out in §330 as explicated by the Fourth Circuit.  Unlike a trustee's fee which is

statutorily capped, an attorney's fee is not capped at a particular dollar amount.  11 U.S.C. §326.

The results of a case, while a factor, are not the determining factor.    In bankruptcy,

attorney's for debtors and for trustee's are rarely paid on a contingency basis.  The Bankruptcy Code

clearly envisions hourly based fees.  The determination of whether a service was beneficial is

prospective not retrospective.  11 U.S.C. §330(a)(3)(C).  This merely acknowledges the reality that

everything that looks promising at the inception does not deliver on the promise.  This is particularly

true in litigation.  Parties commence litigation with the best information available.  Through

discovery, they develop the facts, understand the opposing litigant's position and evaluate the

strengths and weaknesses of both their position and their opponents.  Both may enter the litigation

believing he has a sound case and will prevail, but in the end, only one prevails.  That does not mean

that one of the lawyers wasted his time and efforts or was incompetent.

In a bankruptcy case, value is added to the administration of the estate by determining that

certain ostensive assets are not, in fact, assets.  This does not give a trustee or counsel the right to

run amuck, to look under every stone, to comprehensively investigate every rumor.  The action must

be reasonable when undertaken and remain reasonable during the course of resolving it.  The trustee

or attorney must exercise his continuing professional judgement.  *See In re Computer Learning

Centers, Inc.,* 272 B.R. 897, 901-06 (Bankr.E.D.Va. 2001) (application to employ attorney denied

where trustee had not made initial evaluation of claims proposed counsel would be pursuing).  If

counsel reasonably exercises his professional judgment, he will not be denied his fee solely because

the action, in the end, was less successful than initially expected or, indeed, was wholly unsuccessful.

## B.  Requirement to Propose Chapter 11 Plan
## and Case Management

The debtor argues that the chapter 11 trustee did not comply with §1106(a)(5) which requires a trustee to file a chapter 11 plan, file a report whey no plan will be filed or recommend conversion or dismissal of the case, all "as soon as practicable".[46]   11 U.S.C. §1106(a)(5).  Examining the debtor's argument more closely, it is apparent that the debtor really makes two arguments.  The first is that the chapter 11 trustee did not file a chapter 11 plan as soon as practicable.  The second is that the chapter 11 trustee administered the case in an ad hoc, haphazard manner to the detriment of the estate.

## 1.  Requirement to Propose Chapter 11 Plan, 11 U.S.C. §1106(a)(5)

Most chapter 11 debtors are debtors-in-possession.  No chapter 11 trustee is appointed in them.  Examining how debtors-in-possession manage their cases and comply with §1106(a)(5) is instructive because it is a duty with which they must comply as well as chapter 11 trustees.  Debtors-in-possession have all of the rights and powers and "shall perform all of the functions and duties, except the duties specified in sections 1106(a)(2), (3), and (4) of [Title 11], of a trustee serving in a case under [Chapter 11]."  11 U.S.C. §1107(a).  Notably absent from the list of exclusions is §1106(a)(5) which clearly shows that debtors-in-possession as well as chapter 11 trustees must

---

[46]It is not clear that a chapter 11 trustee's attorney is responsible for compliance with §1106(a).  There is a division a authority and labor between a trustee and counsel.  This is a specific trustee duty, not the trustee's counsel's duty.  The court will address the issue as if the duty were counsel's because the trustee and counsel are the same person.

comply with §1106(a)(5).  *In re Gusam Restaurant Corp.,* 737 F.2d 274, 275-76 (2nd Cir.1984)

(§1106(a)(5) applies to debtor-in-possession); *In re Bayou Group, L.L.C.,* 363 B.R. 674, 688

(S.D.N.Y.2007) (same).

The time within which debtors-in-possession in chapter 11 cases file chapter 11 plans, a

report or a motion to convert, or dismiss the case, varies widely and is dependent on the

circumstances of the case.  In some cases – not many – a chapter 11 plan is filed a the very beginning

of the case.  Those are usually the result of pre-petition negotiations.  There is a rising trend for

debtors-in-possession to seek to sell all their assets in a §363 sale at the outset of the case.  In many,

the proceeds of sale are distributed in accordance with an order of distribution and the case is

dismissed after the distribution is made.  In some cases, a chapter 11 plan is filed a significantly long

time after the petition is filed.  The practice is that a chapter 11 plan is filed at an appropriate time.

This practice is consistent with §1106(a)(5).  Section 1106(a)(5) imposes no deadline by

which a chapter 11 plan must be filed.  Nor does chapter 11, except in the case of a small business

debtor, establish any deadlines for filing a chapter 11 plan, filing a report, or filing a motion to

convert or dismiss the case.[47]  There is good reason for this flexibility.  A chapter 11 plan filed

prematurely may not be confirmed. The plan may not have the necessary votes.  Core legal or

economic issues may not have been sufficiently resolved to enable the affected parties to agree on

plan terms or for a debtor-in-possession to propose plan terms that may be reasonably expected to

be approved over the objection of a creditor.  In short, the case may not be sufficiently mature to

---

[47]The exclusively period provided in §1121(b) does not set a deadline for filing a plan.  It only prevents parties other than the debtor from filing a plan during the exclusivity period.

propose a plan.[48]  Typically, chapter 11 debtors discuss proposed plan treatment with creditors and negotiate terms.  Sometimes this is done directly with the creditors, sometimes through a creditors committee.  Those negotiations can be very helpful in formulating a plan and achieving confirmation.  The language of §1106(a)(5), "as soon as practicable", reflects this pragmatism.  "As soon as practicable" is to be read in the context of the circumstances of a case and not as a fixed deadline, as is the case in a small business case.  *See In re New Life Fellowship, Inc.,* 198 B.R. 813 (Bankr.W.D.Ok.1996) (chapter 11 trustee entitled to interim compensation, even though disbursements had not been made because a delay in filing a plan and making disbursements was in best interests of estate).

There are adequate remedies for chapter 11 debtors-in-possession who do not move their case forward or do not timely file chapter 11 plans.  Interested parties may move to have a chapter 11 trustee appointed, or to convert or dismiss the case as was done in this case while the debtor was in possession of his estate.[49]  They may request that the court establish deadlines for filing a plan or achieving confirmation.  The debtor's argument that the mere lateness of the chapter 11 trustee's plan should disqualify her from compensation is not well taken.  Trustee's or attorney's compensation should not be reduced or disallowed unless there is unjustified delay in the filing a plan and the estate or a party in interest is prejudiced by the unjustified delay.

---

[48]The court notes that the debtor's chapter 11 plan was filed early but was denied confirmation.

[49]Section 1112 concerns conversion or dismissal of a chapter 11 case.  In contradistinction to §1106(a)(5) which speaks of a plan being filed "as soon as practicable", §1112(b)(2)(A) provides that part of the conversion or dismissal decision turns on whether a chapter 11 plan can be confirmed within "a reasonable period of time."

Section 1106(a)(5) applies to a chapter 11 trustee in the same manner as a debtor-in-possession.  In order to evaluate the objection, the case itself and the trustee's management of it must be examined.

## 2.  Trustee's Management of the Case

The chapter 11 trustee did have a plan for the administration of the estate.  From the beginning of her administration, she recognized the estate was likely solvent and intended to liquidate sufficient assets to pay creditors, turn the balance back to the debtor in a manner he could afford, and ask that the case be dismissed.  She early on recognized that the Scottsdale property was unnecessary and a drain on the estate.  In fact, the debtor had already placed the Scottsdale property on the market.  The chapter 11 trustee retained the realtor the debtor selected and continued to market the property.  She investigated the circumstances surrounding the Great Falls property, concluded that it was too expensive for either the estate or the debtor to retain and sought to sell it to protect the equity in it, pay the costs of administration and pay creditors.  She investigated the claims against third parties, notably the Bears, the NFL Disability Plan, and Chase, concluded that they should be pursued and pursued them.[50]  Her actions throughout the bankruptcy case clearly evince this plan.  She stated in open court that she intended to proceed in this manner and to seek to dismiss the case rather than file a chapter 11 plan.

---

[50]The debtor's proposed chapter 11 plan and his objections to the sale of the Great Falls property were all founded on reinstating the mortgage the Great Falls mortgage, paying it off, or refinancing it at a lower amount.  The source of funds to accomplish any of the three alternatives was the claims that the chapter 11 trustee litigated.

In addition to the statements in open court, the chapter 11 trustee provided the debtor with her written analyses of the administration of the estate.[51] They show the adversary proceedings against the Bears, the NFL Disability Plan and Chase; the costs of administration; and the claims. The first, described as an updated analysis and dated August 26, 2004, showed a shortfall in the estate of $335,510 with the resolution of the adversary proceedings and sale of the Scottsdale property. It showed estimated professional fees, other than trustee's fees which were a separate line item, of $280,815.65.[52] Trustee's Response to Debtor's Objections, Exhibit B at 2-4. (Docket Entry 876). It was transmitted to the debtor and debtor's counsel with a cover letter dated September 7, 2004. This was followed by another analysis transmitted to the debtor and debtor's counsel on October 28, 2004. This analysis reduced the estimated gross value of the adversary proceedings from $540,000 to $320,000, and a net after estimated taxes from $324,000 to $192,000. Professional fees were discussed in Footnote 1. It stated that professional fees of $99,725.83 had already been paid; that $111,184 had been earned but were unpaid; and that there were an estimated additional professional fees of $120,000 for a total of $330,909.83. *Id.* Exhibit B at 8-10. This was followed by another analysis dated February 7, 2005. This valued the adversary proceedings at $350,000 with

---

[51]The chapter 11 trustee attached six written analyses to her Response. The debtor attached one to his Objection. The chapter 11 trustee stated in argument that she had prepared 14 asset/liability analyses. Transcript of October 5, 2009 Hearing at 11. (Docket Entry 890).

[52]Part II of the analysis, "Estimated Administrative Expenses" does not include all professional fees, only those that were unpaid and estimated. If professional fees were already paid, the asset line item "Cash on Hand" was reduced by the payment. This is the proper way to present the status of the administration of the estate at that time. It showed the cash on hand, the estimate value of assets to be liquidated, the estimated administrative expenses to be paid from those assets and the estimated claims to be paid from those assets. It quickly showed the solvency of the estate and the necessity for liquidation of other properties. However, it did not show, except in the footnote, the total of the professional fees paid and estimated to be paid. Nor did it show other expenses or claims paid, such as the mortgage on the Scottsdale property that had been sold.

a net after tax of $222,000.  *Id.* Exhibit B at 14-16.  These analyses were followed with ones on June 21, 2005 and August 25, 2006.  *Id.* Exhibit B.[53]

The debtor attached the chapter 11 trustee's analysis dated July 16, 2003.  (Docket Entry 871).  The trustee was appointed on March 20, 2003 and this was either the first or one of the first analysis.  It reflected the administration of the estate without the sale of the Melbourne, Great Falls or Titusville properties.[54]  Two things stand.  The first is that professional fees other that trustee fees were estimated at $150,000.  It was clear from the beginning that the professional fees would be significant.  This should not have been surprising because three significant adversary proceedings were envisioned – and included as assets to be liquidated.  The second matter that stands out is the chapter 11 trustee's comparison of total assets and total liabilities.  While she valued the  assets, including the adversary proceedings at a gross value of $980,000 and a net value of $588,00 after payment of taxes on Part I, "Estimated Assets (Other than Collegewood, Titusville and Gallop Wood)", in Part III she gave a range of values by excluding the Chase and the NFL Disability Plan adversary proceedings.  The lower value, net of taxes, was $420,000.  The higher value did not anticipate the sale of the Melbourne or the Great Falls properties.  The lower value required the sale of one or both of them.[55]

---

[53]No testimony was taken at the hearing on October 5, 2009.  The debtor filed a number of exhibits with his Objection including his declaration under penalty of perjury.  *See* Debtor's Objection to Final Compensation and Exhibits.  (Docket Entries 870, 871, 872 and 873).  The chapter 11 trustee attached eight exhibits to her Response, including her declaration.  (Docket Entry 876).  The exhibits, including the declarations, were considered by the court with the consent of the parties.  Transcript of October 5, 2009 Hearing at 4.  (Docket Entry 890).

[54]The analyses attached to the chapter 11 trustee's Response were updated over time to reflect the sales of the Melbourne and the Great Falls properties as they occurred.

[55]The Bears and the NFL Disability Plan adversary proceedings were not filed until February 4, 2004.  The Chase adversary proceeding was filed by the debtor prior to the appointment of the chapter 11 trustee and was pending at the time the analysis was made.

78

The chapter 11 trustee followed through on her plan as expressed in open court and the analyses.  On September 6, 2006, she filed her Trustee's Motion for Authority to Pay Pre-petition Creditors and Distribute $10,000 to Mr. Marshall.  (Docket Entry 671).  This motion sought to pay creditors their claims.  In it, she restated her plan of administration:

> 7. The Trustee anticipates that a motion to dismiss this case will be filed, rather than a plan of reorganization, because it does not appear necessary or desirable to incur the expense of filing a plan of reorganization and disclosure statement given that there are sufficient assets to pay all creditors in full and given that a substantial surplus will be distributed to [the debtor]. However, such a motion is premature at the present time, because a decision on the disability appeal should be forthcoming soon, and because it is necessary first to file the 2005 and 2006 tax returns and to obtain approval of such returns from the Internal Revenue Service.

> 8. Even though it may be premature to dismiss this case at the present time, the Trustee nevertheless believes that payment of creditors and the requested $10,000.00 distribution to [the debtor] are appropriate at this time, given that there is sufficient cash in the bankruptcy estate to make these payments and also pay the remaining administrative expenses, and given the length of time that this case has already been pending.

Trustee's Motion for Authority to Pay Prepetition Creditors and Distribute $10,000 to Mr. Marshall, ¶¶7-8 at 3-4.

The chapter 11 trustee prepared an analysis dated August 25, 2006, which she sent to the debtor and debtor's counsel.  It supported her motion to pay the pre-petition creditors.  It reflected that there was enough cash to pay the pre-petition claims and the administrative expenses with the debtor receiving back the Titusville property where his mother lived and about $20,000.  Trustee's Response.  Exhibit B at 20-22.  (Docket Entry 876).

The chapter 11 trustee's stated:

> [T]hroughout her administration of the estate, the Trustee was mindful of the fact that [the debtor] had had two prior bankruptcy cases which had not resolved any of the financial issues that he faced, resulting in the filing of the present case.  The Trustee was mindful that [the debtor] was unable to obtain a confirmed plan in the

79

instant case or to administer the case properly. The Trustee was mindful that the appointment of a Chapter 11 Trustee, rather than dismissing or converting the present case, was considered necessary by the Court in order to resolve [the debtor's] financial issues and prevent yet another bankruptcy case from being filed. This was the Trustee's mandate, and this mandate has been fulfilled.

Early on in her administration of the case, the Trustee considered the possibility of filing a plan of reorganization, but she determined that she could not in good faith propose a plan under which [the debtor] would keep the Great Falls residence, because any such plan was likely to be followed by another bankruptcy case, and therefore would not fulfill the purpose for the appointment of the Trustee, nor would any such plan meet the confirmation requirement of Bankruptcy Code §1129(a)(11), that confirmation not be likely to be followed by the need for further financial reorganization.

Eventually, the Trustee came to believe that a dismissal of the case, once the assets were administered, would be a more cost effective way of closing the case, rather than filing a plan of reorganization. Therefore, the Trustee did not propose a plan of reorganization. However, the Trustee later realized that dismissal of the case would have caused [the debtor] to lose the tax benefit of the deductions taken on the estate's tax returns for the costs of administering the case. Therefore, after consulting with Mr. Sullivan [debtor's counsel], the Trustee determined that a plan was the best way to close the case, notwithstanding the cost associated with a plan and disclosure statement.

Trustee's Response to Debtor's Objections at 13-14.

After having heard the matters in this case since its inception, reviewing the record, considering the exhibits that the debtor and the chapter 11 trustee submitted in connection with the application and the debtor's objection, the court is satisfied with the chapter 11 trustee's reason for not filing a chapter 11 plan earlier than she did and is satisfied that she timely administered the case in an organized, coherent manner, consistent with the nature of the assets and liabilities and the interests of the creditors and of the debtor.

### C.  Competency

The debtor's competency objection includes other factors than simply whether Ms. Meiburger had the requisite legal skills to perform the legal services undertaken.  It includes aspects of his arguments that the she did not have a coherent plan of administration, that the prosecution of various matters was unnecessary or wasteful, that her conduct was inappropriate, and that her actions were not in the best interests of either the estate or the debtor.  The court previously addressed and rejected the debtor's argument that the trustee administered the estate in a haphazard, ad hoc manner and without a coherent plan.  In order to address the other issues raised by the debtor, each of the principal actions will be examined, first the adversary proceeding,  then the sales of the properties and finally, the overall administration of the estate.

### 1.  The Adversary Proceedings

### a.  The Chase Adversary Proceeding

The nature of the claims and the course of the litigation are set out above.  Essentially, the debtor alleged that the existing lender of the note secured by the mortgage on his Scottsdale property wrongfully commenced a foreclosure action against the property.  In order to resolve that matter, he sought to refinance the mortgage and turned to Chase who had recently refinanced his Great Falls property.  With the foreclosure sale imminent, the loan officers represented to the debtor and the lender that they would refinance the Scottsdale property.  In order to postpone the imminent sale, they signed, without the debtor's consent, an agreement postponing the foreclosure.  The agreement also waived the debtor's claims against the lender for the alleged wrongful foreclosure.  The loan officers then prepared a loan application for the debtor, but it was rejected. In order to save the

Scottsdale property, the debtor had to refinance the Great Falls property and lost the benefit of his recent refinance of it. The debtor alleged the loan officers and the new lender did not intend to make the Scottsdale loan and were, essentially, churning the account by refinancing the Great Falls property twice.

The debtor filed the complaint before the chapter 11 trustee was appointed. When she was appointed, she faced a motion to dismiss. She amended the complaint. In particular, she added a breach of contract claim which, surprisingly, the debtor did not include. The motion to dismiss was granted as to the fiduciary duty claims on the basis that the claims were time barred.

The debtor argues that the chapter 11 trustee was correct in evaluating the Chase claim and that her amendment to the complaint benefitted the estate. He then states his objection:

> At that point, however, she should have been valuing the claim rather than just litigating it. Her valuation of the claim had begun at $200,000 (in July 2003) but was subsequently refined to $95,332.04, the amount of the Debtor's actual loss. In her quest to obtain that $95,332.04, Ms. Meiburger sought and obtained $59,235 in attorneys' fees . . . then settled the claim for $45,000—a reasonable settlement of the value of the claim, but a $14,235 detriment to the estate. At the time of settlement, Ms. Meiburger had lost the main dispositive motion in the matter, involving the statute of limitations on the non-contract claims, and there may have been no worse time to settle.

Memorandum in Support of Debtor's Objection to Compensation at 9-10. (Docket Entry 875).

The time records show that trustee's counsel consulted with both the debtor and his counsel before undertaking any significant action and particularly when she was drafting her amended complaint. This activity, which consumed 7.9 hours, occurred on July 11, 2003. First Interim Application at 38. (Docket Entry 186).[56] On July 16, 2003, five days later, she prepared the Analysis

---

[56]Consultations and communications between the chapter 11 trustee and the debtor and his attorney continued. *See, for example,* First Interim Application at 43 (time entries for September 10, 2003, "Conference with Werblood re:
(continued...)

of Assets and Liabilities attached to the debtor's objection.  It valued the "Chase/Homecomings

Claims" at a gross value of $200,000.  Debtor's Objection to Final Compensation at 1 (Docket Entry

871).  On July 17, 2003, Ms. Meiburger met with Mr. Werblood, the debtor's attorney, and spoke

with Mr. Greenfeld, also debtor's attorney, by telephone, about the case.  *See* First Interim

Application of Janet M. Meiburger for Allowance of Compensation and Expenses for Services as

Chapter 11 Trustee, Exhibit B at 12.  (Docket Entry 523).

　　　Trustee's counsel pursued the litigation.  She argued the motion to dismiss on November 19,

2003, which was granted in part by an order entered on February 12, 2004 which was also a

reconsideration of an order entered on December 22, 2003.  Substantial discovery did not take place

until after the determination of the motion to dismiss.  Ultimately, the chapter 11 trustee concluded

that the actual damages were $95,332.04 and reached a settlement of $45,000.  Trustee's Motion for

Approval of Settlement of Adversary Proceeding, Settlement of Arizona Homeowners' Association

Claim and Authority to Release Funds from Escrow, ¶¶4 and 5 at 2.  (Docket Entry 430).

　　　The debtor's objections are not supported by the record.  He concedes that the trustee's

counsel's initial investigation and that the settlement amount were appropriate.  But, he infers, she

should have realized earlier that the maximum recovery was $95,332.04 and should have settled,

without expending much more effort, for $45,000 which he acknowledges is "a reasonable

settlement of the value of the claim."  Memorandum in Support of Debtor's Objection at 10.

(Docket Entry 875).  The chapter 11 trustee did not reach this conclusion until later.  At the initial

stages she consulted with the debtor and his counsel and was, apparently, influenced by their

---

[56](...continued)
statute of limitations issues" and for September 12, 2003, "Telephone conversation with Marshall re: issues relating to
lawsuit.")

comments. They thought that the case was worth much more. She accepted that position on her

July 16, 2003 analysis. She continued to evaluate the case and engaged in discovery which is a two-

way street. Ultimately, she rejected the debtor's evaluation and sought to settle the case. Trustee's

Motion for Approval of Settlement of Adversary Proceeding, Settlement of Arizona Homeowners'

Association Claim and Authority to Release Funds from Escrow, ¶4 at 2. (Docket Entry 430). The

debtor persisted in his valuation. He objected to the settlement asserting that "the Trustee's

calculation of damages  .  .  . was erroneous and flawed" and that the actual damages "were a

substantial multiple of the Trustee's calculation." Objection to Trustee's Motion for Approval of

Settlement of Adversary Proceeding, Settlement of Arizona Homeowners' Association Claim and

Authority to Release Funds from Escrow" at 1- 2.[57]

The record shows that the trustee properly handled this matter. She promptly investigated

it. She consulted with the debtor and his attorneys. Unlike the debtor who never budged in his

valuation of the matter, the trustee continued to value the claim and adjusted her valuation in light

of the proceedings in the case, particularly the results of discovery and  the outcome of the motion

to dismiss. Ultimately, over the debtor's objection, she reached the conclusion that the matter should

be settled at $45,000. The settlement was set down for hearing and approved, over the debtor's

objection. Trustee's Motion for Approval of Settlement of Adversary Proceeding, Settlement of

Arizona Homeowners' Association Claim and Authority to Release Funds from Escrow; Objection

to Trustee's Motion for Approval of Settlement of Adversary Proceeding, Settlement of Arizona

---

[57]The court notes the inconsistency of the debtor's positions. When the chapter 11 trustee sought to settle the
case for $45,000, he argued that the settlement was too little. Now he asserts that it was reasonable. Then he wanted
the chapter 11 trustee to further litigate the matter – necessarily incurring additional attorney's fees. Now he argues that
she should have litigated the case less. There is consistency between his two objections:  he said then as he says now
that the attorney's fees were excessive.

Homeowners' Association Claim and Authority to Release Funds from Escrow. (Docket Entries 430 and 437).

The debtor tries to buttress his competency argument by asserting that there "may have been no worse time to settle" because the trustee "had lost the main dispositive motion in the matter, involving the statute of limitations on the non-contractual Claims." Memorandum in Support of Debtor's Objection to Compensation of Janet M. Meiburger as Trustee and Counsel at 10. (Docket Entry 875). This argument is problematic in two respects. First, while it is true that the court dismissed Count VI as to Chase and the two individuals as to the alleged breach of fiduciary duties, this was not the main dispositive motion in the case. The first value that the trustee added to the case was to amend the complaint to assert breach of contract claims against the three lenders involved. Trustee's Motion for Leave to File Amended Complaint (Adv.Proc.No. 03-1012, Docket Entry 19); Agreed Order Granting Trustee's Motion for Leave to File Amended Complaint (Adv.Proc.No. 03-1012, Docket Entry 22); and Amended Complaint (Adv.Proc.No. 03-1012, Docket Entry 21). The debtor agrees. He states, the trustee's "amendment of the complaint in the Chase adversary proceeding was a benefit to the estate; she added a contract count which was absent in the Debtor's initial filing." Memorandum in Support of Debtor's Objection to Compensation of Janet M. Meiburger as Trustee and Counsel at 9. (Docket Entry 875). These counts remained after the dismissal of Count VI and were the basis of the settlement. As the trustee noted in connection with the claim against the former chapter 7 trustee and the court discusses below, the breach of fiduciary duties and the contract claims were duplicative. Recovery under either one was sufficient. Recovery under both did not increase the recovery.

The second problem with the debtor's argument assumes that parties could not evaluate the merits of the motion to dismiss the breach of fiduciary duties claim before it was argued or even before the motion was filed. The defendants correctly thought that the motion was meritorious, a view supported by the record at that time. In fact, the chapter 11 trustee started with a weak position. The debtor's argument assumes that this was the best time to settle the case. However, at that time, the trustee had not completed her discovery, the extent of the merits of the defendant's motion was unclear and the strength of the breach of contracts claims was not fully developed. The motion was ultimately granted, but only as to the breach of fiduciary duties.

The real question is not whether the final settlement could have been obtained earlier, but whether the process the trustee followed reasonably informed her of the true value of the case and a reasonable settlement. At that time, the defendants were seeking to dismiss one of seven counts and the debtor was urging her on, asserting that the case was meritorious and very valuable. She had to reconcile these competing positions. The manner in which she did was appropriate and the actions taken were necessary to do so.

It was expensive. The court, like the debtor, noticed, is concerned and considered the fact that the costs of litigation exceeded the ultimate recovery. This is unfortunate. But, lawyers do not and cannot guarantee the outcome of a case. The outcome cannot be known in advance. The limitations of information, factual developments and other uncertainties and unanticipated matters alter an attorney's evaluation of a case as it develops. The recovery may be less – or more – than initially anticipated. The amount of work necessary to achieve the result may be different than initially anticipated.

Section 330 refers to the time the services are rendered.  The fee was not a fixed fee.  It was not a contingent fee.  It is a reasonable fee as viewed when the services were rendered.  The ultimate outcome may be a factor in enhancing or reducing a fee.  In this instance, the time records reflect work that was properly and appropriately undertaken at the time it was done.  The work was competently done.  The debtor wanted the matter pursued and objected to the settlement.  That issue was squarely before the court.  The court determined it against the debtor knowing at the time that the costs of litigation "negated" the settlement.  *See* Objection to Trustee's Motion for Approval of Settlement at 1-2.  (Docket Entry 437).  There is nothing in the record to cause the court to believe that the settlement was improvident.  The record  reflects that the trustee's attorney reasonably and properly prosecuted the claim.

## b.  The Chapter 7 Trustee Adversary Proceeding

The time Ms. Meiburger expended on the Chapter 7 Trustee adversary proceeding both as trustee and counsel, while minimal, was proper.  The basis of the case was that the chapter 7 trustee failed to prosecute the debtor's claims for breach of fiduciary duty against the banks and loan officers in connection with the Scottsdale and Great Falls refinances.  This court dismissed the breach of fiduciary duties claims against the banks and the loan officers in the adversary proceeding filed by the debtor because they were time barred.  The statute of limitations expired during the chapter 7 trustee's administration of the debtor's prior bankruptcy case.

The debtor argued that the chapter 7 trustee breached his duties to the debtor by not filing a suit on the claims.  The chapter 7 trustee apparently did not file a suit because no creditors filed a proof of claim and he closed the case without liquidating any assets.  The debtor insisted that the

action be filed.  Debtor's Motion for an Order Directing the Chapter 11 Trustee to Abandon the

Debtor's Estate's Claim Against the Former Chapter 7 Trustee.  (Docket Entry 278).  He asserted

that the claims against the chapter 7 trustee "represent[ed] a very substantial adversary proceeding

in favor of the Debtor and Debtor's estate." *Id.* ¶2 at 2.  (emphasis in original).  The chapter 11

trustee's response noted that she was pursuing a breach a contract case against Chase and that if she

recovered on it, she would recover all the damages that the chapter 7 trustee could have recovered

and there would be no damages caused by the chapter 7 trustee. Trustee's Response to Debtor's

Motion to Compel the Trustee to Abandon the Estate's Claim Against the Former Chapter 7 Trustee,

¶4 at 2.  (Docket Entry 294).  She did not oppose the debtor pursuing the case himself, however, she

wanted to maintain control of the litigation and be assured that any recovery by the debtor was paid

to the estate.  *Id.* ¶5 at 2.  Apparently the debtor did not want to pursue the matter himself because

at the hearing on the debtor's motion, she agreed to pursue the claim.  Order Denying as Moot

Debtor's Motion to Compel the Trustee to Abandon the Estate's Claim Against the Former

Chapter 7 Trustee.  (Docket Entry 352).  She did pursue the matter.  She filed a complaint in this

court about a month after order was entered, but, did not serve the summons on the former chapter 7

trustee.  The debtor filed a motion asking the court to order the chapter 11 trustee to serve the

summons in the adversary proceeding or abandon it to the debtor.  Debtor's Motion for an Order

Compelling the Chapter 11 Trustee to Serve and Pursue the Debtor's Estate's Claim Against the

Former Chapter 7 Trustee or to Abandon the Claim.  (Docket Entry 401).  The chapter 11 trustee

stated in her response that she had postponed serving the chapter 7 trustee until she had conducted

discovery in the Chase adversary proceeding.  She had done that and concluded that while there

"may be a meritorious breach of fiduciary duty claim" against Chase, the debtor:

did not incur any damages from the breach of fiduciary duty.  To the contrary, it appears that the Foreclosure Postponement Agreement, to which [the debtor's] signature was allegedly forged, was instrumental in preventing a foreclosure on [the debtor's] Arizona residence and thereby helped to preserve the equity in that property for [the debtor].

Trustee's Response to Debtor's Motion For an Order Compelling the Chapter 11 Trustee to Serve and Pursue the Debtor's Estate Claim Against the Former Chapter 7 Trustee or to Abandon the Claim . ¶7 at 3.  (Docket Entry 414).

The chapter 11 trustee concluded that the claim against the former chapter 7 trustee had no value to the chapter 11 estate and she had no objection to abandoning the claim to the debtor.  *Id.* at 3-4.

The chapter 11 trustee did minimal work on the matter.  Her attorney's fees were $2,110.  Most of the time were occasioned by the debtor's motions.  She properly and ably responded to the debtor while resolving the claim.  She pursued discovery in the Chase adversary proceeding which allowed her to fully analyze the claims against the chapter 7 trustee and conclude, based on facts she developed and could support, that the claim had little or no value for the estate.  She understood that if she did not have a case against Chase she had none against the chapter 7 trustee.  She also understood that the actions of which the debtor complained sounded in both tort and contract, but that the debtor was entitled to only one satisfaction.  She expended her efforts where they mattered most, on the claims against Chase and in the process, fully examined the chapter 7 trustee claim.  The court notes that the adversary proceeding was closed shortly after it was abandoned to the debtor.  He took no action against the chapter 7 trustee.

### c.  The Chicago Bears Adversary Proceeding

The chapter 11 trustee's attorney requested fees totaling $192,984 in connection with the

Chicago Bears adversary proceeding.  The nature of the Chicago Bears claim was discussed above.

The matter was ready for trial but settled shortly before the scheduled trial date.  In settlement, the

Bears paid the trustee $350,000 and withdrew its two claims.  One was an administrative claim for

$189,859.05.[58]  The second was a contingent unsecured claim for $605,000. The latter claim was for

the Bears obligation to the bank in the event that the zero coupon bond, that was collateral for the

bank's $600,000 loan to the debtor and guaranteed by the Bears, was determined to be unperfected.[59]

---

[58]To the extent that the administrative claim had been allowed, the bankruptcy estate would have paid the claim and the surplus returned to the debtor would have been reduced.

[59]In a solvent estate, this claim probably did not alter the overall nature of the claims.  If the zero coupon bonds were collateral for the debtor's loan, the bank's loan would be paid by the redemption of the zero coupon bonds.  If the zero coupon bonds were not properly perfected, the chapter 11 trustee would receive the value of the bonds, the Bears would pay the bank on its guarantee and the bankruptcy estate would reimburse the Bears.  In an insolvent estate, the Bears would receive the same prorata distribution on its guarantee claim as other unsecured creditors.  In an insolvent estate, the recovery of the zero coupon bond would be a significant recovery.

Should the trustee be criticized for having pursued the bank with respect to the bond when everyone  thought that this was a solvent estate?  The debtor alleges repeatedly that the trustee did not have a plan, and specifically, a plan to pay her fees.  He argues that the trustee's decision to undertake some actions was questionable because, had she lost, she would have incurred administrative expenses without obtaining a corresponding recovery.  Memorandum in Support of Debtor's Objection to Compensation of Janet M. Meiburger as Trustee and Counsel at 13 (the trustee "filed [the NFL and the Bears] adversary proceedings . . . with . . . no plan for payment of her fees . . . should the claims be lost."; "But the point . . . is that the Trustee . . . filed and prosecuted the [NFL complaint] to an extent that would have been irresponsible had she not been successful.").  (Docket Entry 875).  The decision to pursue the bond issue is a matter of judgment, of discretion of the trustee.  In this instance she did not abuse her discretion and her judgment was sound.  It is simply not known if an estate will be solvent at the end of the day.  As the debtor notes, the two cases could have been lost.  This would have had a negative effect on the estate and may have rendered it an insolvent estate, as most bankruptcy estates are.  Some estates are even administratively insolvent.  In that case, the bond issue should clearly have been pursued.

The court notes that the trustee prevailed on the NFL claim in this court, but the judgment was reversed by the District Court which was in turn reversed by the Court of Appeals.  This court acknowledges that the debtor firmly believes that the trustee would have prevailed had the Bears case gone to trial.  This court does not share the debtor's blind faith.  With the information that the court has – which is not necessarily the evidence that would have been introduced at trial or even all of the evidence that would have been introduced at trial – the court believes that the case would have been interesting and that the outcome was far from certain.  The uncertainties of litigation and the effect on the solvency of the estate support the trustee's judgment to pursue the bank on the bond perfection issue.

The debtor raised two basic objections to her fees.  The first was competency.  He asserted

that the trustee had "no experience in dealing with [this] kind of claim".  Memorandum in Support

of Debtor's Objection to Compensation of Janet M. Meiburger as Trustee and Counsel at 13.  He

added:

> The Trustee's prosecution of these two cases was undertaken not only without
> the assistance of counsel experienced in such cases but completely contrary to the
> expressed wishes of the Debtor.  The Debtor <u>had</u> counsel experienced in such
> matters. He had retained counsel to prosecute the NFL claim, and he had counsel
> who had negotiated and otherwise dealt with the Bears claim.  He literally begged
> [the trustee] not to take these claims on herself but to allow him to prosecute these
> claims through his retained counsel.

*Id.* at 16 (emphasis in original).

The debtor argued further that the chapter 11 trustee settled the matter "at a value that is less

than she thought it was worth." *Id.* at 14.  While this may relate to the trustee's competency, the

debtor makes clear that it is really an assertion that the trustee breached her fiduciary duty to the

estate:

> It appears that the reason the Trustee settled so cheap was not the interests of the
> estate but the interest of herself as counsel: She stated to the Debtor that she had to
> settle the matter because she had no money to pay herself.

*Id.* at 15-16.[60]

The debtor described Bears claim as "relatively straightforward." *Id.* at 14.  He stated:

> The facts relating to the Bears claim are relatively straightforward. Mr.
> Marshall had a "signing bonus" agreement when he began with the Bears in 1986.
> That agreement required that the Bears pay him $72,000 a year for nearly 20 years.
> The $72,000 per year payment obligation was directly related to the Bears' agreement
> to provide the Debtor a $600,000 loan from Bank One with an interest "floor" of

---

[60]The debtor also asserted that the trustee had no plan for the payment of her fees or expenses either on a current
basis or if the suit were unsuccessful.  Memorandum in Support of Debtor's Objection to Compensation of Janet M.
Meiburger as Trustee and Counsel at 13.

12% per annum (meaning he would never pay less than 12% interest) but the Bears agreed that, if the interest rate rose above 12%, the Bears would pay the excess, too.

Mr. Marshall, however, was able to obtain a loan with a "floating" interest rate, meaning that if the interest rate went down, the payment by the Bears of $72,000 per year would pay down the loan principal. He secured the principal amount of that loan with a stripped U.S. Treasury receipt for $600,000 due to mature at about the same time as the end of the Bears' payments.

Bank One erred: First, and for 10 years, it treated Mr. Marshall's loan as if it were fixed at 12% per annum, applying the entire $72,000 each year to interest. Then, when it discovered that mistake, it made another. Instead of applying the payments in excess of the (lower) interest to principal, it credited the Bears for its "excess" interest payments.

The result of this over several years, and the effect of non-payment against the principal amount of the $600,000 loan, was that the Bears had underpaid the Debtor by $852,000. (That was the Trustee's estimate: See: Attachment 4, Exhibit 6 p.11; the Debtor reserves the right to show that the underpayment would have been even greater.)

*Id.* at 14-15.

The chapter 11 trustee's complaint adopted the debtor's interpretation of the signing bonus.

She alleged in her complaint that:

Pursuant to the Signing Bonus Agreement, the Bears agreed to pay a signing bonus to Mr. Marshall in the fixed amount of $1,668,000.00. The Bears agreed to pay $300,000.00 of Mr. Marshall's $1,668,000.00 signing bonus directly to Mr. Marshall. The Bears also agreed to pay $1,368,000.00 by making payments with respect to a $600,000.00 loan (the "Loan") that the Bears arranged for Mr. Marshall pursuant to the Loan Agreement.

Complaint at ¶9. (Adv.Proc. 04-1019, Docket Entry 1). The critical assertion was that the Bears agreed to pay "the fixed amount of $1,668,000.00." *Id.* Thus, if the interest rate fell below 12%, the Bears were still required to pay $72,000 a year, the balance after the payment of interest to the debtor. If the interest rate rose above 12%, the Bears agreed to pay the additional interest and could pay more than $1,668,000.

92

The Bears disagreed.  They asserted that:

The Chicago Bears and the Debtor agreed that the Chicago Bears would fulfill its obligations under the Signing Bonus Agreement by providing a 19 year interest free loan in the principal amount of $600,000.

The Chicago Bears Football Club, Inc's Answer to Complaint at ¶26.  (Adv.Proc. 04-1019, Docket Entry 10).

These two statements were the nub of the disagreement between the trustee and the Bears. The issue was who got the benefit of the reduced interest payments if the interest rate fell below 12%.

The trustee's attorney's time records reflect the course of the litigation.  There was nothing unusual about the course of the litigation.  The trustee investigated the matter before she filed the complaint.  She reviewed documents and discussed it with various individuals who were involved in the transaction.  She reviewed the law.  After she filed her complaint, the parties undertook discovery.  After discovery was concluded, the trustee and the bank filed motions for summary judgment.  The trustee's sought summary judgment as to both the bank and the Bears.  All the parties filed reply memoranda and argued the motions.  The bank's motion for summary judgment was granted and the trustee's was denied.  The parties filed their witness lists and trial exhibits and were ready for trial when they reached a settlement.  While the debtor opposed the settlement as inadequate, the court approved it.

The debtor's assertion that the trustee did not competently handle the case is without merit. The time records and the pleadings filed with the court show that the trustee's work was focused on the issues of the case.  In some cases, the court senses that one or more of the parties are thrashing about looking for an understanding of the case or a direction in which to proceed.  It can be reflected

in overly broad discovery, loosely drafted pleadings, and blurred requests. Time records may reflect this as well. That is not the situation in this case. The time records indicate that the trustee quickly grasped the substance of the case, undertook the discovery necessary to resolve the matters, brought the case to a head with the cross motions for summary judgment, and then achieved a good settlement. The pleadings of all counsel were comprehensive and excellent. The trustee's motion for summary judgment and the Bears' response clearly set out the issues of the case and show that they were not as "relatively straight forward" as the debtor claimed . The trustee did not prevail on her motion for summary judgment, but it was worth the effort. It narrowed the issues for the parties and showed that the trial issues were well formed.

The quality of the trustee's legal work is also reflected in her comprehensive settlement proposal of January 2005. Trustee's Response to Debtor's Objections to Final Compensation of Janet M. Meiburger as Trustee and as Counsel for Herself as Trustee, and Request for Order Requiring Return of Any Previously Granted Interim Compensation Disallowed, Exhibit E. (Docket Entry 876). It is also reflected in her communications with the debtor's attorneys, particularly Steven H. Greenfeld relating to the settlement proposal. The correspondence between the trustee and Mr. Greenfeld was professional and cooperative. There is no indication the Mr. Greenfeld believed that the trustee was off-track, had overlooked a significant factor, or was doing an inadequate job. *Id.*

Ms. Meiburger described her experience and reputation in her fee applications. She stated, without contradiction that:

> The Experience, Reputation and Ability of Counsel: Ms. Meiburger, personally, holds an AV rating from Martindale Hubbell. Ms. Meiburger has almost 30 years of experience as an attorney. She has specialized in bankruptcy for more than 15 years

and is experienced and qualified in all types of bankruptcy matters.  Ms. Meiburger
also has a Master of Laws in Taxation and experience in transactional and real estate
matters.

First Interim Application of Meiburger & Associates, P.C., for Compensation and Reimbursement
of Expenses Incurred as Counsel for the Chapter 11 Trustee and the Bankruptcy Estate, ¶9(vi) at 6.
(Docket Entry 186).

The same statement appears in her other fee applications.  While obviously a part of her form, the

contents were never objected to.

The quality of her work in this case shows her to be an experienced, mature attorney.  While

it may be true that Ms. Meiberger had never handled a sports litigation matter before, the matter was

a contract issue for which she was fully qualified to represent the estate and did so ably.[61]

The debtor objects to the attorney's fees because the settlement was inadequate.  The record

does not support this assertion.  The debtor states:

> The Trustee had made a settlement demand on the Bears and Bank One for
> $451,122.50, stating that if the defendants did not agree to that demand she would
> litigate for the $852,000.  The Debtor agreed with that settlement demand.  Instead,
> the Trustee agreed, without consulting the Debtor or his counsel, to a settlement of
> $350,000.

Memorandum in Support of Debtor's Objection to Compensation of Janet M. Meiburger as Trustee
and Counsel at 15 .  (Docket Entry 875).[62]

The trustee briefly described  the Bears adversary proceeding in her interim fee applications.

In the first four she stated that she sought to recover more than $450,000.  She sent periodic analysis

---

[61]None of debtor's attorneys, Mr. Werblood, Mr. Greenfeld or Mr. Sullivan, all of whom assisted or participated
in these matters, have a reputation for expertise in sports law.

[62]The settlement proposal is Exhibit 6 to Declaration of Wilber B. Marshall, Jr. (Docket Entry 873).  A copy
was sent to debtor's two attorneys.  A draft of the settlement letter is Trustee's Response to Debtor's Objections to
Final Compensation of Janet M. Meiburger as Trustee and as Counsel for Herself as Trustee, and Request for Order Requiring
Return of Any Previously Granted Interim Compensation Disallowed, Exhibit E at 4-13. (Docket Entry 876). The
debtor's attorneys commented on the draft.

of claims to the debtor and his counsel. In her August 26, 2004 analysis of assets, she estimated the value of all the adversary proceedings the claim at $540,000. Trustee's Response to Debtor's Objections to Final Compensation of Janet M. Meiburger as Trustee and as Counsel for Herself as Trustee, and Request for Order Requiring Return of Any Previously Granted Interim Compensation Disallowed, Exhibit B at 3. (Docket Entry 876). On her October 25, 2004 analysis she valued them at $320,000. *Id.* at 9. On the February 2, 2005 analysis she valued the Chicago Bears claim and the NFL disability claim at $350,000. *Id.* at 15. The trustee discussed the settlement proposal with Mr. Greenfeld before it was sent. She discussed the settlement negotiations with him and kept him informed of developments. *Id.* Exhibit E. The $852,000 number the debtor now asserts was the value of the claim was part of the trustee's negotiation tactics with the Bears. It showed that there was a potential for a much larger recovery, but the trustee's communications with the debtor and his counsels show that she had in mind a maximum settlement of $450,000. Debtor's counsel did not object to this during the negotiations. The allegation that the trustee settled the matter "without consulting the Debtor or his counsel" for $350,000 is not true.[63] *Id.* at 15. The documentation the trustee submitted clearly shows the contrary.

The trustee sought approval of the settlement on November 15, 2005. (Docket Entry 606). The debtor objected. (Docket Entry 611). The objection is somewhat cryptic. It accurately reflected the proposed settlement, but objected to the settlement because:

> The Debtor will not be substantially rehabilitated by implementation of this settlement. Debtor asks this Court to examine whether this settlement will be fair

---

[63]The court notes that this assertion is contained in the debtor's Memorandum in Support of Debtor's Objection to Compensation of Janet M. Meiburger as Trustee and Counsel (Docket Entry 875) but is not supported by Mr. Marshall's declaration. *See* Declaration of Wilber B. Marshall, Jr. ¶7. (Docket Entry 873).

and equitable in the context of Debtor's participation and interest the bankruptcy estate.

Objection to Trustee's Motion for Approval of Settlement of Adversary Proceeding and Claims of the Chicago Bears Football Club, Inc. at ¶5. (Docket Entry 611).

The settlement was approved over the debtor's objection.

The debtor argues that the attorney's fees related to the adversary proceeding were "roughly 55% of the amount received by the estate – and left the estate an amount that was only one-fifth of [the trustee's] estimate of $852,00 value of the claim . . ." Memorandum in Support of Debtor's Objection to Compensation of Janet M. Meiburger as Trustee and Counsel at 15. (Docket Entry 875). The use of the $852,000 number is inappropriate. It was an outside liability without significant likelihood of being achieved. The debtor's use of the figure of 55% as reflecting the amount of the recovery that was awarded in legal fees is misleading. The 55% does not take into account the withdrawal of the Bears' administrative expense claim. If the administrative expense claim were allowed in full, the benefit to the estate of the settlement would be $551,271.09 consisting of the $350,000 paid to the estate and the withdrawal of the Bears' $201,271.09 administrative expense claim. Trustee's Motion for Approval of Settlement of Adversary Proceeding and Claims of the Chicago Bears Football Club, Inc. at ¶9. (Docket Entry 606). In this case, the attorney's fees would be about 35% of benefit to the estate.[64]

The debtor raises one last argument, that the trustee breached her fiduciary duty by settling for an inadequate amount so that her fees could be paid. As discussed above, the predicate of the

---

[64]The court did not decide whether the administrative expense claim should be allowed. It is possible that it would not have been allowed in full. While that would increase the attorney's fee as a percent of the benefit to the estate to a maximum of the 55% the debtor uses, the estate would have necessarily incurred additional attorney's fees to adjudicate the administrative expense claim. The withdrawal of the Bears' administrative expense claim without further legal action was a clear benefit to the estate.

97

argument, that the settlement was inadequate, is not supported by the record.  Nor is there any indication in the record that the settlement was occasioned to pay the trustee fees.  The record shows the development of the adversary proceeding.  There is no correlation between the development of the case and any payment of compensation of the trustee.  It is true that administrative claims cannot be paid until the trustee has funds in hand.  But that is a far cry from saying that a receipt was engineered solely for the purpose of paying the trustee and was done so to the detriment of the estate.

The record does not support Mr. Marshall's statements in paragraphs 4, 7 and 8 of his declaration.  Declaration of Wilber B. Marshall, Jr.  (Docket Entry 873).  The court does not credit them.

The court reviewed Ms. Meiburger's attorney's fee applications relating to the Bears adversary proceeding in light of the standards set out in 11 U.S.C. §330(a) and by the Court of Appeals for the Fourth Circuit and finds that the award of the requested fees is appropriate.  The court is aware that the amount of the fees is significant.  The work was necessary and was well done.  This court disallowed significant attorney's fees claimed by creditors in *In re Valley Historic Ltd. P'ship,* 307 B.R. 508 (Bankr.E.D.Va. 2003) and *In re Jackson*, 2010 WL 2836161 (Bankr.E.D.Va. 2010).  They were disallowed not because they were large, but because they were unnecessary and unreasonable.  The infirmities present in those cases are not present here.

### d.  The NFL Disability Plan Adversary Proceeding

The debtor played professional football for the Chicago Bears, a member of the National Football League.  At the end of his career, he was awarded disability payments from the NFL Disability Plan.  The debtor was required to submit to periodic  physical examinations to determine

98

whether his disability continued. After one exam, the Plan determined that he was no longer disabled and terminated his benefits. A later exam found him to be disabled and reinstated his benefits. He lost $72,436.28 in benefits from May 2001 to December 2001. In his view, he was disabled for the entire period and was entitled to recover the $72,436.28. A portion of those payments were not property of the estate. The other portion was property of the estate.

The course of the litigation was describe above. In addition to the improperly denied benefits of $72,436.28, the trustee recovered pre- and post-judgement interest and attorney's fees. The total paid by the Plan was $317,407.68. It is broken down as follows:

| | |
|---|---|
| Denied benefits | $72,436.28 |
| Pre-judgment interest | $17,153.96 |
| Post-judgment interest | $16,343.61 |
| Additional post-judgment interest | $248.61 |
| Attorney's fees: | |
|     The Meiburger Law Firm, P.C. | $138,000.98 |
|     Tesler & Werblood | $1,030.00 |
|     Beins, Axelrod, Kraft, | |
|         Gleason & Gibson, P.C. | $10,962.50 |
|     Tighe Patton Armstrong Teasdale, PLLC | $61,231.74 |
| | |
|   Total: | $317,407.68 |

The debtor received $99,205.86 from the judgment which represented payment in full of the denied benefits plus pre- and post-judgment interest. The rest went to four law firms.

The trustee was awarded and paid by the bankruptcy estate $138,469. The fees were $77,152 for the bankruptcy court services; $21,000 for the district court services; and $40,308 for the court of appeals services. The fees for Mr. Sullivan of Tighe Patton Armstrong Teasdale, PLLC were $61,231.74 for work at the court of appeals. The fees for Mr. Werblood of Tesler & Werblood were $1,030.00 for work in the bankruptcy court. The fees for Beins, Axelrod, Kraft, Gleason & Gibson,

P.C., were for $10,962.50 for work principally to the time the chapter 11 trustee was appointed. The

firm did the initial analysis and evaluation and prepared the initial demand letter dated January 3,

2003. It had not filed suit when the firm discovered that Mr. Marshall was in bankruptcy. This was

which was shortly after the chapter 11 trustee was appointed. *See* Declaration of Regina Markey,

Esq., Law Firm of Beins, Axelrod, Kraft, Gleason & Gibson, PC in Support of Attorneys Fees and

Cost Petition, Exhibit D at ¶13. (Adv.Proc. 04-1020, Docket Entry 93). Their total fees were

$49,604.17. Trustee's Memorandum on Fees to Be Awarded for Services Rendered by Beins,

Axelrod, Kraft, Gleason & Gibson, P.A. and on Amount of Prejudgment Interest to Be Awarded

(Adv.Proc. 04-1020, Docket Entry 101).[65]

The initial question is whether the debtor has any standing to object to the fees paid by the

Plan. The Plan objected to the fees, lost the objection and paid them. If the debtor were to have

standing and a portion of the fees were disallowed, they would be returned to the Plan, not the

debtor. An attorney may not share attorney's fees awarded in a case with his client. Va. Rules of

Prof'l Conduct Rule 5.4(a).

The debtor's objection appears to recognize this and is directed to a different issue, that is,

whether the trustee should have pursued the NFL Disability Plan claim without a source of payment

of her fees. In other words, he contends, the trustee sold real property – Scottsdale, Melbourne and

---

[65]The trustee sought an award of attorney's fees under ERISA. Only a portion of Beins, Axelrod's fees were
recoverable under ERISA. The firm was not paid any fees from the bankruptcy estate. The court is not aware if the
balance of their fees was paid by the debtor. If they were not, they may have been discharged by the discharge granted
to the debtor in this case.

Great Falls – to finance the litigation.  Had she not pursued the litigation, she would not have incurred the expenses and would not have sold the real properties.[66]

The record does not support this allegation.  The debtor himself started the sales process of the Scottsdale property.  The trustee continued marketing the property with the same real estate agent the debtor selected.  The Great Falls property was sold because neither the estate nor the debtor could afford it.  The Melbourne property does not fall within these two circumstances.  The trustee exercised her discretion to sell it based on the circumstances of the case at the time and the need to liquidate portions of the estate.  An examination of the sequence of the sales of the real properties, the resolutions of the adversary proceedings and the fee applications do not show the correlation the debtor asserts.  At best, one would have to assert that the trustee planned to sell the real properties so that she would have cash on hand to fund her fees in the adversary proceedings.  The record does not support this and it is at odds with the debtor's fundamental complaint that the trustee had no plan to administer the estate, that it was all ad hoc.  *See* Memorandum in Support of Debtor's Objection to Compensation of Janet M. Meiburger as Trustee and Counsel, Part III at 5 - 18 (Docket Entry 875).[67]

---

[66]"All of those fees and expenses were ultimately recovered as a result of the decision of the Fourth Circuit. But the point for the purpose of this objection is that the Trustee (and herself as counsel) filed and prosecuted the claim to an extent that would have been irresponsible had she not been successful: expending $138,000 to recover $72,000 makes no sense.  The estate did ultimately break even, eventually, but that was not a result of any pre-litigation planning or of any plan for the administration of the estate. ***Ms. Meiburger's huge expenditure of attorneys' fees meant that she had to sell assets of the estate in order to pay herself on a current basis during the four-year course of the litigation, to wit: Melbourne, Arizona and Great Falls.***"

Memorandum in Support of Debtor's Objection to Compensation of Janet M. Meiburger as Trustee and Counsel at 13-14. (emphasis added.)  (Docket Entry 875).

[67]"The Trustee Never Had Any Plan for Administering the Estate; Rather, She Dealt with the Estate on an Ad Hoc Basis, 'Administering' the Estate Reactively Rather than with Any Estate-Oriented Goal in Mind."  Memorandum in Support of Debtor's Objection to Compensation of Janet M. Meiburger as Trustee and Counsel at 5.  "[F]rom the very
(continued...)

The debtor also uses the NFL disability claim to argue that the trustee was not competent to handle the NFL or the Bears matters, and later, that she should have retained counsel experienced in these matters, that the debtor had such counsel and brought this to the trustee's attention.[68]

The debtor asserted that had he "retained counsel to prosecute the NFL claim, and he had counsel who had negotiated and otherwise dealt with the Bears claim" and that he "begged" the trustee to "allow him to prosecute these claims through his retained counsel." Memorandum in Support of Debtor's Objection to Compensation of Janet M. Meiburger as Trustee and Counsel at 16 (Docket Entry 875); Declaration of Wilber B. Marshall, Jr. at ¶3. (Docket Entry 873). The court's record does not support the debtor's assertion that he had other counsel in the Bears matter, as opposed to the NFL disability matter. The schedules and statement of financial affairs, filed on March 4, 2002, show no executory contracts. (Docket Entry 12, Schedule G). There are no lawyers listed as creditors. (Docket Entry 12, Schedule F). No suits were pending or had been pending within one year prior to the filing of the petition in bankruptcy. (Docket Entry 12, Statement of Financial Affairs, Question 4). No claims are listed against the Chicago Bears. (Docket Entry 12, Schedule B). The debtor did not file an application to employ any attorney (including for Mr. Werblood who was his bankruptcy attorney) from the filing of the case on February 5, 2002 until Ms. Meiberger was appointed chapter 11 trustee on March 20, 2003. (Docket Entry 85). Mr. Werblood's time records show no communications with any attorney relating to the NFL or Bears claims from the filing of the case until the chapter 11 trustee was appointed. First Interim Application of Mark

---

[67](...continued)
beginning of her trusteeship, Ms. Meiburger had no plan, formal or informal, for dealing with this estate." *Id.* at 7.

[68]The debtor apparently means Beins, Axelrod, Kraft, Gleason & Gibson, PC. The court notes that although the debtor retained them and utilized their services while he was a debtor-in-possession, he never sought their employment in the chapter 11 case.

F. Werblood, Esq., for Compensation and Reimbursement of Expenses Incurred as Counsel for the

Debtor. (Docket Entry 253). Neither the debtor's proposed chapter 11 plan nor the disclosure

statement mention any attorneys retained for the NFL disability claim or in relation to the claim

against the Bears. Chapter 11 Plan of Reorganization (Docket Entry 31); Disclosure Statement

(Docket Entry 32).

The petition, schedules and statement of affairs show that the debtor did not have an attorney

involved in the NFL or the Bears claims when he filed his petition on February 5, 2002. The record

show that on July 2, 2002, the debtor first spoke with an attorney at Beins, Axelrod, Kraft, Gleason

& Gibson, P.A. The attorney billed 5.25 hours for the meeting and research on the statute of

limitations and consequential damages. Trustee's Memorandum on Fees to Be Awarded for

Services Rendered by Beins, Axelrod, Kraft, Gleason & Gibson, P.A. and on Amount of

Prejudgment Interest to Be Awarded, Exhibit A at 1 (time entry for July 2, 2002) (Adv.Proc.No.

04-1020, Docket Entry 101). Beins Axelrod's time records show no communication with Mr.

Werblood, the debtor's bankruptcy attorney, and Mr. Werblood's time records show no

communication with Beins Axelrod. *Id.* Exhibit A; First Interim Application of Mark F. Werblood,

Esq., for Compensation and Reimbursement of Expenses Incurred as Counsel for the Debtor.

(Docket Entry 253).[69]

---

[69]Mr. Werblood prepared and filed the debtor's disclosure statement on May 14, 2002, about seven weeks before the debtor first met with the attorney at Beins Axelrod. The plan of reorganization was premised in large part on payments from the NFL Disability Plan. He stated in his disclosure statement:

Debtor will receive a lump sum this month [May 2002] of approximately $60,000.00 from his NFL Disability Award as well as an additional $9,157.00 of monthly disability income which had been awarded to him at the time of the filing of this Petition. In addition, Debtor expects to receive additional back disability in the form of a lump sum award of approximately $180,000.00. Debtor is attempting to obtain an increase in this sum due to the interest lost and resulting financial distress counsel *[sic]* by the failure of the National Football League physicians to recommend the prompt

(continued...)

Unlike the Bears matter in which there is nothing in the record suggesting that the debtor had retained or even consulted any attorney to represent him, he retained Beins Axelrod in the NFL disability matter.[70]  The chapter 11 trustee found out about Beins Axelrod shortly after she was appointed trustee, presumably from the debtor.  She first spoke with Regina Markey at the firm on April 22, 2003.  The law firm cooperated with the chapter 11 trustee on the matter and the trustee ultimately filed the complaint on February 4, 2004. The trustee relied on the Beins Axelrod's work in preparing the complaint as is evident from the relatively small amount of time expended in preparing the complaint.  There were communications and time was expended by Beins Axelrod through March 28, 2005.  Beins Axelrod expended about $13,400 from April 22, 2003 through March 28, 2005.  It is clear that the trustee consulted with Beins Axelrod and benefitted from their initial work.  *See* Declaration of Regina Markey, Esq., Law Firm of Beins, Axelrod, Kraft, Gleason & Gibson, PC in Support of Attorney's Fees and Cost Petition, ¶¶13-15.  (Adv.Proc. 04-1020, Docket Entry 93).

The trustee handled the matter professionally and competently.  The matter was brought to a head on cross motions for summary judgment which were dispositive of the case.  She prevailed in the bankruptcy court.  The NFL took an appeal and prevailed in the District Court.  It is instructive

---

[69](...continued)
commencement of disability payments.

Wilbur Marshall, Jr. Disclosure Statement of Claims and Interests at 4.  (Docket Entry 32).

At the time the disclosure statement was written, the debtor's disability payments had been reinstated but there was $72,436.28 that had not been paid during the period when the Plan found the debtor was not disabled.  There is nothing in the record that supports the assertion that the Plan was prepared to pay any portion of the $72,436.28 or that there would be an additional lump sum award of $180,000.  Mr. Werblood's time records show no effort to verify the statement.  It appears that the statement originated with the debtor and was accepted uncritically by Mr. Werblood.

[70]The debtor apparently did not advise his bankruptcy attorney of this development and clearly did not tell Beins Axelrod of his bankruptcy.

to note that the debtor was a party to the suit in the bankruptcy court.  He was added to overcome the NFL's motion to dismiss for lack of standing and to assure that all necessary parties were before the court.  Mr. Werblood represented the debtor in the bankruptcy court and the District Court in the matter.  The debtor could have, but did not, retain Beins Axelrod to represent his interests in the bankruptcy court or on appeal in the District Court.  Only after the bankruptcy court's judgment was reversed and the matter was appealed to the Circuit Court did the debtor retain additional counsel, Mr. Sullivan.  Again, Beins Axelrod was not retained.  Both Mr. Sullivan and Ms. Meiburger participated in the appeal to the Circuit Court and prevailed.  Mr. Sullivan is a well respected attorney who practices frequently in this court, but he is not known for any particular expertise in ERISA matters.

The court cannot find any merit to the debtor's argument that the trustee was not competent to handle the NFL claim or that she ignored debtor's preferred counsel, Beins Axelrod.  Neither Ms. Meiburger nor Mr. Sullivan specialize in ERISA matters and both handled the matter competently. Ms. Meiburger succeed in the bankruptcy court.  Had she failed there, it is not as likely that an appeal would have been successful.  The difficulty of the case is illustrated by the differing opinions of the judges who heard the case at trial and on appeal.  It was an interesting and challenging case that was competently tried by all counsel involved.

The amount of the fees reflects the challenging nature of the case.  Beins Axelrod billed almost $50,000, all before a complaint was filed.  The trustee billed a bit more in the bankruptcy court up to the time of the initial judgment.  An additional $40,000 was billed in the bankruptcy court and the district court relating to the appeal.  Mr. Sullivan billed over $61,000 for work on the appeal to the Court of Appeals.  The trustee billed less, about $40,000.  Mr. Werblood billed a

nominal amount, leaving the work before Mr. Sullivan was retained to the trustee. When the fees

of the various counsel are compared, the trustee's attorneys fee is well within the bounds of both

Beins Axelrod and Mr. Sullivan. When the time records are examined individually, the court finds

that the work was well within the standards of practice before this court and on appeal.

However, one looks at the trustee's attorneys fees on the NFL matter, they were reasonable

and necessary. The debtor wanted the matter resolved. It formed a core part of his own chapter 11

plan which was not confirmed. He retained counsel to pursue the matter and, in fact, pursued it. The

matter was properly pursued by the trustee, initially without any help from the debtor's counsel,

although the debtor was a party to the suit. In the end, she prevailed. The debtor received almost

$100,000 as a result which was payment in full of the claim with pre- and post-judgment interest.

By the time the case was resolved, the pre-litigation agreement on the division of the recovery

between the estate and the debtor had been overtaken by events and the debtor got the entire

recovery. The estate paid less that about $500 for the trustee's legal fees and that only from a small

miscalculation. In light of the result, the court had no trouble in allowing it even though it would

have been included in the judgment against the NFL had the oversight been seen earlier.

There is no correlation between the trustee's sale of real estate and funding this or any other

litigation. Taking into account the factors set out in §330(a) and the decisions of the Court of

Appeals, the court finds that the award of all the fees, almost all of which were paid by the

defendant, is warranted.

## 2.  The Sales of the Properties

### a.  Scottsdale, Arizona

The debtor objected to the chapter 11 trustee's fees in connection with the sale of his

residential property in Scottsdale, Arizona, which was described above.  The objection is based on

competency.  He states in his objection:

> Arizona. The Trustee put the Arizona residence up for sale.  The Debtor does
> not dispute the reasonableness of that decision.  The Debtor does, however, dispute
> the reasonableness of the process by which the Trustee went about determining to sell
> the property to the ultimate purchaser.
>
> The Trustee marketed the property for 8 months.  The first more than 6
> months of that process was without the property having been put in condition for
> sale.  Then the Trustee decided to place the property in a condition in which a market
> price might be achieved – by fixing it up, and to lower the asking price (by $60,000).
> The Trustee expended reasonable efforts to make the property ready for sale – then
> failed to expose the property to the market, selling it instead to the very person the
> Trustee had hired to put it into a position to be sold.  See Marshall Declaration ¶5.,
> (Attachment 4). The Trustee accepted a price of $54,000 less than the reduced asking
> price only one month after making the repairs, and without waiting for better offers.
>
> The person to whom she sold the property for $685,000 turned it around
> within three months in a sale to another real estate sales agent in the same firm as the
> firm she had hired to market the property – at a price of $165,000 more than the price
> at which the Trustee sold it, i.e., $850,000. See Attachment 4 at ¶5. This appears to
> have been fraud on the part of the real estate agency, but it is not fraud with which
> the Trustee is chargeable.  The Debtor has no basis to believe that the Trustee knew
> that such collusion existed.  The Trustee is, however, chargeable with her failure to
> have adequately exposed the property to the market after making it ready for sale.

Memorandum in Support of Debtor's Objection to Compensation of Janet M. Meiburger as Trustee

and Counsel at 10-11.  (Docket Entry 875).

The objection appears to be directed more to Ms. Meiberger in her capacity as trustee than

in her capacity as attorney for the trustee.  No particular time entry or series of time entries as

counsel were brought to the court's attention.  There is no assertion that she expended too much time

107

or took actions as attorney that should have been treated as trustee duties.  The court will consider the objection principally as an objection to both her application for compensation as trustee, and to the extent applicable, as counsel for the trustee.

The debtor presented no evidence at the hearing on his objection to support his assertions and the record as evidenced by the filings in this case is to the contrary.[71]  The debtor submitted his Declaration and filed several papers as an attachment to his Memorandum.  Attachment 4 to Memorandum, Declaration of Wilber B. Marshall, Jr. (Docket Entry 873) and Attachment 3 to Memorandum (Docket Entry 872).  Paragraph 5 of the Declaration addresses the Scottsdale property. It states:

> 5. After Ms. Meiburger had spent money to fix up the Arizona house, she reduced the listing price and sold it, for less than the reduced listing price, to the same man that had done the work to fix it up.  I heard that the buyer resold the home for nearly $200,000 more within a few months and brought this to the attention of Ms. Meiburger, who said there was nothing she could do about it.

Declaration of Wilber B. Marshall, Jr. at ¶5.  (Docket Entry 873).

The court cannot accept the debtor's Declaration.  On many points, although not with respect to Paragraph 5, Ms. Meiburger's Declaration and Mr. Marshall's Declaration are in conflict.  *See* Declaration of Janet M. Meiburger.  (Docket Entry 877).  With respect to the Scottsdale property,

---

[71]The court has not relied on collateral estoppel with respect to the debtor's arguments and is not now. However, the court notes that the debtor objected to the sale of the Scottsdale property at the time fo the sale because the sales price, he asserted, was inadequate, the same argument that he is making here.  In this instance, he asserts a reason for the inadequacy, the "reasonableness of the process by which th trustee went about determining to sell the property."  The objections are one in the same, simply articulated differently.  *See* Debtor's Response to Trustee's Motion for Order Approving the Sale of Real Property in Scottsdale, Arizona, Free and Clear of Liens and Authorizing Payment of Real Estate Commissions (Docket Entry 223) and Memorandum in Support of Debtor's Objection to Compensation of Janet M. Meiburger as Trustee and Counsel at 10-11 (Docket Entry 875).  The court overruled the objections at the hearing on the trustee's motion to sell and the debtor's objection.  Order Approving the Sale of Real Property in Scottsdale, Arizona, Free and Clear of Liens and Authorizing Payment of Real Estate Commissions. (Docket Entry 282).

the debtor's Declaration contains unsupported hearsay.  ("I heard that the buyer . . .") This statement is not from Mr Marshall's personal knowledge.

The debtor gives the impression that after the Scottsdale property had been on the market for some time,[72] the trustee expended money to fix up the property "to place the property in a condition in which a market price might be achieved."  Memorandum at 10.  (Docket Entry 875).  Then, after she made "reasonable efforts to make the property ready for sale" did not expose it to the market but sold it to the person she had hired to fix it up.  *Id.*  She sold it "one month after making the repairs, and without waiting for better offers."  *Id.*

The court's record contradicts Mr. Marshall's Declaration.  The debtor appears to be referring to the Trustee's Motion to Modify and Extend Real Estate Listing Agreement for Scottsdale, Arizona Property.  (Docket Entry 147).  This was filed on January 26, 2004, ten months after Ms. Meiburger was appointed chapter 11 trustee on March 20, 2003.  From March 2003 to January 2004,[73] she had marketed the property through the same real estate agent the debtor had originally retained.[74]  The January 26, 2004 motion recites the history of the sales efforts.  The debtor listed the property at $820,000 from October 16, 2002 through April 16, 2003.  There were no offers to purchase the property.  *Id.* at ¶2.  From June or July 2003 to January 2004, the trustee received two offers, one at $670,000, the other at $680,000.  She countered both offers but neither prospective purchaser responded.  *Id.* at ¶3.  The trustee visited Scottsdale and inspected the property.  She met with the

---

[72]The debtor's Memorandum, but not the debtor's Declaration, says six months.  Memorandum at 10.  (Docket Entry 875).

[73]Trustee's Application for Approval of Real Estate Listing Agreement and Employment of Realtor.  (Docket Entry 100).  It is not clear what marketing was undertaken during the period from the expiration of the debtor's listing to the approval of the trustee's listing.

real estate agent, Patrick Watt of Re/Max Excalibur Realty, and obtained an estimate of $9,000 to make certain minimal repairs, such as replacing broken windows; refinishing, repairing and rehanging several doors; repairing damaged drywall; repairing water damage; replacing faulty plumbing; repairing sliding glass doors that did not open; and other matters. The estimate did not include all potential repairs, particularly 100 feet of cracked Travertine floor tiles in the entrance way and hallways or an outside staircase to a rooftop observation deck. *Id.* at ¶4.

The trustee's motion discussed the financial condition of the bankruptcy estate and referred to the real estate agent's advice. Based on all the considerations, the trustee requested, not to expend money to make the repairs, but to lower the listing price and sell the property "as is." *Id.* at ¶¶6 - 7. She asked that the listing price be reduced to $739,900.

The debtor opposed the trustee's motion. He asserted, without evidence, that the proposed listing price was inadequate. He cited a sale more than a year before for $822,000. Debtor's Response to Trustee's Motion to Modify and Extend Real Estate Listing Agreement for Scottsdale, Arizona Property. (Docket Entry 157). The trustee's motion was granted and the listing price was reduced.

The trustee obtained a contract on the property and sought authority to sell it for $685,000. Trustee's Motion for Order Approving the Sale of Real Property in Scottsdale, Arizona, Free and Clear of Liens and Authorizing Payment of Real Estate Commissions. (Docket Entry 204). She described the marketing after the listing price was reduced. She received four offers: $600,000; $640,000; $660,000; and $685,000. She described why she selected the $660,000 offer which she countered at $685,000, which was accepted. *Id.* at ¶4. After her counteroffer was accepted, she received an offer at $688,000 and described why she felt the $685,000 offer was better. *Id.* at ¶5.

110

The debtor again objected, stating that the sales price was inadequate.  Debtor's Response to

Trustee's Motion for Order Approving the Sale of Real Property in Scottsdale, Arizona, Free and

Clear of Liens and Authorizing Payment of Real Estate Commissions.  (Docket Entry 223).  The

trustee showed that she was acting within her business judgment.  The debtor argued, but presented

no evidence, that she was not.  Based on the record, the sale was approved and the debtor's objection

was overruled.

The monthly operating reports filed by the chapter 11 trustee show that the trustee did not

expend money on fixing up the property when the listing price was reduced in February 2004.  *See*

Monthly Operating Report (January 2004); Monthly Operating Report (February 2004); Monthly

Operating Report (March 2004); Monthly Operating Report (April 2004); Monthly Operating Report

(May  2004); and Monthly Operating Report (June 2004).  (Docket Entries 177, 213, 275, 320, 359

and 375).

The debtor argues in his Memorandum (Docket Entry 875) that the trustee's purchaser:

> turned [the property] around within three months in a sale to another real estate sales
> agent in the same firm as the firm [the trustee] had hired to market the property – at
> a price of $165,000 more than the price at which the Trustee sold it, i.e., $850,000.
> See Attachment 4 at ¶5.

Memorandum in support of Debtor's Objection to Compensation of Janet M Meiburger as Trustee
and Counsel at 11.  (Docket Entry 875).

The Memorandum goes beyond the Declaration.  The Declaration makes no mention of a sale

to a real estate agent in Mr. Watt's firm, Re/Max Excalibur.  There is an attempt to support the

statement with documents filed as Attachment 3 to the Memorandum.  (Docket Entry 872).  Neither

the Declaration nor the Memorandum make reference to them.  If considered, and in the light most

favorable to the debtor, the first would show that the trustee's purchaser re-sold the property on

September 22, 2004 for $850,000 to Leanne E. Myers.  Attachment 3 at 1.  (Docket Entry 872).  The

third top of the third page is confusing.  The first line is "Recent Sales: (from 1/01/06 - 5/31/06)",

a period not under consideration.  The property address is then stated with an apparent listing price

of $897,000 and an apparent sales price of $850,000.  Underneath is the name "Makayla Elizabeth

Myers" and the property address.

The bottom of the third page seems to be a professional listing for Brian Myers, a real estate

agent whose home and work addresses are the property address.  His real estate company is Re/Max

Fine Properties.  Although affiliated with Re/Max, it is a different real estate company than Mr.

Watt's company, Re/Max Excalibur.

The fourth page has an estimate, purportedly from Zillow.com of $961,500, a professional

listing form Brian Myers, and a listing for "Fix It Floyd, LLC" at the property address.  The date of

the estimate is not given.

The debtor presented no evidence in support of his opposition to the trustee's fees or her

attorney's fees.  His Declaration cannot be accepted.  It was not from personal knowledge and is not

otherwise supported.  The documents that constitute Attachment 3 are hearsay.  They are

unexplained.  Their source is unknown.  The time to which they speak is unknown.  If they show

anything, they show that Brian Myers is not in the same real estate office as Patrick Watt.  They fail

to show what, if any, work was done on the property by the trustee's purchaser.  It is known that

work was needed.  The extent of the work undertaken and the increase in value resulting from that

work is unknown.

More importantly, the trustee's filings which were the basis for the court's prior rulings, fully

support a reasonable and orderly sales process.  They reflect the use of a real estate professional and

112

the receipt of multiple offers that clustered within a particular range.  They reflect a considered decision on marketing and selection of the final acceptable offer.  The property was exposed to the market for an extended period at different asking prices.  It only sold when the listing price was lowered, and then for a price less than the new listing price.

The debtor made the argument that the listing price was inadequate when the trustee sought to reduce it and was overruled.  He made the argument that the sales price was inadequate when the trustee sought to sell the property and was overruled.  For the third time, he argues that the sales price was inadequate, this time in connection with the trustee's applications for compensation for her services as trustee and as attorney.  He advances no new evidence, and in fact, no credible evidence at all.  On the other hand, the court's records show that the chapter 11 trustee reasonably marketed the property for an extended period of time and reasonably exercised her business judgment in selling the property.

The debtor's objections to Ms. Meiburger's trustee's and attorney's fees are not well taken with respect to the sale of the Scottsdale property and will be overruled.

### b.  Melbourne, Florida

The debtor complains that the trustee did not utilize the opportunity of the unsolicited offer to further market the property, that is, to "shop the offer" in an effort to obtain a higher offer or to further negotiate with the prospective purchaser.  In addition, he complains that she paid a full six percent real estate sales commission, two percent of which went to the real estate agent that was managing the property as a rental property.  While the debtor did not file a written objection to the

sale, he did participate in the hearing on the trustee's motion.  The sale of the Melbourne, Florida, property is discussed above.

A trustee has discretion as to how and when to sell property of the estate and the price and terms upon which to sell it.  There is no single marketing procedure that a trustee is required to follow in every case.  Here, the trustee received an unsolicited offer, reviewed the offer, decided that it was a good offer and accepted it, subject to court approval.  It was all cash and all contingencies had been satisfied.  The sales price was 50% higher than the debtor valued the property on his schedules.  The trustee disclosed that the offer was unsolicited and that the rental agent was acting as the trustee's agent and would be paid a fee.  *See* Trustee's Motion for Order Approving the Sale of Real Property in Melbourne, Florida, Free and Clear of Liens, Approving Payment of Liens at Closing and Authorizing Payment of Real Estate Commissions (Docket Entry 149) and Schedule A (Docket Entry 12).

The trustee's disclosures concerning the sale were appropriate but do not themselves overcome objections related to them made to the sale.  The court was satisfied  at the time that the sale was proper and was within the trustee's business judgment.  In reviewing the matter again, the court is again satisfied that the trustee showed that the sale was within her business judgment and was a benefit to the estate.  The debtor did not present any satisfactory evidence at the time of the sale or in connection with his objection to the final application for compensation showing that the trustee abused her discretion, that the sale was improper, or that handling the sale in a different manner would likely have resulted in a significantly higher sales price within a reasonable period of time.  The trustee has borne her burden of proof on the fee applications with respect to the administration of the Melbourne property.

114

### c.  Great Falls, Virginia

The sale of the debtor's home in Great Falls was the most contentious aspect of this case between the debtor and the chapter 11 trustee.  The actions involved in the sale of the home were discussed above.  The debtor scheduled the property with a value of $1.4 million.  Prior to the appointment of the chapter 11 trustee, the automatic stay had been modified to require that the debtor to make monthly adequate protection payments.  He failed to comply with the order and the lender filed a notice of default shortly before the chapter 11 trustee was appointed.  The chapter 11 trustee successfully sought a modification of the prior order and prevented a foreclosure sale of the property.  On January 26, 2004, the trustee sought to list the property for $1,499,000, noting that the pay-off of the first trust was about $1 million.  The debtor objected to the chapter 11 trustee selling his home, asserting that he could refinance the property, that the estate could afford to make the monthly payments, that the property was worth more than the requested listing price, and that the sale was unnecessary.  Notwithstanding the debtor's objections, the court authorized the trustee to list the property for sale as requested.  The debtor unsuccessfully appealed the ruling to the district court.

In June 2004, the debtor sought court approval to refinance the property, but the court sustained the trustee's objection.  The proposed refinance was not feasible and not in the best interests of the estate.  After a significant marketing period, the trustee obtained a contract for the sale of the property for $1,520,000.  The contract was approved by the court on April 26, 2005 and the property was sold.

Throughout the process, the debtor used every means possible to delay or prevent the sale.  His optimism in the value of the property, his ability to refinance the property and service the new loan, and the outcome of the various adversary proceedings (including the anticipated resolution of

115

the cases) was not founded on facts.  The debtor did, however,  achieve his objective of delay.  The trustee took more than two years to sell his home.  She listed it at the value the debtor wanted, although it did not sell for that amount.  It was properly exposed to the market and ultimately sold for more than the debtor scheduled it for, although it should be noted that the trustee made repairs to the home that improved its marketability and value.

The debtor renews his arguments about the trustee's handling of the sale, but again produced no evidence in support of the allegations.  There is no evidence supporting the debtor's assertion that the final sales price was inadequate or that the trustee accepted it, "not because that was the true value after adequate exposure to the market but because she had no funds with which to pay herself the fees already incurred pursuing the Debtor's claims against the NFL and the Bears." Memorandum in Support of Debtor's Objection to Compensation of Janet M. Meiburger and Trustee and Counsel at 12-13.  (Docket Entry 875).  To the contrary, the trustee properly pursued the sale. She exposed the property to the market for a significant period of time.  She expended funds on repairs to the home to increase its marketability.  She listed it at the price the debtor sought and reduced the listing amount when offers were not forthcoming.  The debtor was afforded every opportunity to refinance his home and keep it, but was only able to obtain a very bad offer that would inevitably have resulted in him losing the house at foreclosure within one to two years.

The court acknowledges the debtor's deep attachment and commitment to his home, but his financial circumstances did not permit him to keep it.  The trustee obtained the best price available for the property.  She marketed it in a reasonable manner calculated to bring the best price available. The hope that the house need not be sold because the resolution of the claims against the Bears and the NFL Disability and Retirement Plans would generate sufficient funds to pay all creditors and

116

resolve the default on the mortgage on the Great Falls property did not materialize. They were more complex and expensive than the debtor anticipated and less beneficial in outcome notwithstanding the trustee's efforts which were appropriate to the circumstances. The record shows that the chapter 11 trustee reasonably marketed the Great Falls property and reasonably exercised her business judgment in selling it.

### 3.  Overall Administration of the Estate

The court looked at the trustee's fees and the attorney's fees from several perspectives. The time records were reviewed to determine if any particular entry was unreasonable or unnecessary or if any series of entries was unreasonable or unnecessary. It is difficult to review a large number of time entries because individually they may not reflect the context of the work performed. The court, therefore, also looked at the context by examining the particular tasks undertaken. The individual tasks are discussed above. The fees in the context of the tasks undertaken are reasonable and the work was necessary.

The debtor correctly points out that the total requested is large. He endeavors to link this to the trustee's inexperience, incompetence, misfeasance, lack of a coherent plan, and avarice as the reasons for the large fees. The court can find no meaningful evidence that supports these allegations. Ms. Meiburger's actions show an experienced, competent trustee who reasonably administered the estate pursuant to an overall plan that was announced to the parties and the court. Nor does the court find any evidence that Ms. Meiburger administered the estate for her own benefit or in a manner calculated to maximize her fees, either as trustee or attorney.

117

One way to evaluate Ms. Meiburger's effectiveness is to compare the debtor's objectives with the trustee's results. The debtor's principal objectives were to (1) retain the Great Falls property, his home; (2) retain the Titusville, Florida, property, the home in which his mother resided and he owned free and clear of all liens; (3) resolve the claim against the Bears for the signing bonus; (4) resolve the claim against the NFL Retirement and Disability plans for benefits he was denied; and (5) resolve the claim against Chase for the manner in which it handled his Scottsdale loan and related refinance on his Great Falls property.

It is instructive to look at where the trustee began. When the trustee was appointed, orders modifying the automatic stay had been entered with respect to the Great Falls and Scottsdale properties. The debtor had missed almost all of the payments agreed to be made under the Great Falls consent order. A notice of default had been filed and foreclosure was imminent. The Bears claim and the NFL claims appeared to be going nowhere. No applications to employ any attorneys to prosecute the Bears or the NFL claims had been filed. The debtor had, without court approval, retained counsel to represent him in the NFL claim. That counsel did not know about the debtor's bankruptcy. The debtor was not current in payment of their fees. The third claim, the claim against Chase, was a little different. Debtor's bankruptcy counsel had filed a complaint in this court with respect to the Chase claim. That case, as a practical matter, was on the verge of dismissal.

From these inauspicious beginnings, the trustee achieved all of the debtor's objectives except retaining the debtor's home in Great Falls. There she prevented a foreclosure sale and sold it herself. The trustee avoided all threatened foreclosures and sold the Great Falls and Scottsdale properties. She amended the Chase complaint and resolved it. She filed complaints in the Bears and the NFL

cases and prevailed on them.  She saved the Titusville property which was occupied by the debtor's mother and was unencumbered.

With respect to the Great Falls property, the trustee concluded that the debtor could not afford the property.  She acted to maximize the benefit to the estate by protecting the equity, that is, selling the property.  Her judgment was reasonable.  There were two approaches to saving the Great Falls property.  The first was to cure the arrearage and resume regular monthly mortgage payments.  The other was to refinance the mortgage.  The first was not practical.  The debtor had, essentially, never made the required monthly mortgage payment.  He missed 26 of 28 pre-petition payments and made none of the 13 post-petition payments when the chapter 11 trustee was appointed.  His income was simply not sufficient to allow him to make the required payment and other monthly living expenses.  His Schedule J is notable for the monthly expenses not listed on it.  There was no car payment or car insurance expense.[75]  There was no health insurance expense.  There were no clothing or recreational expenses.  There were no expenses for his children.

A refinance would not have helped unless the principal amount of the debt was substantially curtailed.  This required favorable resolution of the Bears, NFL, and Chase claims.  While this is what the debtor sought, the outcomes were not sufficient to have paid down the Great Falls mortgage to a level that the debtor could have afforded.

The trustee's results compared to the debtor's objectives were very good.  She achieved all of them except saving the Great Falls property, an objective that could not reasonably have been achieved.

---

[75]No car was scheduled on Schedule B, "Personal Property", or Schedule G, "Executory Contracts and Unexpired Leases".  The car, a 1997 Mercedes-Benz, surfaced later in the case when DaimlerChrysler Services North America L.L.C. filed a proof of claim and a motion for relief from the automatic stay.  (Docket Entry 482).

119

The debtor argues that saving the Great Falls property was an achievable objective, if only the trustee's fees – both attorney and trustee – were not excessive.  The court has discussed the debtor's specific objections to her fees.  They are not supported by the record.  What is left, is a very large fee.  And that is the essential objection.  The debtor says, "The amounts sought are grossly excessive in light of any benefits realized by the debtor, the estate, or creditors."  Memorandum in Support of Debtor's Objection to Compensation of Janet M. Meiburger as Trustee and Counsel at 4.  (Docket Entry 875).

The total paid to the trustee as trustee and as counsel is very large.  The size of a requested fee is not, in and of itself, grounds to disallow the requested fee.  Size alone may bring attention to the fee request and invite close review, but it is not itself grounds to allow or to disallow the requested fee.[76]

The debtor argues that Ms. Meiburger received a much larger percentage of the funds disbursed to unsecured creditors than is typically allowed.  The calculation is not complete.  It omits the money paid to the secured creditors.  That was a benefit to them rather than obtaining the property at foreclosure and being required to sell it in order to liquidate their loans.  It benefitted the debtor by maximizing the equity in the properties and eliminating the possibility of deficiency claims.  It does not take into account that a significant portion of her attorney's fees – as well as all of Mr. Sullivan's and a portion of Beins Axelrod's – were paid by a third party and not from property of the estate.  It does not take into account that the chapter 11 trustee was constantly dealing with objections made by the debtor to her proposed sales and settlements.  The debtor certainly had a right to object, but the effect was to increase the chapter 11 trustee's attorneys fees.  It also does not take

---

[76]There is no cap on attorney's fees, although there is one for trustee's fees.

into account that the chapter 11 trustee left the debtor with a fresh start.  He did not have the home

he wanted, but he was in a financial condition that allowed him to go forward without past financial

entanglements or unresolved claims.  Chapter 11 is a rehabilative chapter and the chapter 11 trustee

achieved this, if the debtor sought to and was able to take advantage of it.  These considerations are

different that the rule-of-thumb percentage distribution that is commonly mentioned in chapter 7

cases.  The process involved multiple pieces of major litigation and the sale of multiple properties.

It was expensive.

The reasonableness of both attorney's fees and chapter 11 trustee's fees is determined by the

factors enunciated in 11 U.S.C. §330(a) and the case law.  The factors set out in *Johnson v. Georgia

Highway* are the time and labor required; the novelty and difficulty of the questions presented; the

skill necessary to perform the services; the preclusion, if any, of other employment resulting from

acceptance of the case; the customary fee for similar work in the community; whether the fee is fixed

or contingent; time pressures imposed; the amount involved and the results obtained as a result of

the attorney's services; the desirability of the case; the nature and length of the professional

relationship with the client; and the awards in similar cases.  *Johnson v. Georgia Highway,* 448 F.2d

at 717 -719.

Each of these factors has been discussed above or considered by the court and support the

trustee's applications.  The work was complex and challenging.  The bankruptcy case involved two

major adversary proceedings, the Bears and the NFL matters.  The time expended was reasonable

and the rates charged were reasonable.  None of the adverse elements present in *In re Jackson,* 2010

WL 2836161; *In re Mueller,* 2010 WL 1740858 (Bankr.E.D.Va. 2010); *In re Laines,* 2007 WL

2287905 (Bankr.E.D.Va. 2007); *In re Computer Learning Centers, Inc.,* 285 B.R. 191

121

(Bankr.E.D.Va.2002) *appeal dismissed* 407 F.3d 656 (4th Cir.2005); and *In re Valley Historic Ltd.*

*P'ship,* 307 B.R. 508 are present in this case.


### Conclusion

The burden of proof is on the applicant who seeks compensation. The failure of a debtor or

a creditor to present evidence in support of his objections is not sufficient to sustain the applicant's

burden.[77] In this case, Ms. Meiburger has sustained her burden of proof primarily through the time

records that she maintained as trustee and attorney, some of her work papers, and the court's records

in the bankruptcy case and the adversary proceedings. They show the nature of the problems she

faced, the work she did to address them, the opposition and cooperation she received and the

outcomes. In consideration of them, the final applications for trustee's fees and attorney's

compensation will be allowed and the debtor's objections will be overruled.

Alexandria, Virginia
October 10, 2010

/s/ Robert G. Mayer
Robert G. Mayer
United States Bankruptcy Judge

copies to:

Janet M. Meiburger
Mark F. Werblood

Wilbur B. Marshall, Jr.
47661 Pennrun Way
Sterling, Virginia 20165

15785

---

[77]The court considered the debtor's declaration, but finds that it lacks credibility.